**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

D.C., *by his parents and*
*guardians, Trevor Chaplick and*
*Vivian Chaplick*,

Trevor Chaplick,

Vivian Chaplick,

and

Hear Our Voices, Inc. *on behalf*
*of themselves and all others*
*similarly situated*

       Plaintiffs,

v.

Fairfax County School Board,

Dr. Michelle Reid,
Superintendent of Fairfax
County Public Schools
(in her official capacity),

Virginia Department of
Education,

and

Jillian Balow,
Superintendent of Public
Instruction of Virginia
Department of Education
(in her official capacity)

       Defendants.

Civil Action No. _____

**JURY TRIAL DEMANDED**

**[PUBLICLY FILED]**

1

**PLAINTIFFS' ORIGINAL CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES**

Plaintiffs, by their undersigned counsel, bring this civil action for declaratory and injunctive relief, as well as damages, to remedy violations of the Constitution and laws of the United States of America and the Commonwealth of Virginia, resulting from actions undertaken by the Defendants under color of law.

### Introduction

1. D.C. was born in 2002. He has faced significant challenges throughout his life, including Autism, Attention Deficit Hyperactivity Disorder-Primarily Hyperactive-Impulsive Type, Tourette's Syndrome, Encephalopathy, Adjustment Disorder with Anxiety and Disturbance of Conduct, and an Intellectual Disability of an undetermined severity, as well as severe gastrointestinal complications and sleep disturbance.

2. D.C. engaged in daily aggressive behaviors since he was six years old. These behaviors include self-injury, such as head-banging, biting, hitting, and kicking, as well as emotional meltdowns, elopement, aggression and violence towards others, throwing items (glass, food, furniture), and damaging property. These behaviors have resulted in multiple hospitalizations to himself and others.

3. These aggressive and self-injurious behaviors have resulted in injury to his family, caregivers, therapists, and other children and adults in the home, community, and school environments. In some cases, the injuries to himself and others have required immediate medical assistance or visits to the Emergency Room.

4. Since 2004, D.C.'s parents have provided him with extensive and intensive biomedical, homeopathic, developmental, behavioral, and educational interventions across the home and school environments, to include a full-time Applied Behavioral Analysis ("ABA")

2

therapist, and private developmental, oral motor, speech/language, occupational, and behavioral therapies.  Despite these efforts, his aggressive and self-injurious behaviors and additional problems with mood, impulsivity, and anxiety increased over the course of several years.

5.      FCPS originally found him eligible in August 2008 for special education services as a student with Autism and an Intellectual Disability and provided him with an IEP.

6.      Pursuant to his IEP, D.C. was placed in a special education program within a Fairfax County public school building, where he struggled to make progress both academically and behaviorally.

7.      Because of his profound disabilities and severe aggressive behavior and violence, D.C.'s parents petitioned FCPS for a residential educational placement in the Grafton Integrated Health Network's Integrated Residential/Education Program ("Grafton"), located in Winchester, Virginia.  Grafton is one of the only schools in Virginia that offers an integrated setting for residential and educational care of disabled children.

8.      This request for a residential placement was made after the parents consulted with, and D.C. had been examined by, medical professionals from some of the most prominent autism and general medical centers in the world, including The Children's Hospital in Maryland, the Discovery Center in New York, and Fairfax Innova Hospital in Virginia.

9.      The experts who reviewed D.C.'s history and case were unanimous that he required integrated residential and educational care to learn and to not represent a physical risk to himself and others.  They were also unanimous that this education could not occur within the normal public school that he had been attending.

10.      Despite the overwhelming and largely undisputed clinical and expert evidence that residential placement was exactly what D.C. needed to receive a free appropriate public education

("FAPE"), FCPS dismissed and rejected all the parents' requests for a higher level of educational support, told them that D.C. was appropriately placed in his current public-school setting, and refused to approve a residential educational setting.

11.     As they prepared to challenge the FCPS's decisions, D.C.'s parents were warned by an FCPS social worker who told them they should not bother because they "would lose."  D.C.'s parents pressed ahead with a "due process" hearing anyway, believing the social worker's warning to be hyperbolic.  However, the FCPS social worker knew something D.C.'s parents were able to learn only after losing their hearing and after months of parsing data obtained via Freedom of Information Act ("FOIA") requests—parents and disabled students in Virginia almost *always* lose, especially in Northern Virginia.

12.     Through their FOIA requests, D.C.'s parents learned that from 2010 through July 2021 less than 1% of parents who initiated a due process hearing under the IDEA in Northern Virginia received a favorable ruling, granting the relief they requested.  That is only 3 rulings in 395 cases in all of Northern Virginia, over more than 11 years.  The results are not much better statewide in Virginia with a little over 1.5% of parents who initiated a due process hearing ultimately receiving a favorable ruling—only 13 such rulings in all 847 cases brought in Virginia over that same 11-year period.[1]  This very low percentage of rulings in favor of parents has been a problem for almost 20 years, which is as far back as the parents could obtain data through FOIA on individual hearing officers.  ***Moreover, during the last twenty years approximately two thirds of the hearing officers have never ruled in favor of parents, not even once.  Even worse, in***

---

[1] Many of the parents who initiate a due process hearing ultimately withdraw their due process hearing requests. While Plaintiffs do not know all the reasons that a disabled student's parents may withdraw their request for a due process hearing, it is certain that many requests are withdrawn because parents have no reasonable hope of success under the current system, regardless of the evidence presented at the hearing or they cannot afford to pursue a due process hearing.

*Northern Virginia, 83% of hearing officers never once ruled in favor of parents over the eleven-plus years from 2010 to July 2021*.

13.     One of the primary reasons for this low parental success rate is that the Virginia Department of Education ("VDOE")—in cooperation with local education agencies ("LEAs"), like Fairfax County Public Schools ("FCPS")—developed and maintain an exclusive roster of school-friendly hearing officers, whom the VDOE and FCPS have kept in place for more than a decade.

14.     Under state law, the VDOE is responsible for certifying hearing officers to hear special education due process cases, determining the number of hearing officers who will be certified, reviewing hearing officer actions, and recertifying hearing officers.  The VDOE is also responsible for training and compensating hearing officers.  These powers give the VDOE near-absolute control over these hearing officers.  Using this power, the VDOE carefully curated a group of twenty-two (22) hearing officers who nearly always rule in favor of school districts and against parents.  Despite (or because of) the incredibly one-sided outcomes from these hearing officers, the VDOE continued to recertify these same 22 hearing officers.  The VDOE failed to add a single hearing officer during this entire 11-year period, ensuring that no one except for VDOE's own tried-and-tested allies would adjudicate due process hearings.  The result has been an entire generation of disabled children and their parents facing a near-insurmountable hurdle to obtaining a fair due process hearing.  D.C. and his parents are just one of the ***hundreds*** of families in Virginia who have suffered from a biased system that confirms LEA decisions as a matter of course, no matter how strong the contradictory evidence.

15.     This systemic failure of the due process hearing system in Virginia—ostensibly sanctioned by state law—directly contravenes the Individuals with Disabilities Education Act ("IDEA").

16.     The IDEA was implemented to guarantee a free appropriate public education to disabled children, one of the most vulnerable groups in our population.  If a school fails to provide an appropriate public education to a disabled student, the IDEA gives that student and their parents the right to challenge the school in a due process hearing in front of a knowledgeable, fair, and impartial hearing officer.  This right to an impartial due process hearing is one of the most fundamental protections in the IDEA.  Without a fair and impartial hearing, the goals of the IDEA will not be met, and disabled children will continue to be left behind.  Further, a system perceived by parents as tainted by biased hearing officers deters them from fulfilling their role under the IDEA as education advocates for disabled children.  That is exactly what is happening in Virginia and, particularly, in Northern Virginia.[2]

17.     As fully set forth below, Plaintiffs seek—on behalf of themselves and all others similarly situated—a judicial declaration that Virginia's "due process hearing" procedures, policies, and practices, as employed by the VDOE and LEAs, including FCPS, do not effectuate the congressional objectives articulated in the IDEA, fail to satisfy the requirements of the IDEA, and fail to meet the minimum requirements of procedural due process.  Specifically, among other things, VDOE and FCPS have actively cultivated an unfair and biased due process hearing system.  Plaintiffs also seek injunctive relief to end structural flaws in the VDOE and FCPS procedures that systematically deprive special needs students of their rights under the IDEA.

**Parties**

18.     D.C. ("D.C.") is a nineteen-year-old, educationally disabled student who at all times relevant to this action resided in Fairfax County, Virginia.

---

[2] Northern Virginia is identified as Region II and encompasses six (6) counties: Fairfax, Arlington, Loudon, Prince William, Fauquier, and Rappahannock Counties.

19.      Plaintiffs Trevor Chaplick and Vivian Chaplick are D.C.'s parents and guardians, with their primary residence in Fairfax County, Virginia, within this judicial district and division. They bring this action on D.C.'s behalf, in their own right, and on behalf of a class of similarly-situated individuals as alleged below.

20.      Organizational Plaintiff Hear Our Voices, Inc. ("HOV"), is a private, non-profit member organization that is incorporated in Delaware.  HOV was established to protect and advocate for the rights of persons with disabilities and to safeguard the rights of individuals with developmental disabilities, like D.C.  HOV has members that are residents of Virginia and of Fairfax County.

21.      Organizational Plaintiff HOV brings this suit on behalf of its members and in furtherance of its efforts and expenditure of resources in promoting its principal mission of securing appropriate and equal educational services for students with disabilities, including the right to a fair due process hearing before an impartial hearing officer as required by federal law.

22.      Organizational Plaintiff HOV has a mission of ending systemic mistreatment of persons with disabilities, including in school.  Thus, Organizational Plaintiff HOV has both organizational and representational standing through their members who have been unjustifiably denied fair and impartial due process hearings by Defendants.

23.      Defendant Fairfax County School Board (the "Board") is the governing body of FCPS, a school division of the Commonwealth of Virginia.  The Board directs, controls, and supervises the operation and administration of all schools, programs, and activities within FCPS and is organized under the laws of Virginia.  Va. Code Ann. § 22.1-71.  FCPS is the tenth largest school system in the country, and it receives federal funds under the IDEA, 20 U.S.C. §§ 1400 *et seq*.  FCPS serves over 187,000 students each year.  In the 2019–2020 school year, FCPS'

approved budget for the school operating fund totaled $2.9 billion.  FCPS has a staff of over 24,000.

24.     Defendant Dr. Michelle Reid is the FCPS Superintendent.  She was elected by the Board and appointed effective July 1, 2022.  Dr. Reid is responsible for working in conjunction with the Board and for overseeing the daily operations of FCPS, including overseeing its student IEP process, allocation of resources, training of employees, and methods of data collection.

25.     Defendant Virginia Department of Education ("VDOE") is an executive department of the Commonwealth of Virginia established by and operating under the laws of the Commonwealth of Virginia.  *See* Va. Code §§ 2.2-208, 22.1-8, *et.seq*.  VDOE is subject to the IDEA and is responsible for ensuring Virginia's and its local school systems' compliance with the provisions of the IDEA.

26.     Defendant Jillian Balow, the Virginia Superintendent of Public Instruction, serves as the executive officer of the VDOE and manages its internal and external operations.

### Jurisdiction and Venue

27.     This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, as this action includes claims brought pursuant to 42 U.S.C. § 1983 to challenge actions undertaken by the Defendants under color of the laws of the Commonwealth of Virginia that deprive Plaintiffs of rights conferred by the Fourteenth Amendment to the Constitution of the United States and the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 *et seq*.

28.     The declaratory relief sought in this Complaint is authorized by 28 U.S.C. §§ 2201 and 2202.

29.     This Court may exercise personal jurisdiction over each defendant, as each is located and has offices within this judicial district.

30.     Venue is properly laid in this Court pursuant to 28 U.S.C. § 1391, in that each defendant is located and has its principal office within this judicial district, and the events giving rise to the claims occurred within this judicial district and division.

### Class Action Allegations

31.     Plaintiffs bring this action on behalf of themselves and on behalf of a class of similarly-situated individuals under Federal Rules of Civil Procedure 23(a) and 23(b)(2).  The proposed Class consists of "All disabled students and their parents involved in a special education due process proceeding between January 1, 2010 and the present."

32.     This Class includes hundreds of Class members, such that joinder of all Class members in the prosecution of this action is impracticable.  The identities and addresses of class members can be readily ascertained from the records maintained by Defendants.

33.     Plaintiffs' claims are typical of the claims of all Class members because they were all subject to the same unfair due process hearing system in Virginia, the same group of biased hearing officers in special education due process proceedings, and they suffered the same statutory and constitutional violations.

34.     Plaintiffs will fairly and adequately represent the interests of the Class because they suffered the same violations as other Class members, they have no conflicts with any Class member, and they have retained sophisticated and competent counsel experienced in prosecuting class actions and other complex litigation.

35.     There are numerous questions of law and fact common to the Class—including but not limited to the following:

a.      Whether Defendants' actions in developing and maintaining a roster of hearing officers who nearly always rule in favor of school districts violates Plaintiffs' and Class members' constitutional rights, or their rights under state or federal law;

9

b.      Whether Defendants' failure to certify any new hearing officers for more than a decade violates Plaintiffs' and Class members' constitutional rights, or their rights under state or federal law;

c.      Whether Defendants' have met their obligation under state and federal law to provide impartial hearing officers and impartial due process proceedings;

d.      Whether Defendants have violated Plaintiffs' and Class members' right to Due Process and Equal Protection under the U.S Constitution;

e.      Whether Defendants' other actions, as described below, violate Plaintiffs' and Class members' constitutional rights, or their rights under state or federal law;

f.      Whether the Virginia statutory and administrative procedures violate Plaintiffs' and Class members' constitutional rights, or their rights under state or federal law;

g.      Whether the Plaintiffs and the Class members are entitled to declaratory or injunctive relief.

36.    The Defendants' actions apply generally to the Class, so that final injunctive and declaratory relief are appropriate for the Class as a whole.

## The Background and Objectives of the IDEA

37.    Congress enacted the IDEA to guarantee children with disabilities an education that meets their unique needs and prepares them for further education, employment, and independent living, and to make parents of children with disabilities full partners in how their children are educated and protected.

38.    Prior to passage of the IDEA, over half of the more than eight million American children with disabilities did not receive a suitable and integrated education.  More than one million of those children were excluded entirely from public schools.  Children with disabilities who did attend public schools were disproportionately subjected to disciplinary and other exclusionary

10

practices that left them sitting idly in classrooms, ostracized by their peers, denied meaningful accommodations, and biding their time until they were old enough to drop out.

39.     Together with its precursors, the Education for All Handicapped Children Act and the Americans with Disabilities Act, the IDEA represented an evolution in society's treatment of people with disabilities, away from seeing them as medical anomalies to be cured, pitied, or tolerated, and toward acceptance of individual differences as part of the human experience.

40.     At the core of the IDEA and other disability-rights statutes is respect for human diversity, eradication of discriminatory practices, and opportunity for inclusion and participation in public life.  Indeed, since its enactment and subsequent amendments and expansion, the IDEA has helped millions of children and their families obtain equal access to education and lead independent and meaningful lives as adults.

41.     The IDEA grants students a substantive right to free appropriate public education ("FAPE") (defined at 20 U.S.C. § 1401(9)), achieved primarily through the development of an individualized education program, suited to their particular needs ("IEP") (defined at 20 U.S.C. § 1401(14)).   Under the IDEA, school districts receiving federal funds are required to educate children with disabilities, to the maximum extent possible, with children who do not have disabilities, and provide children with disabilities supplementary services, such as transportation, speech therapy, sign language interpretation, and school nursing to prevent them from being removed from regular classrooms.

42.     The IDEA requires that each IEP take account of the child's particular needs, measure the child's current levels of academic achievement, and commit to a list of measurable goals for the child, elaborating on the specific set of services the child will receive, and describing

how and to what extent the child will participate in educational programs with nondisabled children.

43.     The IDEA also grants procedural rights.  Serving not only to guarantee the substantive rights accorded by the Act, the IDEA's procedural rights, in and of themselves, form the substance of IDEA.  It requires school districts to provide parents both with notice and consent to participate in the creation of their child's IEP, and further entitles parents to an in-person due process hearing before an impartial tribunal to challenge the form and content of the IEP.

44.     Parents with reasons to believe that the IEP proposed by their school district does not meet the IDEA's standard of providing their child with an appropriate education may initiate a due process hearing.

45.     The due process hearing is a critical feature of the IDEA.  It is the only process through which children with disabilities and their parents can challenge a school district's refusal to provide services or accommodations necessary to ensure that a disabled child receives a free appropriate public education guaranteed by the IDEA.  Without a fair and impartial hearing process, school districts would be free to ignore requests for services and accommodations, with little consequence.

46.     To ensure that the due process hearing is fair and impartial, it is critical that the hearing officer presiding over the due process hearing be knowledgeable, impartial, objective, and free of bias.  If hearing officers always, or nearly always, rule in favor of the school district and against the disabled child, that virtually eliminates the ability of disabled children and their parents to obtain the services and accommodations guaranteed under the IDEA when schools refuse to provide them.  Facing near-certain failure also deters parents from initiating legitimate challenges, resigning instead to the sad truth that whatever the school district says goes, notwithstanding

parental concerns.  This is a serious problem, as school district interests are often unaligned with those of disabled students.

47.    Although there is technically a right of appeal from an adverse hearing officer ruling, the significant cost of that process (on top of the cost of the due process hearing itself) makes the appellate process financially impossible for the vast majority of disabled children and their parents.  Without a fair and impartial due process hearing, the rights guaranteed under the IDEA are left entirely to the whim of the local school district.[3]

48.    The IDEA requires that "[e]ach State that receives funds under this chapter shall . . . ensure that any State rules, regulations, and policies relating to this chapter conform to the purposes of this chapter."  20 U.S.C. § 1407 (a)(1).  This includes the IDEA's requirement that parents have opportunity for a fair due process hearing before a knowledgeable and impartial hearing officer.

### VDOE's Hearing Officer System Systematically Deprives Parents of Their Rights to a Fair and Impartial Due Process Hearing Under the IDEA

49.    VDOE's administration of its due process hearings all but ensures that disabled and special needs families who do not withdraw or settle their cases will lose.  And FCPS officials have told parents exactly that when parents indicate they intend to pursue a due process hearing.

50.    Following the behavior and ruling by hearing officer Morgan Brooke-Devlin as discussed below, the parents of D.C. commenced their investigation of the Virginia hearing officer system on July 16, 2021 by submitting through counsel a FOIA request to James Lane, the Superintendent of the VDOE.  Their FOIA request sought relevant records between January 1,

---

[3] As explained in detail below, the U.S. Department of Education has caught Fairfax County Public Schools and the VDOE repeatedly violating the provisions of the IDEA, to the substantial detriment of Fairfax County's and Virginia's disabled community.

2010[4] up to the date of the FOIA request.  The parents expended significant legal and out-of-pocket costs, and, after meeting consistent resistance from the VDOE, were forced to send multiple FOIA requests, for over a year to obtain relevant records from the VDOE.

51.     The documents obtained in the parents' FOIA requests included documents previously not made public and include, but are not limited to, the official Decisions Log for Hearing Officers as maintained by the Executive Secretary for the Virginia Supreme Court.[5]  This log is a manual ledger that, to the parents' knowledge, has never been digitized, analyzed, or otherwise disclosed to the public until the parents of D.C. undertook this task, at significant personal expense and effort.[6]  The results are now known and summarized in this complaint as set forth herein in Exhibit A, Exhibit B, and Exhibit C.

52.     In the eleven-year period between 2010 and 2021, 847 due process claims were filed in the Commonwealth of Virginia to seek an adjudication of rights under the IDEA.  Of those 847 cases, only 13 resulted in a ruling granting the relief requested by a disabled student or the student's parent.  That is less than 1.5% in the entire state of Virginia.  The numbers in Northern

---

[4] The parents subsequently requested on June 29, 2022 through FOIA additional documents from the VDOE going back to January 1, 2000.

[5] While the VDOE does publish on its website redacted hearing officer decisions (going back to 2003), this information is not practically useful for parents wanting to know aggregate outcomes or statistics, which the VDOE does not publish.  *See* https://www.doe.virginia.gov/special_ed/resolving_disputes/due_process/hearing_officer_decisions/2020-21/index.shtml.  D.C.'s parents were only able to obtain the accumulated decision history maintained on the Hearing Officer Decision Log from their FOIA requests.

[6] D.C.'s parents undertook a significant amount of personal time to manually enter into a spreadsheet the results from all hearing officer decisions from 2003 through 2021, and to then categorize and analyze such results by judicial region.  The results from 2003 through 2021 are summarized herein in Exhibit A (2010 through 2021), Exhibit B (2003 through 2009), and Exhibit C (cumulative hearing officer decisions from 2003 through 2021).  As discussed below, the parents ultimately entered 1,391 hearing officer cases over a twenty-year period and analyzed the results.  *See* Exhibit A, Exhibit B and Exhibit C.

14

Virginia are even more stark and disappointing.  In Northern Virginia,[7] only 3 rulings out of 395 cases filed in this eleven-year period ultimately resulted in a ruling in favor of the disabled student or the student's parents.  This represents less than one percent (specifically 0.76%) of the total due process hearing cases filed by such families.  See Exhibit A.

53.     Moreover, out of the twenty-two (22) hearing officers eligible to serve during the last decade, only four (4) have ruled in favor of a disabled student or family more than once.  See Exhibit C.

54.     Fourteen (14) hearing officers, representing sixty-four percent (64%) of all eligible hearing officers, never ruled fully in favor of a disabled student or family in a due process hearing during this entire 11-year period.  See Exhibit A.

55.     In Northern Virginia, the statistics are even more shocking.  Eighty-three percent (83%) of the eligible hearing officers never ruled in favor of a disabled student or family in a due process hearing between 2010 and 2021 in almost 400 cases.  See Exhibit A.

56.     The lack of rulings in favor of disabled or special needs children is a problem that has existed for at least twenty (20) years, which is as far back as the VDOE has kept individual hearing officer decisions in the Decisions Log made available to D.C.'s parents.  Specifically, since 2003, hearing officers in Virginia have only ruled 25 times fully in favor of disabled children out of 1,391 cases representing only 1.8% of the total aggregate cases overseen by these hearing officers.  Over this same twenty-year period, hearing officers in Northern Virginia have only ruled fully in favor of disabled children in 7 cases out of 578 cases.  See Exhibit C.

---

[7] The Office of the Executive Secretary of the Virginia Supreme Court ("OES") organizes the Commonwealth into six (6) geographic regions.  Northern Virginia is identified as Region II and encompasses six (6) counties: Fairfax, Arlington, Loudon, Prince William, Fauquier, and Rappahannock Counties.  Hearing officers were classified as serving in either Northern Virginia or outside of Northern Virginia in Exhibits A through C based on their business address set forth in the Special Education Hearing Officer listing published in June 2021 by the VDOE that was delivered to the parents in response to their FOIA requests.

57.     The same core group of twenty-two (22) hearing officers responsible for these decisions has been virtually unchanged over the last two decades which represents two generations of disabled children seeking a better education under the IDEA.  See Exhibit A, Exhibit B, and Exhibit C.

58.     The table attached as Exhibit A to this Complaint and excerpted below show the percentages of each category of resolution for the entire Commonwealth of Virginia and for Northern        Virginia        (Region        II)        during        the        last        decade:

**Hearing Officer Ruling Results for the Period from 2010 through July 2021**

| Key Statistics | Northern Virginia | | Virginia | |
|---|---|---|---|---|
| | Officers | Pct | Officers | Pct |
| Number of Hearing Officers with Zero Rulings for Parents | 10 | 83.33% | 14 | 63.64% |
| Outcomes of Cases Initiated | Cases | Pct | Cases | Pct |
| Withdrawn | 191 | 48.35% | 433 | 51.12% |
| Settled | 68 | 17.22% | 115 | 13.58% |
| Dismissed or in Ruling in Favor of Schools | 127 | 32.15% | 266 | 31.40% |
| Partial Decision for Parents and School District | 6 | 1.52% | 20 | 2.36% |
| Ruled in Favor of Parents | 3 | 0.76% | 13 | 1.53% |
| Total Cases | 395 | 100% | 847 | 100% |

59.     As this attached and excerpted table shows, the parental success rate, by any measure, is astoundingly low.  Though a significant percentage of the filed cases were withdrawn by the parents, the reason for each of these withdrawn cases is unknown.  Considering the significant time and cost of pursuing a due process hearing, the minimal chance of success, and the warnings from school district social workers, it is likely that many parents gave up, rather than face significant legal bills, with very little chance of success.  Unfortunately, such parental deterrence is the intended consequence of Virginia's carefully curated system of crony hearing officers.

**VDOE Hearing Officers Rule Against Parents at Disproportionately
Greater Rates Than Other Jurisdictions**

60.     The U.S. Department of Education does not require states to publish aggregate hearing officer statistics.  And states, like Virginia, do not provide easy access to such aggregate statistics.  Consequently, VDOE hearing officers have operated in a zone of low transparency with little public awareness of their aggregate ruling record.

61.     Through FOIA requests, Plaintiffs obtained and compiled aggregate hearing officer data for Virginia.  This data shows that Virginia's hearing officer ruling record is atrocious relative to national and state-by-state statistics.  Again, such statistical results are the natural and intended consequence of Virginia's practices of consistently certifying as hearing officers only those with a proven track record of favoring school districts over parents.

62.     To identify comparable ruling statistics for benchmarks against Virginia, D.C.'s parents spent a significant amount of time researching studies of hearing officer decisions in other states.  This research is summarized below.

63.     A few national studies have analyzed hearing officer statistics.[8]  One of the recent, national studies of hearing officer decision statistics across multiple states was conducted in the Gershwin-Mueller and Carranza study, which analyzed 575 due process cases under the IDEA that occurred in 41 states from 2005 to 2006.  In such hearings, the school districts prevailed 58.6% of the time, and the parents prevailed 30.4% of the time, with 10.4% of the cases involving a split decision in which the school district or the parents obtained partial relief.[9]

---

[8] See Perry A. Zirkel & Cathy A Skidmore, National Trends in the Frequency and Outcomes of Hearing and Review Officer Decisions under the IDEA: An Empirical Analysis, 29 Ohio State J. on Disp. Resol. 529–31 (2014).

[9] Tracey Gershwin Mueller & Francisco Carranza, *An Examination of Special Education Due Process Hearings*, 22 J. Disability Policy Studies, 131, 137 (2011).  The study analyzed petitioner, disability, dispute and outcome including hearings of specific learning disabilities (26%), autism (20%), and health impairments (15%).  In such study, parents initiated 85% of the hearings under the IDEA.

17

64.     An earlier, national study conducted during the time frame of 1975 to 1995 found a roughly similar parental win percentage of 28% before hearing officers in IDEA cases.[10]

65.     For purposes of comparison of Virginia to individual states, both the General Accounting Office and various researchers have confirmed that at least 80%, if not more, of all due process hearings occur in the following states: New York, California, Texas, New Jersey, Pennsylvania, Maryland, the District of Columbia, Massachusetts, and Illinois.[11]  All states in the country, other than six, place the burden of proof on the party requesting the due process hearing,[12] and the vast majority of due process hearings are requested by parents.[13]

66.     California has the largest population of special-needs students in any state in the country.[14]  A study of due process cases in California found that parents prevailed in 34.6% of

[10] Perry A. Zirkel & James Newcomer, An Analysis of Judicial Outcomes of Special Education Cases, 65 Exceptional Child. 469, 473 n. 23, 475 (1999); see also Perry A. Zirkel & Cathy A. Skidmore, National Trends in the Frequency and Outcomes of Hearing and Review Officer Decisions under the IDEA: An Empirical Analysis, 29 Ohio State J. on Disp. Resol. 525, 532 n.30 (2014) (discussing such national study of hearing officer statistics).

[11] Tracey Gershwin-Mueller & Francisco Carranza, *An Examination of Special Education Due Process Hearings*, 22 J. Disability Policy Studies, 131, 132 (2011).

[12] In 2005, the Supreme Court ruled that the party requesting a due process hearing bears the burden of proof under the IDEA unless a state enacts legislation to the contrary.  See Schaffer v. Weast, 546 U.S. 49, 61–62 (2005); *see also* Bailey Sanders & Jane Wettach, *Insights Into Due Process Reform: A Nationwide Survey of Special Education Attorneys* (October 16, 2021), Conn. Pub. Interest Law J., Vol. 20, 2021 at 245, *available at* https://ssrn.com/abstract=3944061 ("The majority of states have declined (despite pressure from parents and advocates) to pass such legislation.  Because the vast majority of due process cases are initiated by parents, they typically bear the burden in the states that have not specifically shifted it to school districts.").  Only the following six states place the burden of proof on the school district: Connecticut, Delaware, Florida, New Jersey, Nevada and New York.  See Sanders & Wettach, supra at 245.

[13] *See also* Bailey Sanders & Jane Wettach, *Insights into Due Process Reform: A Nationwide Survey of Special Education Attorneys* (October 16, 2021), Conn. Public Interest L. J., Vol. 20, 2021 at 245, *available at* https://ssrn.com/abstract=3944061.

[14] Andrew A. Feinstein, Michele Kule-Korgood & Joseph B. Tulman, *Are There Too Many Due Process Cases? An Examination of Jurisdictions with Relatively High Rates of Special Education Hearings*, 18 U.D.C.L. Rev. 249, 255 (2015).  For example, for the 2011–12 school year, California had 688,346 special education students followed by New York State which had 450,794 special education students.  *See id.* at n.42.  While the New York City Department of Education is the largest school district in the country, Los Angeles is the second largest, with approximately 640,000 students in over 900 schools. *See id.* at 266 n.44.

18

these cases.[15]   The same study found similar parental win statistics by parents in Ohio, where

parents prevailed in 32.7% of due process cases.[16]

67.   In Pennsylvania, a study of hearing officer decisions published on the Pennsylvania

Office for Dispute Resolutions (ODR) showed that parents prevailed 58.75% of the time in due

process hearings when they were represented by counsel.[17]   Similarly, in a study of 343 IDEA

cases in Illinois, parents who were represented by counsel prevailed in 50.4% of such due process

cases.[18]

68.   Researchers examined 139 special education due process hearings that occurred

between 2011 and 2015 in Texas.   Districts prevailed in 72% of such due process cases, and parents

prevailed in 28.06% of such cases.   In a study of 258 due process cases in Massachusetts held over

---

[15] Ruth Colker, *Disabled Education: A Critical Analysis of the Individuals with Disabilities Education Act* 187–88 (N.Y.U. Press 2013).  Of the 101 decisions subject to the study between May 2, 2010 and June 20, 2011, the most frequent disabilities were: autism (30%), emotional disturbance (19%), speech and language impairments (17%), Other Health Impairment (OHI) (15%), learning disabilities (13%), and mental retardation/cognitive impairment (9%).  *See id.* at 188.

[16] *Id.* at 148–49.  Professor Colker noted that Ohio has a two-level administrative process for due process complaints.  The first stage is before an independent hearing officer and the second stage is before a state-level review officer.  Only after exhausting these two stages can a party appeal a decision to a state or federal court.  In her study, parents won 42.8% of the sufficiency decisions and such cases then proceeded to a review by the independent hearing officer.  The above parental win percentage of 32.7% involved fifty-five cases during 2002 to 2006 before first-level hearing officers.

[17] Kevin Hoagland-Hanson, *Getting Their Due (Process): Parents and Lawyers in Special Education Due Process Hearings in Pennsylvania*, 163 U. Pa. L. Rev. 1805, 1802 (2015).  The author of this publication examined 526 hearing officer decisions from the Pennsylvania ODR issued between February 2008 and September 2013.  In such cases, counsel represented parents in roughly three-quarters of all hearings and experienced a 58.75% success rate of rulings in their favor.  Pro se parents involved in the remaining quarter of such cases had a much lower rate of success prevailing only 16.28% of the time.  The combined rate of parental success in due process cases during such period was 48.24% taking into account the lower rate of success of pro se parents.

[18] *Id.* at 1819.  Like Pennsylvania, parents who proceeded without counsel only succeeded in 16.8% of such cases, which brought the composite parental success rate in due process hearings in Illinois to 38.3%.

eight years from 2005 through 2013, school districts prevailed 62.5% on all issues, parents prevailed on 27.2% of the cases, and a mixed decision was issued in 10.3% of the cases.[19]

69.    Two studies of Iowa hearing officer rulings found a parental win rate similar to the national average of approximately 30%.  The first study analyzed 50 hearing officer decisions in Iowa from July 1989 to June 2001.  The parental win percentage was 34% in that study.[20]  The second study examined hearing officer decisions in Iowa from 1978 to 2005.  The parental win percentage was 32% in that study.[21]

70.    One of the lowest percentages identified other than in Virginia was in Maryland. Reporters from the Baltimore Sun investigated parental win percentages in due process hearings conducted under the IDEA from 2014 through 2018.  In an article titled "Why Would We Even Try," the Baltimore Sun reported that parents prevailed in approximately 15% of the researched cases, based on data from the Maryland State Department of Education and Kennedy Krieger Institute Project HEAL[22]:

---

[19] Blackwell, W.H. & Blackwell, V.V., A Longitudinal Study of Special Education Due Process Hearings in Massachusetts: Issues, Representation, and Student Characteristics (2015), available at https://journals.sagepub.com/doi/full/10.1177/2158244015577669.

[20] Kristen Rickey, Special Education Due Process Hearings: Students Characteristics, Issues, and Decisions, 14 J. Disability Pol'y Stud. 46, 46 (2003); see also Perry A. Zirkel & Cathy A. Skidmore, National Trends in the Frequency and Outcomes of Hearing and Review Officer Decisions under the IDEA: An Empirical Analysis, 29 Ohio St J. on Disp. Resol. 525, 535–36 (discussing the Rickey study).

[21] Perry A. Zirkel, Zorka Karanxha, & Anastasia D'Angelo, *Creeping Judicialization in Special Education Hearings?: An Exploratory Study,* 27 J. Nat'l Ass'n Admin. L. 27, 37 (2007).  *See also* Perry A. Zirkel & Cathy A. Skidmore, *National Trends in the Frequency and Outcomes of Hearing and Review Officer Decisions under the IDEA: An Empirical Analysis*, 29 Ohio St J. on Disp. Resol. 525, at 535–36 (discussing such study).

[22] Talia Richman, *Why Would We Even Try?  Parents of Disabled Students Almost Never Win in Fights Against Maryland Districts*, Baltimore Sun (May 2, 2019), *available at* https://www.baltimoresun.com/news/investigations/bs-md-due-process-hearings-20190502-story.html.

Sun Investigates

**'Why would we even try?' Parents of disabled students almost never win in fights against Maryland districts**

By Talia Richman
Baltimore Sun
·
May 02, 2019 at 11:40 am

It's rare for the parents of students with disabilities to prevail in legal battles against Maryland school districts. In the past five years, they've lost more than 85 percent of the time, state education department documents show, even after investing tens of thousands of dollars and countless hours in pursuit of a better education for their children.

Advocates, families and attorneys say the trend is alarming and discourages people from fighting for the rights kids are guaranteed under federal law.

71.     Putting it into perspective, however, as low as Maryland is, the parental success rate in Maryland is substantially higher than Virginia's during the same period.

72.     Virginia's parental success rate is a glaring outlier when compared to other states. It is the product of a system in which—by design—almost two-thirds of the VDOE hearing officers never ruled in favor of a special needs child in a due process hearing over a nearly 20-year period. The Virginia due process hearing data is the result of a deliberate, long-standing effort to reward and institutionalize crony hearing officers, while blocking out new hearing officers who are untested and potentially neutral and unbiased.

### VDOE and FCPS Have a Pattern of Violating Their Obligations Under the IDEA, Rather Than Supporting Them

73.     The IDEA was designed so that state agencies, school districts, and parents would work together to ensure that each disabled student receives a free appropriate public education, including any necessary support or accommodations.  Rather than work with parents to provide an appropriate public education, the VDOE and FCPS have repeatedly violated, ignored, or fought against, their obligations under the IDEA and related statutes.  Some recent examples include the following:

21

74.     The U.S. Department of Education's Office of Special Education Programs ("OSEP") has repeatedly found that the VDOE is in violation of multiple provisions of the IDEA. The OSEP is currently investigating more alleged violations due to systemic, structural defects. Many of these systemic, structural defects are not widely known to the public but were nevertheless recognized in a 2020 audit of VDOE by the U.S. Department of Education following what it called an "unusually high number" of complaints from parents of special education students in Virginia. For example, on June 23, 2020, the OSEP found the VDOE to be in violation of the IDEA and other federal statutes and regulations because the State "does not have procedures and practices that are reasonably designed to enable the State to exercise general supervision over all educational programs for children with disabilities administered with the State, to ensure that all such programs meet the requirements of Part B of the IDEA . . . ." The OSEP wrote a corrective action letter and report in which it instructed VDOE to provide a written plan that describes how it will ensure that all its LEAs (including FCPS) meet the requirements of Part B of the IDEA.

75.     In February of this year, the OSEP wrote VDOE another letter, indicating that the State was still not in compliance and had not demonstrated correction of many of the non-compliance items identified in the OSEP's June 2020 letter. OSEP further wrote that it "continues to be contacted by multiple parents and other stakeholders in Virginia regarding the State's system of general supervision, including, but not limited to, monitoring, due process, and policies and procedures governing independent educational evaluations (IEEs)." The OSEP indicated that it intended to engage further with the state on a number of allegations, including several related to due process hearings, access to special education records, due process hearing officers, and whether the State's complaint resolution process addresses allegations of systematic noncompliance occurring within LEAs.

22

76.     On January 27, 2022, the U.S. Department of Education, Office of Civil Rights ("OCR") opened a formal investigation of FCPS to investigate parents' allegations that FCPS retaliated against them for advocating on behalf of students with disabilities.[23]  OCR is pursuing this investigation under Title II of the Americans with Disabilities Act of 1990, which prohibits discrimination against qualified individuals with disabilities by public entities.

77.     OCR is also investigating FCPS for potential discrimination against children with disabilities.  By letter dated January 12, 2021, from Kimberly Richey, the Acting Assistant Secretary for Civil Rights to Scott Braband, the Superintendent of Schools for Fairfax County, the OCR announced its federal probe of FCPS for potential discrimination against children with disabilities during the pandemic including "due to disturbing reports involving . . . the provision of educational services to children with disabilities during the COVID-19 pandemic."

78.     FCPS was also sued in this District in October 2019 because of its practice of excessively using physical restraint and seclusion against special needs students, a primitive practice which violates state and federal law.  For more than two years, FCPS fought this litigation and continued these practices.  Finally, on December 2, 2021, FCPS entered into a settlement agreement and consent order, in which it agreed to eliminate these practices.

79.     The investigations and litigation described above are symptomatic of the deep underlying problems of IDEA noncompliance by the VDOE and local school systems in Virginia, including FCPS.  Hearing officer data reveals that these systemic problems have had a dramatic effect on the due process hearing process, including the qualification, training, and selection of hearing officers.

---

[23] *See* Letter from Zorayda Moreira-Smith of the Office of Civil Rights of the U.S. Department of Education (Jan. 27, 2022), as published on https://specialeducationaction.com/office-of-civil-rights-opens-investigation-into-fairfax-county-public-schools-retaliation/.

**VDOE Developed a Roster of School-Friendly Hearing Officers
And Then Declined to Certify New Hearing Officers for More Than a Decade**

80.     Perhaps the most significant impact the VDOE has on the appointment of hearing officers is through its control over the certification, removal, training, and compensation of hearing officers.  The VDOE is responsible, under Virginia law, for certifying special education hearing officers and it is responsible for determining annually whether to recertify each hearing officer based on his or her performance.  8 VAC 20-18.D.  VDOE is also responsible for determining the number of hearing officers to include on its list of qualified special education hearing officers.  And the VDOE is responsible for paying hearing officers.  This gives the VDOE absolute control over the population of hearing officers that can be appointed for due process hearings.

81.     Between the late 1980s and 2009, the VDOE developed a list of twenty-two (22) hearing officers who almost never ruled in favor of disabled children or their parents.  Then, for more than a decade from 2010 into 2021 the VDOE declined to add or remove a single hearing officer.  In other words, VDOE managed to stack the deck and then close the door to new hearing officers.  Based on information and belief, VDOE did this in knowing cooperation with local education agencies, such as FCPS.

82.     Defendants' actions in stacking the deck of hearing officers and closing the door to new hearing officers is a direct violation of federal statutory and constitutional protections, which guarantee a fair and impartial hearing under the IDEA, and related state laws.

**VDOE's and FCPS's Policies and Practices Have Allowed LEAs to Have *Ex Parte*
Communications with Hearing Officers**

83.     VDOE's policies and practices facilitate *ex parte* communications between hearing officers and local education agencies.  While these communications are supposed to be limited to acceptance of a hearing appointment, they have not always been so limited.

24

84.    An internal VDOE e-mail posted on specialeducationaction.com shows such communications between hearing officer Brooke-Devlin, FCPS, and the VDOE[24]:



85.    In this June 2020 email exchange, Brooke-Devlin reached out to Dawn Schaefer of FCPS to indicate that she could be available for a due process hearing, but she would need Ms. Schaefer to delay the assignment so Brooke-Devlin could be free to handle the hearing.  Although

---

[24] https://specialeducationaction.com/why-did-ho-morgan-brooke-devlin-work-out-of-the-office-of-blankingship-keith-during-a-due-process-hearing/ (red annotations added).

10899106v1/017480

the delay of the hearing officer's appointment can be detrimental to the disabled student challenging FCPS's actions, Brooke-Devlin asked FCPS to delay her appointment "as long as you can."  FCPS delayed the appointment for the maximum time possible—five days—and then appointed Brooke-Devlin via letter dated June 9, 2020.  Brooke-Devlin then reached out to Kathryn Jones of the VDOE to relay the special accommodations that FCPS had provided.

86.     Although VDOE and FCPS are not supposed to be involved in the selection of the hearing officer responsible for adjudicating the FCPS's disputes with parents, it appears from the e-mail and a subsequent follow-up letter that VDOE and LEAs are, in fact, making such appointments.  This conduct is inconsistent with the Virginia Administrative Code, 8 Va. Admin. Code § 20-81-210(H)(1)(a), which requires that the Supreme Court of Virginia make hearing officer appointments.

87.     This same June 2020 e-mail also demonstrates that, at the time she sent this e-mail, Brooke-Devlin was working out of the office of FCPS's outside counsel, John Cafferky at Blankenship & Keith, conducting another due process hearing.  This is the same law firm that FCPS retained to handle the due process hearing to which it was about to appoint Brooke-Devlin. This suggests (i) a steady stream of hearing-officer work being funneled to Brooke-Devlin by the very school districts over which she is supposed to adjudicate impartially and (ii) a particularly close relationship between a Brooke-Devlin and the law firm that regularly represents Fairfax County and other local education agencies against disabled students and their parents.  As described in more detail below, Brooke-Devlin is the same hearing officer who presided over both due process hearings for D.C., and Blankenship & Keith is the same law firm who represented FCPS in such due process hearings.

26

88.     In sum, the VDOE, local school districts, and their counsel are collaborating closely given their long-standing relationships and common goal of shutting out parents and defeating them in due process hearings.

89.     VDOE is specially charged with reviewing hearing officer performance annually, based on many factors, including whether hearing officers are involved in improper *ex parte* communications.  Despite repeated complaints about Brooke-Devlin, the VDOE has done nothing to investigate or discipline her, content to instead recertify her for toeing the party line.

### VDOE Certified and Retained Hearing Officers
### Who Were Biased Due to Financial Interests

90.     An important aspect of Virginia's scheme to give biased hearing officers a monopoly on due process adjudications is financial in nature.

91.     As explained above, VDOE has a duty under state and federal law to provide an impartial special education due process hearing system.  In carrying out its obligation, VDOE is also responsible for certifying and recertifying hearing officers who are impartial and free of interests that would conflict with their objectivity.  VDOE has taken steps to ensure that hearing officers have a direct and substantial pecuniary interest that affects their impartiality.

92.     VDOE has absolute control over which hearing officers are certified as special education hearing officers and which hearing officers are removed or recertified each year.  This regulatory structure creates conflicts of interests and financial incentives that undermine the integrity and impartiality of the entire system governing special education due process hearings in Virginia.  To put this in practical perspective, the party litigating against parents before hearing officers—school districts—are overseen by the VDOE, the same party with the power to determine whether such hearing officers remain eligible to serve and receive their fees as hearing officers.  Hearing officers appointed, reviewed, and compensated by the VDOE have demonstrated over

27

many years and in many cases that they are not reliably neutral and impartial. Yet those same hearing officers are time-and-time-again rewarded with recertification, and continue to receive lucrative fees for presiding over due process hearings.

93.    Over the last twenty years, Virginia selected hearing officers who have almost always ruled in favor of school districts. As explained above, VDOE maintained the same core group of twenty-two (22) hearing officers, unchanged, for more than a decade from 2010 into 2021. These same hearing officers have proven to be particularly school-friendly, with very few, if any rulings in favor of disabled children.[25]

94.    VDOE pays a substantial amount to hearing officers, sometimes tens of thousands of dollars for a single case. For example, in the case of Hearing Officer Rhonda Mitchell, she submitted an invoice for a single due process case for $43,325. *See* Exhibit D. With multiple due process cases in a year, substantial fees can accumulate quickly.

95.     These fees can be particularly significant for attorneys who are sole practitioners or who work at small firms.[26] Based on publicly available information, as summarized in Exhibit E, eighteen (18) of the twenty-two (22) hearing officers who served between 2010 and 2021 worked as sole practitioners, and all hearing officers based outside of Northern Virginia worked as sole practitioners. The remaining four (4) work for very small firms that have only two members or partners.

---

[25] As discussed below, after D.C.'s parents discovered in early 2021 that Brooke-Devlin had never ruled for a disabled or special needs child in her entire career spanning over twenty years as a hearing officer, they filed a motion to disqualify her for a conflict of interest. Only several months after the disqualification hearing, the VDOE appointed several new hearing officers. These were the first new appointments in over a decade and possibly up to twenty years.

[26] Two-thirds of sole practitioners have annual revenues less than $200,000, with 28% less than $100,000. Most sole practitioners do their own marketing. Embroker, *50 Solo Law Firm Statistics that Will Surprise You* (Aug. 18, 2022), https://www.embroker.com/blog/solo-law-firm-statistics/. Having a steady stream of due process hearings can therefore be especially important for sole practitioners.

96.     By targeting as hearing officers sole practitioners and lawyers who work at very small firms—who would otherwise need to drum up business using their own limited resources— the VDOE has guaranteed that its hearing officers have an economic stake in the outcome of their hearings.

97.     Specifically, the VDOE and LEAs certify the sole practitioners and small-firm lawyers, train them, pay them, appoint them (accommodating their schedules, as requested, to the detriment of parents), all with the promise of a long-term, steady stream of income that requires no marketing expenses for hearing officers who simply refrain from biting the hand that feeds.

98.     Unsurprisingly, hearing officers appointed, reviewed, and compensated by the VDOE have demonstrated over many years and in many cases that they are not neutral and impartial.  As a reward, those same hearing officers are time-and-time-again recertified, earning a steady stream of lucrative fees.  Exhibit E provides the certification date for each of the 22 hearing officers at issue and provides their ruling record between 2003 and 2021.  Their ruling record against parents over this near twenty-year period is sobering and deeply troubling.

99.     Below are two specific examples of special education hearing officers whose situations illustrate the perverse financial incentives at play.

100.    William Francis practices law as a sole practitioner.  Francis had eleven (11) cases as a hearing officer during the period of 2003 to 2009.  Plaintiffs have learned that Francis was not satisfied with the number of due process cases he received and subsequently lobbied to receive more cases as a hearing officer.  During the period of 2009 to 2021, his hearing officer case load increased to 54 cases representing a significant increase in the number of cases he was assigned, compared to the prior decade.  In these 65 cases, Francis ruled only once in twenty years for a disabled or special needs child.

101.     James T. Lloyd practiced law as a sole practitioner in Norfolk, Virginia and served as a hearing officer with an active docket of due process cases until late 2005.  In 2005, one of Lloyd's clients filed a complaint with the Virginia Bar that he had misused funds from a client escrow account for his personal use.  Lloyd signed an affidavit and consented to the revocation of his license to practice law in Virginia on January 25, 2006 under threat of disbarment by the Virginia State Bar.  This affidavit is a matter of public record and is maintained by the Virginia State Bar Official Register of Disciplinary Action.  This illegal act of taking money from a client's escrow account maintained in trust suggests that Lloyd was subject to economic pressures that made him susceptible to the VDOE's system of perverse financial incentives.  Lloyd never ruled in favor of a disabled or special needs child in any of his due process cases during the period of 2003 to 2009.

102.     The VDOE's and LEAs' coordinated efforts to target and retain financially dependent hearing officers creates a powerful economic and professional incentive for officers to rule in the schools' favor.  Such a system is designed to distort the outcomes of hearings and conflict with hearing officer objectivity, violating the IDEA's requirement for an impartial hearing and the protections provided by the U.S. Constitution.

### D.C. and his Parents, Like Other Families, Have Experienced First-Hand Virginia's Failure to Provide a Fair and Impartial Due Process Hearing

103.     Based on the advice of medical and educational professionals, the parents enrolled D.C. in Grafton in July 2014 at their own expense.  And, against the warning of the FCPS social worker, they filed a due process appeal on June 26, 2015, challenging the school system's inexplicable placement of D.C. in a public day school setting.

104.     At the 2015 due process hearing before hearing officer Morgan Brooke-Devlin, the parents presented extensive evidence including numerous reputable medical, psychological, and

educational experts who uniformly testified that D.C. would not make meaningful educational progress and would be a physical risk to himself and others, unless he were in a residential placement with integrated educational services, like Grafton.

105.    Officials from FCPS conceded in an open, pre-trial hearing that D.C.'s family had presented the largest volume and highest quality of proof demonstrating the severity of D.C.'s disabilities and support for a residential placement—including in the form of institutional and medical expert witness affidavits—that had ever been presented in the history of Fairfax County. Years later, this was corroborated by Grafton officials in a 2020 IEP meeting, who conceded in front of FCPS that D.C. "is one of, if not the, hardest case of autism and adverse behaviors that Grafton has treated in the school's history."  D.C.'s disabilities and behaviors are profound and extreme and have been documented by some of the most respected clinicians in the disability area. And yet FCPS still fought the parents with litigation and refused to consider a residential placement in D.C.'s original IEP.  FCPS also lowballed D.C.'s parents in pretrial negotiations with a settlement offer that would only pay for a fraction of D.C.'s educational costs and none of his residential costs.  If the school systems in Virginia would fight a case as extreme as D.C., then they are likely fighting many more individuals who are entitled to special services under the IDEA. The "unusually high number" of parental complaints to the U.S. Department of Education is evidence of the VDOE's and LEAs' (like FCPS) overly aggressive posture towards parents.

106.    After the due process hearing, D.C.'s parents were shocked when the presiding Hearing Officer, Morgan Brooke-Devlin, issued a decision on September 9, 2015, finding in favor of the school system and denying the parents' requested relief of residential placement.

107.    Bill Reichhardt, counsel for D.C., was one of the most experienced special needs litigators in the Commonwealth of Virginia at the time.  He was so outraged by the hearing officer's

bias and irrational decision that he wrote a multiple-page letter dated October 6, 2015 to Sheila Gray who oversaw the Office of Dispute Resolution and Administrative Services of the VDOE. A copy of the Reichardt letter is attached as Exhibit F.

108.    In his letter, Reichhardt stated that "during my 20 years of law practice in the area of special education I have never experienced such a biased and legally misinformed opinion from a Hearing Officer as was apparent in this case."  He noted specifically the Hearing Officer's lack of knowledge of the law and her willingness to misconstrue or ignore evidence.  The practical effect of her ruling was to invalidate key provisions of both federal and State law regarding D.C.'s rights under the IDEA.

109.    In his letter, Reichhardt requested that Ms. Brooke-Devlin "not be appointed in any further Due Process actions."

110.    Neither Mr. Reichhardt nor the Chaplick family ever received an acknowledgement or reply to Reichhardt's letter from the VDOE to say nothing of any confirmation that VDOE investigated these concerns and took appropriate action against Ms. Brooke-Devlin.  To Plaintiffs' knowledge VDOE took no action in response to this letter.

111.    In the aftermath of the decision, the Chaplicks reluctantly entered into a settlement agreement with FCPS, in which the school system supported the day portion only of D.C.'s educational placement at Grafton.  The Chaplicks did not know, at the time they entered into this settlement agreement, that Brooke-Devlin—like over 80% of the hearing officers in Northern Virginia—had *never* ruled in favor of a special needs family.  For years thereafter, D.C.'s residential costs at Grafton were paid for through a combination of insurance and his parents' own personal funds.

32

112.     During the COVID-19 pandemic, Grafton began to press D.C.'s parents to transfer D.C. to an adult group home not operated by Grafton.  On September 1, 2020, D.C.'s parents, through counsel, again requested that FCPS support D.C.'s program and residential placement at Grafton, stressing that his needs had long qualified him for a residential placement.

113.     FCPS convened IEP meetings with the Chaplicks and staff members from Grafton to discuss the parents' request and to update D.C.'s IEP.  The meetings were held virtually and were chaired by Adam Cahuantzi, at the time the Acting Coordinator for Due Process and Eligibility for all Fairfax County Schools.

114.     After only an hour and a half of discussion of placement, Mr. Cahuantzi announced that FCPS recommended the continuation of the day placement at Grafton, and peremptorily refused the parents' request for a residential placement.

115.     The school system justified its rushed decision by pointing to the alleged progress D.C. had shown through the day placement at Grafton.  FCPS refused to acknowledge that D.C. had been living as a full-time resident at Grafton, and that the financial support of family and insurers, denied years earlier by FCPS, had substantially contributed to the success he had achieved at Grafton.

116.     D.C.'s parents challenged the rejection by the IEP team and pursued additional IEP meetings with FCPS.

117.     D.C.'s parents requested that Mr. Cahuantzi recuse himself and that a new IEP team chairperson be appointed to replace Mr. Cahuantzi.  The parents explained that Mr. Cahuantzi had been delaying and restricting IEP discussions and decisions, had not treated them as equal IEP team participants, and in general did not have D.C.'s best interests at heart.  In response to the parents' requests, Mr. Cahuantzi indicated that he would take the parents' request for recusal under

33

consideration "as the person authorized by Fairfax County to be in charge of all residential placements."

118.    However, in the two months following the meeting there was no response to the parents' recusal request.

119.    Given this second, successive rejection of their requests, the parents commenced another due process hearing against FCPS on February 12, 2021.  They again alleged that FCPS had denied D.C. and his parents the FAPE to which he is entitled under the IDEA, by failing to propose an appropriate residential program and placement for the 2020–21 school year.  Citing the recent holding of the Supreme Court of the United States in *Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 137 S.Ct. 988 (2017), they emphasized that FCPS had failed to provide a cogent and responsive explanation for its refusal to propose a residential program.

### D.C. and his Parents Sought a New Due Process Hearing in 2021 And Were Assigned the Same Hearing Officer Who Ignored the Law and the Undisputed Evidence and Demonstrated Bias In the 2015 Proceeding

120.    After serving FCPS with a formal request for a due process hearing, in February 2021, D.C.'s parents and their counsel were advised that the very same hearing officer who had ignored the law and ruled against them in their 2015 due process hearing, Morgan Brooke-Devlin, had been appointed to serve as the hearing officer overseeing D.C.'s new due process hearing.

121.    The parents immediately expressed concern as to this hearing officer's ability to be fair, impartial, and objective, in light of the issues experienced and the complaints filed against Ms. Brooke-Devlin in 2015.  Counsel for D.C.'s family made an oral motion for Ms. Brooke-Devlin to recuse herself based on her prior involvement with D.C. and his family.  Ms. Brooke-Devlin summarily denied the request.

122.     After Ms. Brooke-Devlin denied the recusal motion, D.C.'s parents directed their counsel, Michael Eig and Paula Rosenstock, to investigate the ruling record of Ms. Brooke-Devlin as a hearing officer based on publicly available information.

123.     The investigation revealed that Ms. Brooke-Devlin has been a hearing officer in Virginia since 1993.  Over this twenty-eight-year period of eligibility, counsel were unable to identify a single due process case in which Ms. Brooke-Devlin had ruled in favor of the family of a disabled or special needs student.

124.     Counsel for D.C. promptly prepared and submitted to Ms. Brooke-Devlin a petition to disqualify her under 28 U.S.C. § 455 and Va. Code § 2.2-4024.1, also citing the Hearing Officer Deskbook published by the OES.  Counsel argued based on this authority that Ms. Brooke-Devlin was unable to serve as an impartial hearing officer because of her prior knowledge of, and objectionable conduct towards, the petitioners.

125.     In the motion, counsel further argued that a hearing officer should never accept a case that could create a conflict of interest or create the appearance of a conflict of interest. Counsel referenced both the conflict arising from the previous 2015 due process hearing and its aftermath, including the Reichhardt letter, and the fact that she had apparently never ruled in favor of a disabled student.

126.     In response to the motion, counsel for FCPS failed to refute the claims regarding Ms. Brooke-Devlin's lack of rulings in favor of disabled students and failed to produce a single case in which Ms. Brooke-Devlin ruled for a student or parents.  Nor did Ms. Brooke-Devlin deny during the hearing that she had never ruled in favor of a disabled or special needs child.

127.     Counsel for D.C. requested and paid for the prehearing call, in which the motion for disqualification was argued and discussed, to be recorded and transcribed.  The hearing

transcript reflects Ms. Brooke-Devlin's open hostility toward counsel for D.C., including interrupting and repeatedly cutting off such counsel when he tried to speak.

128.    Ms. Brooke-Devlin issued a peremptory ruling against D.C.'s motion to disqualify. She provided no rationale for her decision other than to assert that the parents "failed to meet their burden of proof."  In addition, she issued an order that the parties must move forward immediately with their case before her as hearing officer.

129.    Following Ms. Brooke-Devlin's refusal to recuse herself, FCPS held additional meetings with the parents to discuss changes to the IEP.

130.    On August 2, 2021, FCPS announced without explanation that Mr. Cahuantzi was no longer in charge of residential placements, and in fact was no longer employed by FCPS.

131.    On August 4, 2021, after fighting the parents so hard for over eight years on their residential placement request for D.C., FCPS agreed that D.C. required a residential placement and placed him at Grafton, the school where he had been residing and receiving his education for nearly the last seven years.

132.    FCPS then sent the IEP in final form to the parents for signature, which they executed and returned to FCPS on August 17, 2021.

133.    During the COVID-19 pandemic, the family had also been struggling with a challenge from Grafton.  While Grafton believed that D.C. belonged under 24-hour supervised residential care, Grafton was pressing the family to transition D.C. to an adult group home.  Grafton did not provide the family with any referrals or suggestions for a viable adult home option.

134.    On April 9, 2021, the Fairfax County Community Services Board ("CSB") notified the parents that D.C. was eligible to be awarded DD Waiver funds to provide certain residential services but did not include coverage of D.C.'s residential costs.  Over the next six months, the

36

family took the requisite actions to qualify D.C. for DD Waiver, including identifying and reaching out to ResCare, a provider of adult group homes.

135.    Rescare had an opening in an adult group home in Winchester.  This Winchester group home would (i) allow D.C. to continue attending Grafton for his education if he had an appropriate service to take him to and from his home to school, and (ii) provide the same level of care and support on a 24-hour basis that Grafton had been providing D.C.

136.    The DD Waiver program did not cover D.C.'s room and board costs.  The parents had relied on the determination by FCPS that D.C. would be entitled to a residential placement to cover his residential costs.

137.    On September 16, 2021, the parents notified FCPS that D.C. would be moving on October 7, 2021, to his new group home which would be partially funded by the DD Waiver. D.C.'s parents asked FCPS if another IEP meeting was necessary to make the change in location. Despite the impending move date, FCPS did not respond.  On September 29, D.C.'s parents' counsel again raised this question with FCPS, asking where things stood and if they needed to meet again to address the change in location.

138.    FCPS did not respond until nearly three weeks after D.C.'s parents' original request.   At 7:56 pm on Tuesday evening October 5, 2021, without notice or meaningful explanation and less than 48 hours before the move was scheduled to occur, FCPS sent an email to the family informing the parents that D.C.'s placement was being changed without his parents' consent from a residential to a day program.  FCPS stated, in a letter attached to the October 5 email:

> On September 7, 2021, the IEP team was informed that D.C.'s parents are in process of transitioning D.C. to an adult group home through his Community Living Waiver, with a tentative move-in of October 7, 2021.  Once D.C. moves into this group home, FCPS will no longer be able to implement the IEP as agreed-upon

and D.C. will access Grafton as a day school student.  The group home, ResCare, is not associated with Grafton's residential program."

139.   FCPS did not respond to D.C.'s parents' or their counsel's inquiry about whether a new IEP was necessary to effectuate the move.  FCPS instead simply decided that a location change was unnecessary for D.C.  Although FCPS did not respond to the Chaplick's inquiry in that letter, FCPS sent another email later that day, refusing to hold an IEP meeting to address this issue and stating, "[a]n IEP meeting is not necessary at this time."

140.   D.C.'s parents through counsel immediately objected to FCPS's refusal to approve D.C.'s change in location.  In a letter dated October 12, 2021, addressed to outside counsel for FCPS, the parents stated that such unilateral action taken by FCPS was in violation of D.C.'s current IEP and a violation of the IDEA and D.C.'s federal rights.

141.   In response to the FCPS's false assertion that D.C.'s residential placement was being paid for by the DD Waiver, the family countered in a separate email that (i) the DD Waiver was only paying for certain services and was not paying for D.C.'s residential costs, and (ii) nothing had changed in D.C.'s circumstances other than moving from the Grafton group home to an adult group home managed by Rescare, with both locations in Winchester so that D.C. could continue attending Grafton for his education.

142.   D.C.'s family moved him into the Rescare group home because they believed that such move was in his best interest.

143.   To date, FCPS has not responded substantively to the October 12, 2021 letter from the family's attorneys, and FCPS has provided no explanation for its refusal to hold an IEP meeting before changing D.C.'s IEP from a residential to day placement.

**Asserting Allegations and Seeking Injunctive Remedies Concerning the Systemic Flaws in Virginia Due Process Hearings in a Virginia Due Process Hearing Would Be Futile**

144.    Defendants' carefully cultivated system designed to bias its hearing officers—and ostensibly conducted in accordance with state law—cannot be remedied by way of a due process hearing overseen by the very hearing officers, LEAs, and VDOE whose conduct is at issue.

145.    Requiring a systemic challenge to pursue administrative remedies would not further the purposes of the IDEA and would only serve to insulate the state procedures from review—an outcome that would undermine the system Congress selected for the protection of the rights of children with disabilities.

146.    Thus, these allegations of structural shortcomings that resulted in the systemic denial of impartial hearings are appropriately addressed in this litigation, not before a Virginia hearing officer.  Defendants' biased hearing-officer practices place this matter outside the realm of traditional notions of IDEA due process and require this Court's intervention.

147.    Pursuing relief through VDOE and/or FCPS is also futile for the reasons set forth above related to D.C.'s case before hearing officer Ms. Brooke-Devlin who demonstrated a lack of knowledge of federal law, disengagement from the evidence, and open hostility toward the persons seeking relief.  This manifestation of bias and ill-will toward the petitioners and their attorneys fell below the standards required under federal statutes and regulations governing the conduct of due process hearings in IDEA cases.  The hearing officer's record of never having ruled in favor of a family strongly suggests that D.C. and his family were not the only persons who suffered at the hands of a hearing officer who evidenced no interest in neutrality.

148.    Neither hearing officers, nor the VDOE, nor any LEA can provide the injunctive and declaratory relief sought by Plaintiffs.  Thus, pursuing administrative remedies would be futile.

39

149.   Further, the injunctive remedies individual Plaintiffs seek on behalf of themselves and the Class, and the remedies sought by the Organizational Plaintiff, are not available through the IDEA administrative process in Virginia.

## COUNT I (All Plaintiffs)

(42 U.S.C. § 1983 Claims for Due Process Violations of the Fourteenth Amendment to the United States Constitution)

150.   Plaintiffs incorporate all allegations set forth in paragraphs 1–149, as if alleged herein.

151.   Defendants have committed constitutional violations against Plaintiffs, who are citizens of the United States, under color of law.

152.   Under 42 U.S.C. § 1983:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

153.   Defendants have deprived Plaintiffs of their Fourteenth Amendment rights under color of law by depriving them of due process of law and denying them educational opportunities equal to non-disabled students.

154.   The Fourteenth Amendment mandates that all persons born in the United States are entitled to due process before restriction of their liberty or property, and to equal protection of the laws. U.S. Const. amend XIV.

155.   Plaintiffs have a constitutionally protected property interest in being provided with an IEP consistent with the requirements of the IDEA.

156.     Plaintiffs have a constitutionally protected liberty interest in receiving an "Impartial Due Process Hearing" when challenging or contesting a proposed IEP.

157.     Plaintiffs have a clearly established right under the Fourteenth Amendment to the United States Constitution to be free from government interference with, or deprivation of, their property and liberty interest in a FAPE, their property interest in an adequate IEP, and their liberty interest in an Impartial Due Process Hearing consistent with adequate due process of law.

158.     Constitutionally, adequate due process of law requires an objective proceeding, including proper notice and a fair opportunity to be heard.

159.     A fair opportunity to be heard means neutral procedures applied by an impartial and unbiased decision maker, free from self-interest, self-dealing, malice, vindictiveness, or other illegitimate motives.

160.     Procedures that are neutral on their face and in theory but biased at their core and in fact are a sham do not satisfy the procedural due process requirements of the Fourteenth Amendment.

161.     By way of illustration and not limitation, Plaintiff D.C.'s two due process hearings were not adjudicated by an impartial factfinder, but by an individual who demonstrated a lack of knowledge of federal law, disengagement from the evidence, and open hostility toward the persons seeking relief.  This manifestation of bias and ill-will toward the petitioners and their attorneys fell below the standards required under federal statutes and regulations governing the conduct of due process hearings in IDEA cases.  The hearing officer's record of never having ruled in favor of a family strongly suggests that D.C. and his family were not the only persons who suffered at the hands of a hearing officer who evidenced no interest in neutrality.

41

162.    As a result of this sham hearing, Plaintiff D.C. was denied a fair opportunity to be heard in pursuit of his property and liberty interest in a free appropriate public education, his property interest in an IEP, and his liberty interest in an Impartial Due Process Hearing in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

163.    The foregoing actions and omissions of Defendants constitute a policy, practice, pattern, and/or custom of discriminating against Plaintiffs in violation of the constitutionally protected liberty and property interests.

164.    Defendants acted intentionally or with reckless indifference to the constitutional rights of the Plaintiffs.

### COUNT II (All Plaintiffs)

(42 U.S.C. § 1983 Claims for Equal Protection Violations of the Fourteenth Amendment to the United States Constitution)

165.    Plaintiff incorporates by reference all allegations set forth in paragraphs 1–164.

166.    Plaintiffs are citizens of the United States, and all defendants are persons acting under color of state law for purposes of 42 U.S.C. § 1983.

167.    Plaintiffs have a constitutionally protected fundamental right to procedural due process under the Fourteenth Amendment to the United States Constitution.

168.    Defendants violated Plaintiffs' fundamental due process rights by singling them out as a class and depriving them of neutral procedures applied by an impartial and unbiased decision maker, free from self-interest, self-dealing, malice, vindictiveness, or other illegitimate motives.

169.    Defendants' denial of Plaintiffs' fundamental right to procedural due process was arbitrary, capricious, and not rationally related to any legitimate state interest.

10899106v1/017480

## COUNT III (All Plaintiffs)

(*Ex Parte Young* Injunction for VDOE's Failure
to Bring Virginia Into Compliance With Federal Law)

170.     Plaintiffs incorporate by reference each averment set forth in paragraphs 1–169 above, and reallege each as if fully set forth herein.

171.     Defendant VDOE and its Superintendent of Public Instruction are obligated under 20 U.S.C. § 1407(a)(1) to ensure that Virginia's rules, regulations, and policies relating to IDEA conform to the purposes of IDEA.  One of the stated purposes of IDEA, set forth in 20 U.S.C. § 1400(d)(1)(B) is to ensure that the rights of children with disabilities and parents of such children are protected.  The Commonwealth of Virginia is not immune under the 11th Amendment from a suit in this Court to remedy a violation of IDEA, as provided in 20 U.S.C. §1403.

172.     Defendant VDOE and its Superintendent of Public Instruction have failed and continue to fail to ensure that all children with disabilities residing in the Commonwealth of Virginia receive a free appropriate public education.  They have also failed to ensure that appropriate procedures are in place to provide a fair due process hearing before a knowledgeable and impartial hearing officer, as required by federal law.  This ongoing and continual failure includes, but is not limited to, the following acts or omissions:

a.     VDOE and its Superintendent of Public Instruction are failing to adequately monitor the compliance of local school districts, including defendant FCPS, with federal and state laws mandating that districts provide a free appropriate public education to all children with disabilities, including D.C.;

b.     VDOE and its Superintendent of Public Instruction are failing to adequately investigate complaints regarding defendant FCPS's failure to provide a free appropriate public

43

education to all children with disabilities, including D.C., and to otherwise comply with federal and state laws that protect children with disabilities.

c.      VDOE and its Superintendent of Public Instruction are failing to implement and enforce procedures under Va. Code § 22.1-214(B) to afford due process to children with disabilities and their parents or guardians and to school divisions in resolving disputes as to program placements, individualized education programs, tuition eligibility and other matters as defined by federal statutes and regulations.

d.      VDOE and its Superintendent of Public Instruction are failing to implement an *impartial* special education due process hearing system to resolve disputes between parents and local educational agencies as required by state and federal law.

e.      VDOE and its Superintendent of Public Instruction are failing to adequately implement and enforce procedural safeguards required to be afforded to children with disabilities and their parents by 20 U.S.C. § 1415(d) and (f), as further implemented by 34 C.F.R. § 300.121, including ensuring that every hearing officer be knowledgeable and impartial.

173.    The foregoing failures of VDOE and its Superintendent of Public Instruction to bring the Virginia special education due process hearing system into compliance with federal law has injured and will continue to irreparably harm Plaintiffs, unless and until prospectively enjoined by this Court as permitted by *Ex Parte Young,* 209 U.S. 123, 28 S. Ct. 441, 52 L. Ed. 714 (1908) and *Antrican v. Odom*, 290 F.3d 178, 186 (4th Cir. 2002).  *See also* 20 U.S.C. § 1403 (b).

## COUNT IV (All Plaintiffs)

(Violations of Virginia State Law)

174.    Plaintiffs incorporate by reference each averment set forth in Paragraphs 1 through 173 above, and reallege each as if fully set forth herein.

44

175.    Virginia Code Section 22.1-214 requires that the VDOE "prepare and supervise the implementation by each school division of a program of special education designed to educate and train children with disabilities."  It further provides that the VDOE "shall prescribe procedures to afford due process to children with disabilities and their parents or guardians and to school divisions in resolving disputes as to program placements, individualized education programs, tuition eligibility and other matters as defined in state and federal statutes or regulations."

176.    Virginia Administrative Code Section 8 VAC 20-81-210 states that the VDOE provides for "an impartial special education due process hearing system to resolve disputes between parents and local education agencies with respect to any matter relating to: . . . 3. Educational placement services of [a] child [with a disability]; and 4. Provision of a free appropriate public education."  VDOE is responsible for certifying and training hearing officers and it is also responsible for reviewing its list of special education hearing officers annually and determining whether to recertify each hearing officer, including individuals on the special education hearing officers list on July 7, 2009, based on past and current performance.  8 VAC 20-18.D.  Review criteria for hearing officers include, among other things: unprofessional demeanor, inability to conduct an orderly hearing, inability to conduct a hearing in conformity with the federal and state laws and regulations regarding special education, improper ex parte contacts, violations of due process requirements, failure to complete training requirements, professional disciplinary action, and issuing a decision that contains no controlling case or statutory authority to support the findings.

177.    Section 8 VAC 20-81-210.L further requires that the VDOE: (1) maintain and monitor the due process hearing system, (2) ensure that the LEA discharges its responsibilities in

carrying out the requirements of state and federal statutes and regulations, among other requirements.

178.    Virginia Code Section 22.1-215 also requires that each school division, including FCPS, "shall provide free and appropriate education, including special education" for the children with disabilities residing within its jurisdiction.

179.    Defendant VDOE and its Superintendent of Public Instruction have failed and continue to fail to ensure that all children with disabilities residing in the Commonwealth of Virginia receive a free appropriate public education.   They have also failed to ensure that appropriate procedures are in place to provide a fair due process hearing before a knowledgeable and impartial hearing officer.   This ongoing and continuous failure to comply with state and federal law includes, but is not limited to, the following acts or omissions:

180.    VDOE and its Superintendent of Public Instruction are failing to adequately monitor the compliance of local school districts, including defendant FCPS, with federal and state laws mandating that districts provide a free appropriate public education to all children with disabilities, including D.C.;

181.    VDOE and its Superintendent of Public Instruction are failing to adequately investigate complaints regarding defendant FCPS's failure to provide a free appropriate public education to all children with disabilities, including D.C., and to otherwise comply with federal and state laws that protect children with disabilities.

182.    VDOE and its Superintendent of Public Instruction are failing to implement and enforce procedures under Va. Code § 22.1-214(B) to afford due process to children with disabilities and their parents or guardians and to school divisions in resolving disputes as to

46

program placements, individualized education programs, tuition eligibility and other matters as defined by federal statutes and regulations.

183.    VDOE and its Superintendent of Public Instruction are failing to implement an impartial special education due process hearing system to resolve disputes between parents and local educational agencies as required by state and federal law.

184.    VDOE and its Superintendent of Public Instruction are failing to comply with its obligations under 8 VAC 20-81-210, including, for example, its obligations to review hearing officer performance and evaluate whether to recertify hearing officers annually, to implement a fair and impartial due process system, to certify new hearing officers and to otherwise ensure compliance with state and federal law related to the implementation of the special education due process hearing system in Virginia.

185.    VDOE and its Superintendent of Public Instruction are failing to adequately implement and enforce procedural safeguards required to be afforded to children with disabilities and their parents by 20 U.S.C. § 1415(d) and (f), as further implemented by 34 C.F.R. § 300.121, including ensuring that every hearing officer be knowledgeable and impartial.

186.    Similarly, FCPS and its Superintendent have failed to meet their obligation to provide a free appropriate public education to the children with disabilities within its jurisdiction and have failed to meet their obligations to comply with state and federal law.

187.    The foregoing failures of defendants to provide a free appropriate public education, to ensure a fair and impartial hearing and to otherwise bring the Virginia special education due process hearing system into compliance with state and federal law has injured and will continue to irreparably harm Plaintiffs, unless and until prospectively enjoined by this Court.

## COUNT IV (All Plaintiffs)

(Virginia Statutory and Administrative Provisions Violate the IDEA)

188.    Plaintiffs incorporate by reference each averment set forth in paragraphs 1–187 above, and reallege each as if fully set forth herein.

189.    If parents of a disabled child want to challenge the IEP for their child or if they want to challenge other actions of the local education agency under the IDEA, the IDEA guarantees them an impartial due process hearing.  *See* 20 U.S.C. § 1415(f)(1)(B)(i).

190.    The Virginia statutory and administrative provisions related to the certification, appointment, review and compensation of hearing officers, as described above, have created a system with inherent conflicts of interest, which violate the IDEA's guarantee of an impartial hearing officer.

191.    These provisions will continue to irreparably harm Plaintiffs, unless and until they are invalidated and prospectively enjoined by this Court.

## COUNT VI (D.C.)

(20 U.S.C. §§ 1400 *et seq*. - Failure to hold an IEP Meeting)

192.    Plaintiff incorporates by reference each averment set forth in paragraphs 1–191 above, and realleges each as if fully set forth herein.

193.    Defendant FCPS's refusal to hold an IEP meeting relating to D.C.'s new residential placement violates Plaintiffs' rights under the IDEA and Virginia law.

## COUNT VII (D.C.)

(20 U.S.C. §§ 1400 *et seq*. - Failure to provide a Free Appropriate Public Education)

194.    Plaintiffs incorporate by reference each averment set forth in paragraphs 1–193 above, and realleges each as if fully set forth herein.

10899106v1/017480

195.    Defendant FCPS's failure to provide D.C. with a Free Appropriate Public Education violates Plaintiffs' rights under the IDEA and Virginia law.

## COUNT VIII (D.C.)

(20 U.S.C. §§ 1400 *et seq*. - Failure to Offer Appropriate Program and Placement)

196.    Plaintiffs incorporate as though restated each of the factual allegations stated in paragraphs 1–195.

197.    The failure of Defendant FCPS to place and fund D.C. in an appropriate program and placement violates the IDEA and Virginia law.

## COUNT IX (D.C.)

(20 U.S.C. §§ 1400 *et seq*. Failure to Provide Due Process)

198.    Plaintiffs incorporate as though restated each of the factual allegations stated in paragraphs 1–195.

199.    The Local Educational Agency ("LEA") and State Educational Agency ("SEA") violated plaintiff's due process rights under the IDEA and Virginia law by failing to convene an IEP meeting and failing to provide an opportunity for a fair and just due process hearing.

200.    The LEA and SEA violated plaintiff's due process rights under the IDEA and Virginia law by repeatedly failing to ensure the appointment of unbiased, impartial hearing officers with the knowledge and ability to conduct a hearing in accordance with appropriate standard legal practice.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

201.    Certify the proposed class under Federal Rule of Civil Procedure 23(a) and 23(b)(2), with Plaintiffs serving as Class Representatives and with Plaintiffs' counsel serving as Class Counsel.

49

202.     Declare that the hearing officer system administered by VDOE and employed by FCPS and other Virginia local school systems deprives families of procedural due process as provided by the Fourteenth Amendment to the Constitution of the United States by failing to supply knowledgeable and impartial hearing officers who meet the requirements of IDEA;

203.     Declare that VDOE is out of compliance with IDEA, in that it fails to oversee and supervise the hearing officer and due process hearing system in a manner that ensures a fair due process hearing and a knowledgeable and impartial hearing officer, as required by the IDEA;

204.     Declare that FCPS is out of compliance with the IDEA by failing to provide fair due process hearings before knowledgeable and impartial hearing officers, as required by the IDEA;

205.     Enter an injunction ordering Defendants to immediately implement procedures to ensure that VDOE and Local Education Agencies are providing fair due process hearings, in front of knowledgeable and impartial hearing officers, including at least the following:

a.     Establishment of an independent board to oversee the hearing officer system in Virginia composed of knowledgeable educators and parents of disabled or special needs children to ensure balance and fairness, including overseeing the appointment, recertification, compensation, and training;

b.     Defendants shall collect, assemble, and provide to Plaintiffs and this Court monthly and annual individual and aggregate hearing officer ruling statistics, with sufficient detail to determine the ruling record of each hearing officer for the time period at issue;

c.     Defendants shall collect, assemble, and publicly report individual and aggregate hearing officer statistics, on at least a quarterly basis and annual basis, in a manner that is readily accessible to the public;

50

d. Defendants shall conduct an investigation into the hearing records and rulings of each hearing officer whose has ruled in favor of disabled students and parents less than 30% of the time over the last ten (10) years, to determine whether each such hearing officer has demonstrated that they have been knowledgeable and impartial in their rulings; hearing officers who have never ruled in favor of parents or have rarely ruled in their favor should be given particular scrutiny; Defendants shall provide a summary of their findings for each hearing officer to Plaintiffs and this Court and shall further provide any reasonably supporting materials requested by Plaintiffs or this court;

e. Defendants shall remove any hearing officer who has a demonstrated history of unfairly ruling against disabled students and parents in due process hearings;

f. Defendants shall provide to Plaintiffs and this Court a detailed explanation of the process they will use going forward for qualifying, certifying, recertifying, training, and appointing hearing officers for due process hearings in the Commonwealth of Virginia, including the steps they will take to ensure that hearing officers are knowledgeable and impartial in their rulings;

g. Defendants shall provide to the Court on the first day of each quarter a detailed report on their efforts to ensure fair and impartial due process hearings, addressing the issues set out above and any other policies or procedures necessary to ensure such fair and impartial hearings.

206. With regard to D.C., to enter an injunction requiring FCPS to hold an IEP meeting within seven (7) days to consider D.C.'s parents' requested residential placement and other educational services, and, if D.C.'s parents are not satisfied with the IEP, to provide a fair hearing in front of an impartial hearing officer who is sufficiently knowledgeable to make an appropriate determination, based on D.C.'s specific disabilities.

207.    With regard to D.C., to order FCPS to reimburse his parents and other payors for residential costs incurred, and not covered by another source, in connection with his placement at both Grafton and Rescare;

208.    With regard to D.C., to order FCPS to reimburse his family or other payors for the expenses incurred in connection with residential services provided to him at Grafton from the time he was first enrolled until the present;

209.    Award to counsel for the Plaintiffs their attorneys' fees and costs incurred in this action, as provided by the IDEA and by 42 U.S.C. § 1988;

210.    Award such other relief as the Court deems just.

## JURY DEMAND

Plaintiffs hereby demand trial by jury on all issues so triable.


Dated:  September 21, 2022                                Respectfully submitted,


By: */s/ R. Braxton Hill, IV*
R. Braxton Hill, IV (VSB No. 41539)
Craig T. Merritt (VSB No. 20281)
MERRITT LAW, PLLC
919 E Main Street, Suite 1000
Richmond, VA 23219
T  804-916-1600
bhill@merrittfirm.com
cmerritt@merrittfirm.com


Aderson B. Francois
(*pro hac vice to be submitted*)
Civil Rights Clinic,
  Georgetown University Law Center
600 New Jersey Avenue NW, Suite 532
Washington DC 200001
T (202) 661-6721
aderson.francois@law.georgetown.edu


52

William R.H. Merrill
(*pro hac vice to be submitted*)
Michael Adamson
(*pro hac vice to be submitted*)
SUSMAN GODFREY, LLP
1000 Louisiana, Suite 5100
Houston, TX 77002
T 713-653-7865
bmerrill@susmangodfrey.com
madamson@susmangodfrey.com
*Counsel for D.C., Trevor and Vivian
Chaplick and organizational plaintiff Hear
Our Voices*