**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

**D.C.,** *by his parents and guardians,*
*Trevor Chaplick and Vivian Chaplick*,
**Trevor Chaplick,**
**Vivian Chaplick,**

**M.B.,** *by his parents and guardians,*
*James Bingham and Sheila Bingham*,
**James Bingham,**
**Sheila Bingham,**

**and**

**Hear Our Voices, Inc.** *on behalf of*
*themselves and all others similarly*
*situated*

      **Plaintiffs,**

**v.**

**Fairfax County School Board,**

**Dr. Michelle Reid, Superintendent of**
**Fairfax County Public Schools**
**(in her official capacity),**

**Virginia Department of Education,**

**and**

**Jillian Balow,**
**Superintendent of Public Instruction**
**of Virginia Department of Education**
**(in her official capacity)**

      **Defendants.**

Civil Action No. 1:22CV1070-MSN-IDD

**JURY TRIAL DEMANDED**

# Table of Contents

**Page**

I. Introduction ........................................................................................................ 4

II. Parties ............................................................................................................... 11

III. Jurisdiction and Venue .................................................................................... 20

IV. Class Action Allegations ................................................................................. 21

V. The Background and Objectives of the IDEA .................................................. 25

VI. VDOE's Biased Hearing Officer System Deprives Parents and Special Needs Children of Their Right to a Fair and Impartial Due Process Hearing Under the IDEA ................................. 29

    A.    Evidence Revealed Through FOIA Requests  Ultimately Exposed the Travesty of VDOE's Rigged Due Process Hearing System ................................................ 29

    B.    National Statistics Confirm VDOE Hearing Officers Rule Against Parents at Disproportionately Greater Rates Than Other Jurisdictions ..................................... 33

    C.    The Children Behind the Statistics: Named Plaintiffs D.C. and M.B. Experienced First-Hand VDOE's Biased Due Process Hearing System ....................................... 38

    D.    VDOE is Responsible for the Biased Hearing Officer System It Created and Condones ........................................................................................................ 46

        1.    VDOE Hearing Officers Fail to Follow the Law ...................................... 46

        2.    VDOE Hearing Officers Are Not Impartial ............................................... 51

        3.    VDOE Stacks the Deck with Biased Hearing Officers .............................. 57

    E.    Parents and Children Have no Viable Alternative to Due Process Hearings ........... 57

    F.    VDOE's Ongoing and Systematic Practice of Rigging Due Process Hearings Makes it Futile to Seek Relief Through Due Process Hearings ........................................... 60

VII. VDOE and Virginia School Districts Systematically Fail to Evaluate Children with Disabilities ........................................................................................................ 61

    A.    VDOE Permits Virginia LEAs to Exploit a Policy and Practice of Avoiding, Limiting and Delaying the Student Evaluations  Required Under the IDEA ........... 62

    B.    VDOE Sanctions and Supports Virginia LEAs' Policy and Practice of Refusing IEEs as Required under the IDEA ................................................................. 64

    C.    VDOE  Permits Virginia LEAs' Policy and Practice of Manipulating Student Evaluations and Assessments  to Avoid Providing Special Education Services ...... 66

    D.    VDOE's Student Evaluation Policies Violate the IDEA ........................................ 71

VIII. VDOE Systematically Fails to Carry Out its Obligation to Oversee Virginia LEA Compliance with the IDEA ................................................................................... 74

    A.    VDOE is Required to Ensure Compliance with the IDEA ..................................... 74

B.     VDOE's Faulty Oversight Enables FCPS and other Virginia LEAs to Regularly Ignore Their IDEA Obligations ................................................................................. 75

1.    VDOE Fails to Ensure that FCPS and Other LEAs Provide Families Complete and Accurate Student Records ................................................................................................. 76

2.    VDOE Fails to Require FCPS and other LEAs to Develop and Amend IEPs in Accordance with the IDEA ........................................................................................... 79

3.    VDOE Fails to Prevent FCPS' and other LEAs' Pattern and Practice of Making Misrepresentations During the IDEA Process ................................................................ 86

4.    VDOE's Use of IEP "Facilitators" Enables, Rather than Prevents, LEAs' Violations of the IDEA .................................................................................................................... 88

5.    VDOE Fails to Ensure that FCPS and other LEAs Provide Children with the Services to Which They Are Entitled under the IDEA ..................................................... 89

6.    VDOE Fails to Prevent FCPS and other LEAs from Bullying Parents and Advocates When They Attempt to Exercise Their Rights under the IDEA ....................................... 94

C.     VDOE's Systematic Failures Enable and Encourage FCPS and Other LEAs' Concerted and Ongoing Violations of the IDEA ...................................................... 95

PRAYER FOR RELIEF ........................................................................................ 108

**PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT**

Plaintiffs on behalf of themselves and others similarly situated, and by their undersigned counsel, bring this civil action for declaratory and injunctive relief, to remedy violations of the Constitution and laws of the United States of America resulting from actions undertaken by the Defendants under color of law.

## I. Introduction

1.       The Individuals with Disabilities Education Act ("IDEA") and implementing regulations require Defendants to provide a "free appropriate public education" ("FAPE") to children identified as disabled, one of the most vulnerable groups in the country.  Instead, Defendants have established a rigged system designed to delay, limit and avoid providing appropriate services to eligible children within the Commonwealth of Virginia.  In doing so, Defendants have systemically violated for decades the federal, due process, and equal protection rights of disabled children in Virginia.  This abuse has been extensively documented by federal regulators and yet it continues to this day.

2.       Fairfax County Public Schools ("FCPS") and the Virginia Department of Education ("VDOE") have created this rigged system by employing many tactics including obstruction, burden, delay, concealment, bullying, and outright harassment that collectively are designed to prevent disabled students from obtaining the services to which they are entitled under the IDEA.  FCPS is subject to multiple consent decrees as a result of its mistreatment of disabled students.  And, VDOE is subject to ongoing orders from the United States Department of Education's Office of Special Education and Rehabilitative Services (OSEP) based on its multiple and repeated violations of the IDEA and similar laws.

4

3.      This Complaint provides an extensive description of representative violations of federal law carried out by Defendants against parents and disabled children in the Commonwealth of Virginia.  In many cases, these violations have been documented and confirmed in multiple investigations of Defendants by the U.S. Department of Education ("USDOE") spanning many years.  Plaintiffs' allegations against Defendants in this Complaint are organized to demonstrate how Defendants' concerted efforts to undermine the procedural safeguards of the IDEA have caused children in Fairfax County, and across the Commonwealth of Virginia, to be deprived of federally-mandated special education services in violation of their civil rights and rights under the IDEA.

4.      The pervasive and systemic violations start with Defendants engaging in various tactics to avoid and delay evaluating students with disabilities.  Such tactics include ignoring parents' repeated requests for evaluations, failing to conduct evaluations within the requisite time periods required by law, arbitrarily limiting the scope of evaluations, and refusing to pay for an Independent Educational Evaluation ("IEE") as required under the IDEA.

5.      If parents are fortunate enough to overcome these initial obstacles, the next barrier confronting them is an evaluation process that Defendants have designed with bias *against* a finding of disability.  For example, FCPS, acting under the supervision of VDOE, regularly *ignores,* rather than gathers, the functional, developmental, and academic information about eligible children.  Indeed, teachers and other participants in the IDEA process often are instructed to minimize evidence of students' disabilities, exaggerate their academic process, and conceal other relevant information, including the school district's failures to provide FAPE and other specific accommodations and services that are required under the IDEA.

6.      Parents who are aggrieved by this systematic denial of services to their children

have no viable means to pursue relief.  In theory, they have a federally-mandated right to seek a due process hearing to challenge these adverse decisions.  But, in practice, it is impossible for children and parents in Virginia to overcome the obstruction practiced by the Defendants.  If a family with a disabled child has enough resources to hire counsel and engage in a contentious, multi-year fight with the school district – only a very few have such resources – it can file a request for a due process hearing under the IDEA.  But, as school district officials repeatedly warn parents, the parents will lose.  This is because, contrary to the due process hearing right afforded by the IDEA, VDOE has developed a "kangaroo court system" replete with sham procedures, biased "adjudicators," and outcomes against the disabled students that are nothing more than foregone conclusions.

7.     VDOE's sham process begins and ends with its slate of biased, predisposed, and unqualified (so-called) due process hearing officers.  That slate has been carefully curated to ensure that only those hearing officers willing to play ball with VDOE and FCPS – and rule against parents the vast majority of the time – qualify for and remain on the list.  Under state law, VDOE is responsible for: certifying hearing officers to hear special education due process cases, determining the number of hearing officers who will be certified, reviewing Hearing officer actions, and reviewing and recertifying hearing officers on an annual basis.  VDOE is also responsible for training and compensating hearing officers.  These powers give VDOE near-absolute control over these hearing officers.  Using this power, VDOE carefully curated a select group of twenty-two (22) hearing officers who nearly always rule in favor of school districts and against parents.  Despite (or because of) the incredibly one-sided outcomes generated by these hearing officers, VDOE has repeatedly recertified these hearing officers.  VDOE also failed to add a new single hearing officer during the period from 2010 to July of 2021, ensuring that no one

except for VDOE's own tried-and-tested allies would adjudicate due process hearings.  The result has been an entire generation of disabled children and their parents facing a near-insurmountable hurdle to obtaining a fair due process hearing.

8.     VDOE's concerted effort to develop its roster of biased hearing officers has borne bitter fruit.  From 2010 through July 2021 less than 1% of parents who initiated a due process hearing under the IDEA in Northern Virginia received a favorable ruling granting the relief they requested.  That is only 3 rulings in 395 cases in all of Northern Virginia, over more than 11 years. The results are not much better statewide in Virginia with a little over 1.5% of parents who initiated a due process hearing ultimately receiving a favorable ruling—only 13 such rulings in all 847 cases brought in Virginia over that same 11-year period.  Shockingly, nearly two-thirds of these hearing officers have never ruled for a disabled child in a due process hearing in the last two decades. *Worse, in Northern Virginia, 83% of hearing officers never once ruled in favor of parents from 2010 to July 2021.*

9.     Despite receiving numerous complaints about the biased hearing process, VDOE has refused to exercise its oversight authority to ensure that disabled students and their parents receive a fair and impartial due process hearing.

10.     Under VDOE's watch, its hearing officers have fostered a costly (albeit lucrative for themselves) and highly contentious dispute resolution system while repeatedly violating federal law.  Such violations include:

     a.     Backdating decisions to falsify compliance with federal and state laws,

     b.     Engaging in *ex parte* communications with LEA[1] lawyers and personnel to

---

[1] An "LEA" is defined in the IDEA as a "Local Education Agency," which generally equates with the board or district overseeing local public schools.  FCPS is an LEA.

the exclusion of parents,

c.      Ignoring and excluding evidence and open admissions that teachers and school administrators routinely manipulate and falsify academic records,

d.      Imposing unique and biased procedural burdens on parents and not schools,

e.      Rejecting expert testimony provided by parents on frivolous and false grounds,

f.      Attributing statements, claims and requests to parents that were never in fact made,

g.      Unilaterally delaying the proceedings and postponing deadlines without agreement from the parents or on motion from either party, and

h.      Misrepresenting special education law to bar parents from contesting substantive provisions of IEPs[2].

11.     To further ensure favorable outcomes, VDOE employs "hearing monitors" to attend all due process hearings.  These hearing monitors report back to VDOE about the due process proceedings.  There are currently two hearing monitors and, according to one hearing officer, one of these monitors engaged in multiple *ex parte* communications with this hearing officer to try to persuade him to disregard the parents' expert and rule in favor of the school district.[3]

---

[2] An "IEP" is the "Individualized Education Program" developed for a disabled child as required under the IDEA.

[3] VDOE also places VDOE monitors in IDEA mediations, to oversee the process and report back to VDOE.  Like the due process hearing monitors, these VDOE mediation monitors often improperly interfere with the mediation process.  The United States Department of Education's Office of Special Education Programs (OSEP) cited VDOE for its practice of placing VDOE representatives in IDEA mediations and instructed them to discontinue it.  *See* Letter Dated June 23, 2020 from, Laurie VanderPloeg, Director, Office of Special Education Programs, to James

12.     The right to an impartial due process hearing is one of the most fundamental protections in the IDEA.  Without a fair and impartial hearing, the goals of the IDEA will not be met, and disabled children will continue to be left behind.  Further, a system tainted by biased hearing officers deters parents and others from fulfilling their role under the IDEA as education advocates for disabled children.  That is exactly what is happening in Virginia.

13.     In an attempt to hide their egregiously biased system and pervasive violations of the IDEA and other laws, Defendants have taken extreme measures to punish parents and advocates for attempting to challenge the unlawful machine.  Invited advocates for the disabled and counsel have been excluded from or forced to leave IEP preparation sessions by VDOE personnel and administrators, and when they have refused, they have been arrested and charged with trespassing.  Others have been subjected to costly and baseless civil litigation for attempting to uncover and expose Defendants' wrongdoing.

14.     VDOE and its LEAs have also wrongfully claimed that parents must use the Virginia Freedom of Information Act ("FOIA") to access information to which they are entitled under the IDEA.  Yet, when parents attempt to pursue FOIA requests, VDOE, as the gatekeeper of Virginia education information, makes the process so complicated, expensive, and otherwise burdensome that parents rarely can access the necessary information to uncover what has happened, and is happening, to their child.  Indeed, the methodical and ubiquitous policies and procedures employed to frustrate the procedural safeguards and substantive rights of disabled

---

Lane, then Superintendent of VDOE, *available at* https://www2.ed.gov/fund/data/report/idea/partbdmsrpts/dms-va-b-2020-letter.pdf (last accessed January 19, 2023).  OSEP indicated that having a VDOE representative present could influence the process and, on top of that, the VDOE representatives were improperly participating in the mediation process, rather than just observing.  In spite of the order from the USDOE, VDOE has, thus far, refused to remove their representatives from IDEA mediations.

students and their parents in Virginia, described in detail below, were not discovered, and could not have been discovered, until members of HOV spent tens of thousands of dollars and over a year's worth of time preparing detailed information requests, corresponding with VDOE's FOIA gatekeepers, sending multiple follow ups, and combing through mountains of data to uncover the truth.

15.     Defendants' concerted effort to undermine the procedural safeguards of the IDEA has caused a systemic breakdown in IDEA services across the Commonwealth of Virginia. Without effective oversight from VDOE, LEAs routinely violate various provisions of the IDEA and deprive vulnerable disabled children of the special education services to which they are entitled under federal law.  As a consequence, an entire population of children within the Commonwealth of Virginia is currently being denied access to the free public education guaranteed by the Constitution of Virginia.

16.     Named Plaintiffs M.B. and D.C. are children with sensory, emotional, physical, cognitive, developmental or language disabilities, and their parents, who tried to obtain special education and related services from FCPS, and to vindicate their rights through a due process hearing.  Despite their eligibility for such services, FCPS and VDOE have denied, delayed or otherwise deprived plaintiffs of access to these services through a concerted and systematic effort to avoid compliance with the IDEA.

17.     As fully set forth below, Named Plaintiffs seek—on behalf of themselves and all others similarly situated—a judicial declaration that Defendants' policies and procedures, resulting in the failures to provide FAPE, do not effectuate the congressional objectives articulated in the IDEA, satisfy the requirements of the IDEA, or meet the minimum requirements of procedural due process.  Plaintiffs also seek injunctive relief barring the continued use by VDOE and FCPS of

procedures that systematically deprive special needs students of their rights under the IDEA. Plaintiffs further seek an injunction which will require VDOE to finally carry out its federally-mandated oversight of FCPS and other Virginia LEAs which consistently fail to provide eligible children with FAPE.  This action is the only means by which Plaintiffs, and the class they intend to represent, can seek relief necessary to address Defendants' ongoing systematic violations of their and other disabled students' rights under federal law.

## II. Parties

18.    D.C. ("D.C.") is a nineteen-year-old, educationally disabled student who at all times relevant to this action resided in Fairfax County, Virginia.

19.    Plaintiffs Trevor Chaplick and Vivian Chaplick are D.C.'s parents and guardians, with their primary residence in Fairfax County, Virginia, within this judicial district and division. They bring this action on D.C.'s behalf, in their own right, and on behalf of a class of similarly-situated individuals as alleged below.

20.    D.C. has faced significant challenges throughout his life, including Autism, Attention Deficit Hyperactivity Disorder-Primarily Hyperactive-Impulsive Type, Tourette's Syndrome, Encephalopathy, Adjustment Disorder with Anxiety and Disturbance of Conduct, and an Intellectual Disability of an undetermined severity, as well as severe gastrointestinal complications and sleep disturbance.

21.    D.C. engaged in daily aggressive behaviors since he was six years old.  These behaviors include self-injury, such as head-banging, biting, hitting, and kicking, as well as emotional meltdowns, elopement, aggression and violence towards others, throwing items (glass, food, furniture), and damaging property.   These behaviors have resulted in multiple hospitalizations to himself and others.

22.    FCPS originally found D.C. eligible in August 2008 for special education services

as a student with Autism and an Intellectual Disability and provided him with an IEP.

23.     Because of his profound disabilities and severe aggressive behavior and violence, D.C.'s parents petitioned FCPS for a residential educational placement in the Grafton Integrated Health Network's Integrated Residential/Education Program ("Grafton"), located in Winchester, Virginia.  Grafton is one of the only schools in Virginia that offers an integrated setting for residential and educational care of disabled children.

24.     This request for a residential placement was made after the parents consulted with, and D.C. had been examined by, medical professionals from some of the most prominent autism and general medical centers in the world, including The Children's Hospital in Maryland, the Discovery Center in New York, and Fairfax Innova Hospital in Virginia.

25.     Despite the overwhelming and largely undisputed clinical and expert evidence that residential placement was exactly what D.C. needed to receive a free appropriate public education ("FAPE"), FCPS dismissed and rejected all the parents' requests for a higher level of educational support, told them that D.C. was appropriately placed in his current public-school setting, and refused to approve a residential educational setting.

26.     Based on the advice of medical and educational professionals, the parents enrolled D.C. in Grafton in July 2014 at their own expense.

27.     On June 26, 2015, D.C.'s parents filed a complaint for a due process hearing challenging the school system's inexplicable placement of D.C. in a public-school setting.

28.     To the shock and dismay of D.C.'s parents, due process hearing officer Morgan Brooke-Devlin ruled that D.C. and his family were not entitled to any relief.  Although they did not know it at the time, this decision was only the beginning of a long and ongoing struggle between D.C. and his family and FCPS, marked by FCPS' continued resistance to provide

necessary educational services.  FCPS treated D.C. and his family poorly at each turn, and reneged on its commitment for a residential placement at the first possible opportunity.  These struggles mark an ongoing series of inexplicable denials of services and due process for D.C. and his family, which continue to this day.

29.     Plaintiff M.B. is a fifteen-year old, educationally disabled student who at all times relevant to this action resided in Fairfax County, Virginia.  M.B. has been diagnosed with multiple learning disabilities, including Attention Deficit Hyperactivity Disorder ("ADHD"), dyslexia, and dyscalculia.  On multiple assessments spanning Fifth to Eighth grade, M.B. scored well below his grade level in reading, mathematics, and various other areas of academic progress.  M.B. also has challenges with his behavior and social skills.  These behavioral issues have caused him to act out in academic settings.

30.     Plaintiffs James and Sheila Bingham are M.B.'s parents and guardians, with their primary residence in Fairfax County, Virginia within this judicial district and division.  They bring this action on M.B.'s behalf, behalf, in their own right, and on behalf of a class of similarly-situated individuals as alleged below.

31.     During the Summer of 2013, FCPS determined that M.B. was eligible for special education and related services.  At that time, a psychologist evaluated M.B. and concluded: "With intensive special education services under an IEP for his specific learning disabilities in the areas of reading, spelling, written language, fine motor, and speech, a specific remediation program for dyslexia, accommodations for ADHD, Combined Type, additional school supports to help him with organizational skills, and possibly medication, it is expected that [M.B.]'s learning disabilities and ADHD symptoms should be moderated and he should be better able to work up to his potential in school."  Sadly, M.B. would not receive these needed services, and his potential would not be

13

reached for several years.

32.     From 2018 through 2021, M.B. struggled through a series of improper FCPS-mandated public school placements.  During those years, M.B. showed no significant progress in reading, mathematics, and other measures of academic ability.  He was also increasingly isolated from his peers and experienced escalating emotional and behavioral challenges.  These struggles came to a head when, during the COVID-19 Pandemic, FCPS completely failed to implement his IEP and otherwise provide him with FAPE.

33.     In the Fall of 2021, after suffering through years of FCPS' failures to properly develop and implement IEPs for their son, M.B.'s parents placed M.B. at the Phillips School – a non-public day school.  Phillips School developed its own IEP for M.B. which included several services which FCPS had failed to provide, including 1:1 support for completing assignments and behavioral services, which included weekly counseling to address M.B.'s social skills and emotional management.

34.     Once enrolled at the Phillips School, M.B. finally showed significant improvement in both his academics and his behavior.  Nevertheless, FCPS continued to baselessly maintain that a public school setting, where M.B. had languished for years, was the proper placement for him.

35.     M.B.'s parents filed a due process appeal in January 2022, challenging FCPS' IEPs and placements for the 2019, 2020, and 2021 school years.  M.B.'s parents and advocates presented testimony and evidence from multiple experts regarding M.B.'s challenges and needs, and how FCPS had failed to meet them.  They also developed testimony regarding the inappropriateness of FCPS' proposed placement at the Burke School for the 2021 school year.

36.     Despite the evidence that M.B. had been deprived of FAPE, the hearing officer concluded that FCPS' IEPs and placements had been sufficient, and denied all relief to M.B. and

his parents.

37.     On August 15, 2022, M.B. and his parents brought an action in the United States District Court for the Eastern District of Virginia challenging the hearing officer's adverse May 17, 2022 decision. *See M.B. et al. v. Fairfax County School Board*, Case No. 22-cv-00930. That case remains pending.

38.     Organizational Plaintiff Hear Our Voices, Inc. ("HOV"), is a private, non-profit member organization that is incorporated in Delaware. HOV was established to protect and advocate for the rights of persons with disabilities and to safeguard the rights of individuals with developmental disabilities, like D.C. and M.B. HOV has members that are residents of Virginia and of Fairfax County. HOV's members include Trevor and Vivian Chaplick and Sheila and James Bingham, as well as other residents of Virginia and Fairfax County.

39.     Organizational Plaintiff HOV has a mission of ending systemic mistreatment of persons with disabilities, including in school. HOV brings this suit on behalf of its members and in furtherance of its efforts and expenditure of resources in promoting its principal mission of securing appropriate and equal educational services for students with disabilities, including efforts focused on each of the procedures required by the IDEA, from the initial identification of students with potential disabilities through the evaluation, IEP, mediation and the due process hearing and appeal process, including ensuring the right to a fair due process hearing before an impartial hearing officer as required by federal law. HOV works with parents, teachers, advocates, attorneys and other constituents to further these goals, including through assistance, advocacy and legislative efforts.

40.     The violations by VDOE and FCPS  of the United States Constitution and the IDEA ("Defendants' Wrongful Actions") have required HOV to divert its two principal resources, time

and money, away from several of its core efforts and toward efforts designed to address the harm caused by Defendants' Wrongful Actions.

41.     For example, one of HOV's core efforts is legislative analysis and review for potential expansion.  Having started to form a legislative drafting committee to address disability issues on a multi-state and national level, HOV had to put those efforts on hold to address the current situation in Virginia.  HOV's plans included drafting national and state-specific legislation to improve the rights of disabled students under the IDEA and related state legislation and regulations.

42.     HOV had also initiated plans to meet with key officials in-person to discuss some of the issues that need to be addressed in special education law, including potential legislation  to address these issues.  Another core effort HOV was beginning to explore  was expanding work with parents and other constituents to improve educational services available to parents related to the IDEA processes and to work with local organizations to provide enhanced resources and workshops to parents who are unsatisfied with a school's treatment of their disabled child.

43.     HOV's efforts also were to include seeking commitments from law schools to open (or re-open) disability rights clinics and working with volunteer lawyers' organizations to provide such services.  One of HOV's founders had also started to create a toolkit for parents in all states to use when dealing with inadequate treatment of disabled students and the failure of state and local educational agencies to meet their obligations under state and federal law.  For example, the toolkit includes a FOIA demand template and was to include other draft template documents .  It was also going to include a roster of special education experts to assist with issues arising in the implementation of IEPs.  However, like HOV's other efforts, this project has gone  unfinished because of the need to address more immediate issues in Virginia.  Because of the issues in

Virginia, HOV has been forced to put virtually all of its core efforts on hold in order to focus its resources on the more immediate and insidious issues in Virginia, rather than spending its time and money on its other projects.

44.     As a result of the concerns over VDOE and FCPS' ubiquitous failures, HOV has had to focus its efforts on the following activities, which would not be necessary, but for the Defendants Wrongful Actions:

a.      Talking to parents who have reached out (from Virginia), walking them through their options, offering them suggestions regarding various and potential next steps (a significant investment of time);

b.      Reaching out to regulators (e.g., the Department of Justice and the Office of Civil Rights of the U.S. Department of Education), and other organizations about the problems in Virginia specifically;

c.      Spending numerous hours investigating the special needs education problems in Virginia;

d.      Hiring counsel to prepare and continue to pursue over many months Virginia FOIA requests – costing significant time and money – to expose the Defendants' Wrongful Actions;

e.      Preparing for interviews with the press about the problems in Virginia and drafting op-eds on the problems with Virginia;

f.      Diverting resources away from national legislative efforts to efforts in Virginia.

45.     HOV also has representational standing to sue on behalf of its members for each claim it brings because (i) at least multiple identified members would otherwise have Article III

standing to sue in their own right, (ii) the interests at stake are germane to its purpose, and (iii) neither the claims asserted nor the relief requested requires participation of individual members in the lawsuit.

46.     HOV has several members who satisfy the first prong of the associational standing test, including D.C.'s parents, M.B.'s parents and multiple other parents who have suffered from the wrongful conduct described in this complaint.  Several of these individuals were members of HOV at the time that the First Amended Complaint was filed.  They include individuals whose children were denied or delayed the education and services required by the IDEA, at every stage of the IDEA and Virginia statutory process.  This includes: (1) individuals who requested evaluations that were denied and delayed, (2) individuals whose IEPs were not implemented correctly or otherwise followed, (3) individuals who were denied the right to a fair and impartial due process hearing as well as other procedural safeguards, (4) individuals who submitted complaints to VDOE that were either not investigated at all or inadequately investigated by a biased VDOE employee, (5) individuals who either were denied their children's educational records or were provided false and incomplete information, such as manipulated  educational records, false statements and testimony, padded grades, and misrepresentations about student capabilities, and (6) individuals who were refused access to information or from whom information was concealed, in spite of appropriate requests under the Virginia FOIA.

47.     In addition, the interests at stake in this case clearly implicate the purposes of HOV, which was established to "achiev[e] a better education and life for disabled and special needs children and their families."  Central to its mission is to "protect . . . the rights of children with special needs and disabilities, including under the federal civil rights laws and [the IDEA]" and to "end the systemic mistreatment in schools of disabled and special needs children."  Nothing could

18

be more germane to those purposes than a lawsuit challenging Defendants' mistreatment of special needs children and their families.

48.     And, neither the claims asserted nor the relief requested require the participation of HOV's members.  This lawsuit seeks declaratory and injunctive relief against the Defendants, which does not require the participation of HOV members to implement.

49.     Based on the foregoing and the facts described below, Plaintiff HOV has both direct organizational standing and representational standing, through their members who have been unjustifiably denied the substantive rights and procedural safeguards afforded by the IDEA.

50.     Defendant Fairfax County School Board (the "Board") is the governing body of FCPS, a school division of the Commonwealth of Virginia.  The Board directs, controls, and supervises the operation and administration of all schools, programs, and activities within FCPS and is organized under the laws of Virginia.  Va. Code Ann. § 22.1-71.  FCPS is the tenth largest school system in the country, and it receives federal funds under the IDEA, 20 U.S.C. §§ 1400 *et seq*.  FCPS serves over 187,000 students each year.  In the 2019–2020 school year, FCPS' approved budget for the school operating fund totaled $2.9 billion.  FCPS has a staff of over 24,000 employees.

51.     Defendant Dr. Michelle Reid is the FCPS Superintendent.  She was elected by the Board and appointed effective July 1, 2022.  Dr. Reid is responsible for working in conjunction with the Board and for overseeing the daily operations of FCPS, including overseeing its student IEP process, allocation of resources, training of employees, and methods of data collection.  Dr. Reid is the FCPS official responsible for ensuring that FCPS' policies, practices, and procedures comply with the IDEA and other federal laws.

52.     Defendant Virginia Department of Education ("VDOE") is an executive

department of the Commonwealth of Virginia established by and operating under the laws of the Commonwealth of Virginia.  *See* Va. Code §§ 2.2-208, 22.1-8, *et. seq*.  VDOE is subject to the IDEA and is responsible for ensuring Virginia's and its local school systems' compliance with the provisions of the IDEA.

53.     Defendant Jillian Balow, the Virginia Superintendent of Public Instruction, serves as the executive officer of VDOE and manages its internal and external operations.  In that capacity, Defendant Balow is responsible for overseeing the implementation of the IDEA in the Commonwealth of Virginia.  Dr. Balow is the VDOE official responsible for ensuring that VDOE's policies, practices, and procedures comply with the IDEA and other federal laws.

### III. Jurisdiction and Venue

54.     This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, as this action includes claims brought pursuant to 42 U.S.C. §1983 to challenge actions undertaken by Defendants under color of the laws of the Commonwealth of Virginia that deprive Plaintiffs of rights conferred by the Fourteenth Amendment to the Constitution of the United States, as well as claims brought pursuant to 20 U.S.C. §1405 for violations of the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 *et seq*.

55.     The declaratory relief sought in this Complaint is authorized by 28 U.S.C. §§ 2201 and 2202.

56.     This Court may exercise personal jurisdiction over each Defendant, as each is located and has offices within this judicial district.

57.     Venue is properly laid in this Court pursuant to 28 U.S.C. § 1391, in that each Defendant is located and has its principal office within this judicial district, and the events giving rise to the claims occurred within this judicial district and division.

## IV. Class Action Allegations

58.     Plaintiffs D.C., M.B., Trevor Chaplick, Vivian Chaplick, Sheila Bingham, James Bingham, and HOV bring this action on behalf of themselves and on behalf of two classes of similarly-situated individuals under Federal Rules of Civil Procedure 23(a) and 23(b)(2).

59.     The first proposed Class consists of "All students with disabilities aged 3 to 21 and their parents residing in the Commonwealth of Virginia who are eligible for special education and related services and have sought dispute resolution services[4] from VDOE under the IDEA between January 1, 2013 and the present." (The "VDOE Class").

60.     The second proposed Class consists of "All current students with disabilities aged 3 to 21 residing in Fairfax County who have requested or received an evaluation for special education and related services, under the IDEA and their parents."  (The "FCPS Class").

61.     Each Class at least includes hundreds of Class members, such that joinder of all Class members in the prosecution of this action is impracticable.  The identities and addresses of class members can be readily ascertained from the records maintained by Defendants.

62.     Named Plaintiffs' claims are typical of the claims of all VDOE Class members because they have sought special education services in the Commonwealth of Virginia, including procedural safeguards, and were subjected to the same unfair dispute resolution procedures.

63.     Named Plaintiffs' claims are likewise typical of the claims of all FCPS Class members because they are currently seeking to obtain from FCPS special education services, and have been subjected to systematic and pervasive FCPS violations of the IDEA, including failure by FCPS to conduct full and individual initial evaluations and reevaluations to determine if the

---

[4] The phrase "dispute resolution services" is defined to include special education mediation, due process proceedings, and special education complaints.

child is a child with a disability and the nature and extent of such disability pursuant to the requirements of the IDEA, and to develop and implement appropriate IEPs in compliance with the IDEA, as well as FCPS interference with the procedural safeguards afforded under the IDEA, including fair and impartial due process hearings.  Consequently, Named Plaintiffs have suffered the same statutory and constitutional violations as the FCPS Class.

64.    Named Plaintiffs will fairly and adequately represent the interests of each of the Classes because they have suffered and continue to suffer under the same biased system and they suffer the same or similar violations as other Class members, they have no conflicts with any Class member, and they have retained sophisticated and competent counsel experienced in prosecuting class actions and other complex litigation.

65.    There are numerous questions of law and fact common to the VDOE Class—including but not limited to the following:

   a.    Whether VDOE and its Superintendent of Public Instruction have displayed a firm purpose to circumvent the IDEA and existing regulations in order to frustrate the legal rights of Named Plaintiffs and the VDOE Class in violation of their rights under the Constitution of the United States,

   b.    Whether VDOE and its Superintendent of Public Instruction have failed to conduct comprehensive evaluations and reevaluations of any child suspected of having a disability and to ensure that all Virginia LEAs conduct comprehensive evaluations and reevaluations of any child suspected of having a disability,

   c.    Whether VDOE and its Superintendent of Public Instruction have failed to ensure Virginia LEAs authorize and pay for an appropriate independent

educational evaluation ("IEE") when requested by a parent, unless the LEA has promptly initiated an appropriate Due Process hearing,

d.     Whether VDOE and its Superintendent of Public Instruction have failed to require Virginia teachers, education administrators, and any other Virginia education employees to create and maintain accurate, complete, and timely records of a child's academic, emotional, and behavioral progress as required by the IDEA.

e.     Whether VDOE and its Superintendent of Public Instruction have failed to provide to childrens' parents the complete and unaltered records of their child's academic, emotional, and behavioral progress,

f.     Whether VDOE and its Superintendent of Public Instruction have failed to adequately monitor the compliance of local school districts with federal law and regulations under the IDEA,

g.     Whether VDOE and its Superintendent of Public Instruction are failing to adequately investigate complaints regarding the failure of local school districts to provide a free appropriate public education to all children with disabilities, and to otherwise comply with federal law and regulations that protect children with disabilities,

h.     Whether VDOE and its Superintendent of Public Instruction are failing to implement an impartial special education due process hearing system to resolve disputes between parents and local educational agencies as required by federal law and regulations,

i.     Whether VDOE and its Superintendent of Public Instruction are failing to

adequately implement and enforce procedural safeguards afforded to children with disabilities and their parents, including ensuring that every hearing officer is qualified and impartial,

66.     There are also numerous questions of law and fact common to the FCPS Class—including but not limited to the following:

a.    Whether FCPS and its Superintended of Public Instruction have displayed a firm purpose to circumvent existing federal law and regulations and consistently frustrate the legal rights of Named Plaintiffs and the FCPS Class in violation of their Constitutional rights,

b.    Whether FCPS and its Superintendent of Public Schools are failing to conduct comprehensive evaluations and reevaluations of any child suspected of having a disability, as required by 20 U.S.C. § 1414(a)-(c),

c.    Whether FCPS and its Superintendent of Public Schools are concealing information pertinent to the development of the IEP and reevaluation process,

d.    Whether FCPS and its Superintendent of Public Schools are using inflated grades and false indicia of progress in order to manipulate the IEP and reevaluation process,

e.    Whether FCPS and its Superintendent of Public Schools are failing to require teachers, administrators, and other FCPS employees to create and maintain accurate, complete, and timely records of a child's academic, emotional, and behavioral progress as required by the IDEA,

f.    Whether FCPS and its Superintendent of Public Schools are failing, upon

request, to immediately provide to childrens parents the complete and unaltered records of their child's academic, emotional, and behavioral progress,

g.     Whether FCPS and its Superintendent of Public Schools are failing to authorize and pay for appropriate independent educational evaluations ("IEE") when requested by a parent, when FCPS has not promptly initiated an appropriate Due Process hearing,

h.     Whether FCPS and its Superintendent of Public Schools, in an attempt to circumvent existing federal law and regulations, are systematically and consistently delaying implementation of the IEP and procedural safeguards,

i.     Whether FCPS and its Superintendent of Public Schools are systematically using the IDEA's procedural safeguards in a manner that unnecessarily and drastically increases the costs to parents, and

j.     Whether FCPS and its Superintendent of Public Schools are engaging in bullying and threats of retaliation to frustrate the legal rights afforded under the IDEA.

67.     The Defendants' actions apply generally to the Classes, so that final injunctive and declaratory relief are appropriate for each of the Classes.

## V. The Background and Objectives of the IDEA

68.     Congress enacted the IDEA to guarantee children with disabilities an education that meets their unique needs and prepares them for further education, employment, and independent living, and to make parents of children with disabilities full partners in how their children are educated and protected.

69.     Together with its precursors, the Education for All Handicapped Children Act and

the Americans with Disabilities Act, the IDEA represented an evolution in society's treatment of people with disabilities, away from seeing them as medical anomalies to be cured, pitied, or tolerated, and toward acceptance of individual differences as part of the human experience. At the core of the IDEA and other disability-rights statutes is respect for human diversity, eradication of discriminatory practices, and opportunity for inclusion and participation in public life.

70. The IDEA grants students a substantive right to a free appropriate public education ("FAPE") (defined at 20 U.S.C. § 1401(9)), achieved primarily through the development of an individualized education program, suited to their particular needs ("IEP") (defined at 20 U.S.C. § 1401(14)). Under the IDEA, school associations receiving funds are required to identify, evaluate, and supply special education services to children with disabilities in order to ensure a free appropriate public education. In addition to their substantive obligations, school associations are required to provide procedural safeguards such as impartial due process proceedings to ensure that access to FAPE is not lost.

71. Under the IDEA, a state or local level agency must "conduct a full and individual initial evaluation . . . before the initial provision of special education and related services to a child with a disability." 20 U.S.C. § 1414(a)(1). "[A] parent of a child . . . may initiate a request for an initial evaluation to determine if the child is a child with a disability." *Id.* at § 1414(a)(1)(B). "Such initial evaluation shall consist of procedures . . . (I) to determine whether a child is a child with a disability . . . (II) to determine the educational needs of such child." *Id.* at § 1414(a)(C)(i).

72. The IDEA requires that each IEP take account of the child's particular needs, measure the child's current levels of academic achievement, and commit to a list of measurable goals for the child, elaborating on the specific set of services the child will receive, and describing how and to what extent the child will participate in educational programs with nondisabled

children.

73.     The IDEA also grants procedural rights.   Serving not only to guarantee the substantive rights accorded by the Act, the IDEA's procedural rights, in and of themselves, form the substance of IDEA.  It requires school districts to provide parents both with notice and consent to participate in the creation of their child's IEP.  Both federal and Virginia law require the development and revision of IEPs to be a cooperative, deliberative process involving the child's parent(s), teachers and counselors.

74.     Parents with reason to believe that the IEP proposed by their school district does not meet the IDEA's standard of providing their child with an appropriate education may initiate a due process hearing.

75.     The due process hearing is a critical feature of the IDEA.  It is ordinarily the only process through which children with disabilities and their parents can challenge a school district's refusal to provide services or accommodations necessary to ensure that a disabled child receives a free appropriate public education guaranteed by the IDEA.  Without a fair and impartial hearing process, school districts would be free to ignore requests for services and accommodations, with little consequence.

76.     To ensure that the due process hearing is fair and impartial, it is critical that the hearing officer presiding over the due process hearing be knowledgeable, impartial, objective, and free of bias.  If hearing officers always, or nearly always, rule in favor of the school district and against the disabled child, that virtually eliminates the ability of disabled children and their parents to obtain the services and accommodations guaranteed under the IDEA when schools refuse to provide them.  Facing near-certain failure also deters parents from initiating legitimate challenges, resigning instead to the sad truth that whatever the school district says goes, notwithstanding

parental concerns.  This is a serious problem, as school district interests often are not aligned with those of disabled students.

77.     Although there is technically a right of appeal from an adverse hearing officer ruling, the significant cost of that process (on top of the cost of the due process hearing itself), and the substantial deference given to hearing officers makes the appellate process financially and practically impossible for nearly all disabled children and their parents.  Without a fair and impartial due process hearing, the rights guaranteed under the IDEA are left entirely to the whim of the local school district.[5]

78.     The IDEA requires that "[e]ach State that receives funds under this chapter shall . . . ensure that any State rules, regulations, and policies relating to this chapter conform to the purposes of this chapter."  20 U.S.C. § 1407 (a)(1).  This includes the IDEA's requirement that parents have the opportunity for a fair due process hearing before a knowledgeable and impartial hearing officer.

79.     The IDEA has a substantial, measurable impact on the Commonwealth of Virginia's capacity to provide FAPE to all children living within its borders.  For the 2022 to 2023 time period, Virginia received federal funding under Part B of the IDEA in the amount of approximately $289 million.  Of that, approximately $39 million was allocated to Fairfax County.  However, these funds come with strings attached.  Virginia and Fairfax County's continued ability to expend IDEA funds hinges on their compliance with numerous provisions of the IDEA and related federal regulations.  *See* 20 U.S.C. § 1411.  In Virginia, responsibility for ensuring such compliance rests largely in the hands of Defendant VDOE and LEAs like Defendant FCPS.

---

[5] As explained in detail below, USDOE has caught FCPS and VDOE repeatedly violating the provisions of the IDEA, to the substantial detriment of Fairfax County's and Virginia's disabled community.

80.     Disturbingly, and as described in the proceeding sections, Defendants have failed and continue to fail to comply with their obligations at each stage of the process required by the IDEA.

## VI. VDOE's Biased Hearing Officer System Deprives Parents and Special Needs Children of Their Right to a Fair and Impartial Due Process Hearing Under the IDEA

81.     Under the IDEA, a due process hearing is a fundamental safeguard for ensuring children receive FAPE.   The IDEA expressly guarantees the parents of eligible children "an opportunity for an impartial due process hearing" before a knowledgeable and impartial hearing officer.  *See* 20 U.S.C. § 1415(f).

82.     Contrary to this unambiguous obligation, VDOE's administration of its due process hearings, according to LEAs' own employees, all but ensures that special needs families who assert a proper complaint will lose.  Preparing their challenge to FCPS' decisions concerning their child, D.C.'s parents were warned by an FCPS social worker not to even bother with the due process hearing procedures because they "would lose."  D.C.'s parents pressed ahead with a "due process" hearing anyway, believing the social worker's warning to be exaggerated.  However, the FCPS social worker knew something D.C.'s parents could not have known until *after* losing their hearing and *after* months of parsing VDOE data obtained via Virginia Freedom of Information Act ("FOIA") requests:  Parents and disabled students in Virginia almost ***always*** lose their due process hearings.

A.     **Evidence Revealed Through FOIA Requests  Ultimately Exposed the Travesty of VDOE's Rigged Due Process Hearing System**

83.     Following the behavior and ruling by hearing officer Morgan Brooke-Devlin as discussed below, the parents of D.C. commenced their investigation of the Virginia hearing officer system on July 16, 2021, by submitting through counsel a Virginia FOIA request to James Lane, the Superintendent of VDOE.  Their FOIA request sought relevant records between January 1,

2010[6] up to the date of the FOIA request.  The parents expended significant legal and out-of-pocket costs, and, after meeting consistent resistance from VDOE, were forced to send multiple FOIA requests and negotiate through counsel for over a year, to obtain relevant records from VDOE.

84.     The documents obtained in the parents' FOIA requests included documents previously not made public and include, but are not limited to, the official Decisions Log for hearing officers as maintained by the Executive Secretary for the Virginia Supreme Court.[7]  This log is a manual ledger that, to the parents' knowledge, has never been digitized, analyzed, or otherwise disclosed to the public until the parents of D.C. undertook this task, at significant personal expense and effort.[8]  The results are now known and summarized in this Complaint as set forth herein in Exhibit A, Exhibit B, and Exhibit C.

85.     In the eleven-year period between 2010 and 2021, 847 due process claims were filed in the Commonwealth of Virginia to seek an adjudication of rights under the IDEA.  Of those 847 cases, only 13 resulted in a ruling granting the relief requested by a disabled student or the

---

[6] The parents subsequently requested on June 29, 2022 additional documents from VDOE going back to January 1, 2000.

[7] While VDOE does publish on its website redacted hearing officer decisions (going back to 2003), this information is not practically useful for parents wanting to know aggregate outcomes or statistics, which VDOE does not publish.  *See* https://www.doe.virginia.gov/special_ed/resolving_disputes/due_process/hearing_officer_decisions/2020-21/index.shtml.  D.C.'s parents were only able to obtain the accumulated decision history maintained on the Hearing Officer Decision Log from their FOIA requests.

[8] D.C.'s parents undertook a significant amount of personal time to manually enter into a spreadsheet the results from all hearing officer decisions from 2003 through 2021, and to then categorize and analyze such results by judicial region.  The results from 2003 through 2021 are summarized herein in Exhibit A (2010 through 2021), Exhibit B (2003 through 2009), and Exhibit C (cumulative hearing officer decisions from 2003 through 2021.  As discussed below, the parents ultimately entered 1,391 hearing officer cases over a twenty-year period and analyzed the results. *See* Exhibit A, Exhibit B and Exhibit C.

student's parent.  That is less than 1.5% in the entire state of Virginia.  The numbers in Northern

Virginia are even more stark and disappointing.  In Northern Virginia,[9] only 3 rulings out of 395

cases filed in this eleven-year period ultimately resulted in a ruling in favor of the disabled student

or the student's parents.  This represents less than one percent (specifically 0.76%) of the total due

process hearing cases filed by such families.  *See* Exhibit A.

86.      Moreover, out of the twenty-two (22) hearing officers eligible to serve during the

last decade, only four (4) have ruled in favor of a disabled student or family more than once.  See

Exhibit A.

87.       Fourteen (14) hearing officers, representing sixty-four percent (64%) of all eligible

hearing officers, have never ruled fully in favor of a disabled student or family in a due process

hearing during this entire 20-year period.  *See* Exhibit C.

88.      In Northern Virginia, the statistics are even more shocking.  Eighty-three percent

(83%) of the hearing officers have never ruled in favor of a disabled student or family in a due

process hearing between 2010 and 2021 in almost 400 cases.  *See* Exhibit A.

89.      The lack of rulings in favor of  special needs children is a problem that has existed

for at least twenty (20) years, which is as far back as VDOE has kept individual hearing officer

decisions in the Decisions Log made available to D.C.'s parents.  Specifically, since 2003, hearing

officers in Virginia have only ruled 25 times fully in favor of disabled children out of 1,391 cases

---

[9] The Office of the Executive Secretary of the Virginia Supreme Court ("OES") organizes the Commonwealth into six (6) geographic regions.  Northern Virginia is identified as Region II and encompasses six (6) counties: Fairfax, Arlington, Loudon, Prince William, Fauquier, and Rappahannock Counties.  Hearing officers were classified as serving in either Northern Virginia or outside of Northern Virginia in Exhibits A through C based on their business address set forth in the Special Education Hearing Officer listing published in June 2021 by VDOE that was delivered to the parents in response to their FOIA requests.

representing only 1.8% of the total aggregate cases overseen by these hearing officers.  Over this same twenty-year period, hearing officers in Northern Virginia have only ruled fully in favor of disabled children in 7 cases out of 578 cases.  *See* Exhibit C.

90.     The same core group of twenty-two (22) hearing officers responsible for these decisions has been virtually unchanged over the last two decades which represents two generations of disabled children seeking a better education under the IDEA.  *See* Exhibit A, Exhibit B, and Exhibit C.

91.     The table attached as Exhibit A to this Complaint and excerpted below in Figure 1 shows the percentages of each category of resolution for the entire Commonwealth of Virginia and for Northern Virginia (Region II) during the last decade:

**Hearing Officer Ruling Results for the Period from 2010 through July 2021**

| Key Statistics | Northern Virginia | | Virginia | |
|---|---|---|---|---|
| | Officers | Pct | Officers | Pct |
| Number of Hearing Officers with Zero Rulings for Parents | 10 | 83.33% | 14 | 63.64% |
| Outcomes of Cases Initiated | Cases | Pct | Cases | Pct |
| Withdrawn | 191 | 48.35% | 433 | 51.12% |
| Settled | 68 | 17.22% | 115 | 13.58% |
| Dismissed or in Ruling in Favor of Schools | 127 | 32.15% | 266 | 31.40% |
| Partial Decision for Parents and School District | 6 | 1.52% | 20 | 2.36% |
| Ruled in Favor of Parents | 3 | 0.76% | 13 | 1.53% |
| Total Cases | 395 | 100% | 847 | 100% |

92.     As this table shows, the parental success rate, by any measure, is astoundingly

low.[10]   As described in more detail below,[11] prominent studies have shown that the national average parental success rate is approximately 30% in due process cases in states throughout the country.

**B.      National Statistics Confirm VDOE Hearing Officers Rule Against Parents at Disproportionately Greater Rates Than Other Jurisdictions**

93.      The U.S. Department of Education does not require states to publish aggregate hearing officer statistics.  And states, like Virginia, do not provide easy access to such aggregate statistics.  Consequently, VDOE hearing officers have operated in a zone of low transparency with little public awareness of their aggregate ruling record.

94.      Virginia's hearing officer ruling record is atrocious relative to national and state-by-state statistics.  Such statistical results are the natural and intended consequence of Virginia's practices of consistently certifying as hearing officers only those with a proven track record of favoring school districts over parents.

95.      To identify comparable ruling statistics for benchmarks against Virginia, D.C.'s parents spent a significant amount of time researching studies of hearing officer decisions in other states.

---

[10] Though a significant percentage of the filed cases were withdrawn by parents, the reason for each of these withdrawn cases is unknown.  Considering the significant time and cost of pursuing a due process hearing, against the minimal chance of success,  many parents just give up.  Parental deterrence seems to be the ultimate victory for Virginia's flawed and biased system.

[11]  See the section below entitled "VDOE Hearing Officers Rule Against Parents at Disproportionately Greater Rates Than Other Jurisdictions" for an extensive compilation of studies of the parental success rate in due process hearings in other states in the country.  As discussed below, the studies by all measures demonstrate that Virginia's hearing officer system is an extreme outlier in the percentage of rulings against parents.

96.     A few national studies have analyzed hearing officer statistics.[12]  One of the recent, national studies of hearing officer decision statistics across multiple states was conducted in the Gershwin-Mueller and Carranza study, which analyzed 575 due process cases under the IDEA that occurred in 41 states from 2005 to 2006.  In such hearings, the school districts prevailed 58.6% of the time, and the parents prevailed 30.4% of the time, with 10.4% of the cases involving a split decision in which the school district or the parents obtained partial relief.[13]

97.     An earlier, national study conducted during the time frame of 1975 to 1995 found a roughly similar parental win percentage of 28% before hearing officers in IDEA cases.[14]

98.     For purposes of comparing Virginia to individual states, both the General Accounting Office and various researchers have confirmed that at least 80%, if not more, of all due process hearings occur in the following states: New York, California, Texas, New Jersey, Pennsylvania, Maryland, the District of Columbia, Massachusetts, and Illinois.[15]  All states in the

---

[12] *See Perry A. Zirkel & Cathy A Skidmore, National Trends in the Frequency and Outcomes of Hearing and Review Officer Decisions under the IDEA: An Empirical Analysis*, 29 Ohio State J. on Disp. Resol. 529–31 (2014).

[13] Tracey Gershwin Mueller & Francisco Carranza, *An Examination of Special Education Due Process Hearings*, 22 J. Disability Policy Studies, 131, 137 (2011).  The study analyzed petitioner, disability, dispute and outcome including hearings of specific learning disabilities (26%), autism (20%), and health impairments (15%).  In such study, parents initiated 85% of the hearings under the IDEA.

[14] Perry A. Zirkel & James Newcomer, *An Analysis of Judicial Outcomes of Special Education Cases*, 65 Exceptional Child. 469, 473 n. 23, 475 (1999); *see also* Perry A. Zirkel & Cathy A. Skidmore, *National Trends in the Frequency and Outcomes of Hearing and Review Officer Decisions under the IDEA: An Empirical Analysis*, 29 Ohio State J. on Disp. Resol. 525, 532 n.30 (2014) (discussing such national study of hearing officer statistics).

[15] Tracey Gershwin-Mueller & Francisco Carranza, *An Examination of Special Education Due Process Hearings*, 22 J. Disability Policy Studies, 131, 132 (2011).

country, other than six, place the burden of proof on the party requesting the due process hearing,[16]

and the vast majority of due process hearings are requested by parents.[17]

99.     California has the largest population of special-needs students in any state in the

country.[18]   A study of due process cases in California found that parents prevailed in 34.6% of

these cases.[19]   The same study found similar parental win statistics by parents in Ohio, where

parents prevailed in 32.7% of due process hearing cases.[20]

---

[16] In 2005, the Supreme Court ruled that the party requesting a due process hearing bears the burden of proof under the IDEA unless a state enacts legislation to the contrary.  *See Schaffer v. Weast*, 546 U.S. 49, 61–62 (2005); s*ee also* Bailey Sanders & Jane Wettach, *Insights Into Due Process Reform: A Nationwide Survey of Special Education Attorneys* (October 16, 2021), Conn. Pub. Interest Law J., Vol. 20, 2021 at 245, *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3944061 ("The majority of states have declined (despite pressure from parents and advocates) to pass such legislation.  Because the vast majority of due process cases are initiated by parents, they typically bear the burden in the states that have not specifically shifted it to school districts.").  Only the following six states place the burden of proof on the school district: Connecticut, Delaware, Florida, New Jersey, Nevada and New York.  *See* Sanders & Wettach, supra at 245.

[17] *See also* Bailey Sanders & Jane Wettach, *Insights into Due Process Reform: A Nationwide Survey of Special Education Attorneys* (October 16, 2021), Conn. Public Interest L. J., Vol. 20, 2021 at 245, *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3944061.

[18] Andrew A. Feinstein, Michele Kule-Korgood & Joseph B. Tulman, *Are There Too Many Due Process Cases? An Examination of Jurisdictions with Relatively High Rates of Special Education Hearings*, 18 U.D.C.L. Rev. 249, 255 (2015).  For example, during the 2011–12 school year, California had 688,346 special education students followed by New York State which had 450,794 special education students.  *See id.* at n.42.  While the New York City Department of Education is the largest school district in the country, Los Angeles is the second largest, with approximately 640,000 students in over 900 schools. *See id.* at 266 n.44.

[19] Ruth Colker, *Disabled Education: A Critical Analysis of the Individuals with Disabilities Education Act* 187–88 (N.Y.U. Press 2013).  Of the 101 decisions subject to the study between May 2, 2010 and June 20, 2011, the most frequent disabilities were: autism (30%), emotional disturbance (19%), speech and language impairments (17%), Other Health Impairment (OHI) (15%), learning disabilities (13%), and mental retardation/cognitive impairment (9%).  *See id.* at 188.

[20] *Id.* at 148–49.  Professor Colker noted that Ohio has a two-level administrative process for due process complaints.  The first stage is before an independent hearing officer and the second stage

100.    In Pennsylvania, a study of hearing officer decisions available through the Pennsylvania Office for Dispute Resolutions (ODR) showed that parents prevailed 58.75% of the time in due process hearings when they were represented by counsel.[21]  Similarly, in a study of 343 IDEA cases in Illinois, parents who were represented by counsel prevailed in 50.4% of such due process cases.[22]

101.    Researchers examined 139 special education due process hearings that occurred between 2011 and 2015 in Texas.  Districts prevailed in 72% of such due process cases, and parents prevailed in 28.06% of such cases.  In a study of 258 due process cases in Massachusetts held over eight years from 2005 through 2013, school districts prevailed on all issues 62.5% of the time, parents prevailed 27.2% of the time, and a mixed decision was issued in 10.3% of the cases.[23]

102.    Two studies of Iowa hearing officer rulings found a parental win rate similar to the

---

is before a state-level review officer.  Only after exhausting these two stages can a party appeal a decision to a state or federal court.  In her study, parents won 42.8% of the sufficiency decisions and such cases then proceeded to a review by the independent hearing officer.  The above parental win percentage of 32.7% involved fifty-five cases during 2002 to 2006 before first-level hearing officers.

[21] Kevin Hoagland-Hanson, *Getting Their Due (Process): Parents and Lawyers in Special Education Due Process Hearings in Pennsylvania*, 163 U. Pa. L. Rev. 1805, 1802 (2015).  The author of this publication examined 526 hearing officer decisions from the Pennsylvania ODR issued between February 2008 and September 2013.  In such cases, counsel represented parents in roughly three-quarters of all hearings and experienced a 58.75% success rate of rulings in their favor.  Pro se parents involved in the remaining quarter of such cases had a much lower rate of success prevailing only 16.28% of the time.  The combined rate of parental success in due process cases during such period was 48.24% taking into account the lower rate of success of pro se parents.

[22] *Id*. at 1819.  Like Pennsylvania, parents who proceeded without counsel only succeeded in 16.8% of such cases, which brought the composite parental success rate in due process hearings in Illinois to 38.3%.

[23] Blackwell, W.H. & Blackwell, V.V., *A Longitudinal Study of Special Education Due Process Hearings in Massachusetts: Issues, Representation, and Student Characteristics* (2015), available at https://journals.sagepub.com/doi/full/10.1177/2158244015577669.

national average of approximately 30%.  The first study analyzed 50 hearing officer decisions in Iowa from July 1989 to June 2001.  The parental rate win was 34% in that study. [24]   The second study examined hearing officer decisions in Iowa from 1978 to 2005.  The parental win rate was 32% in that study.[25]

103.    One of the lowest percentages identified other than in Virginia was in Maryland. Reporters from the Baltimore Sun investigated parental win percentages in due process hearings conducted under the IDEA from 2014 through 2018.  In an article titled "Why Would We Even Try," excerpted below as Figure 3, the Baltimore Sun reported that parents prevailed in approximately 15% of the researched cases, based on data from the Maryland State Department of Education and Kennedy Krieger Institute Project HEAL[26]:

---

[24] Kristen Rickey, *Special Education Due Process Hearings: Students Characteristics, Issues, and Decisions*, 14 J. Disability Pol'y Stud. 46, 46 (2003); *see also* Perry A. Zirkel & Cathy A. Skidmore, *National Trends in the Frequency and Outcomes of Hearing and Review Officer Decisions under the IDEA: An Empirical Analysis*, 29 Ohio St J. on Disp. Resol. 525, 535–36 (discussing the Rickey study).

[25] Perry A. Zirkel, Zorka Karanxha, & Anastasia D'Angelo, *Creeping Judicialization in Special Education Hearings?: An Exploratory Study,* 27 J. Nat'l Ass'n Admin. L. 27, 37 (2007).  *See also* Perry A. Zirkel & Cathy A. Skidmore*, National Trends in the Frequency and Outcomes of Hearing and Review Officer Decisions under the IDEA: An Empirical Analysis*, 29 Ohio St J. on Disp. Resol. 525, at 535–36 (discussing such study).

[26] Talia Richman, *Why Would We Even Try?  Parents of Disabled Students Almost Never Win in Fights Against Maryland Districts*, Baltimore Sun (May 2, 2019), *available at* https://www.baltimoresun.com/news/investigations/bs-md-due-process-hearings-20190502-story.html.

<u>Sun Investigates</u>

## 'Why would we even try?' Parents of disabled students almost never win in fights against Maryland districts

By Talia Richman
Baltimore Sun
.
May 02, 2019 at 11:40 am

It's rare for the parents of students with disabilities to prevail in legal battles against Maryland school districts. <u>In the past five years, they've lost more than 85 percent of the time</u>, state education department documents show, even after investing tens of thousands of dollars and countless hours in pursuit of a better education for their children.

Advocates, families and attorneys say the trend is alarming and discourages people from fighting for the rights kids are guaranteed under federal law.

104.     As troubling as the Maryland data is, its parental success rate is substantially higher than Virginia's during the same period.  Virginia's parental success rate is a glaring outlier when compared to other states.  It is the product of a system in which—by design—almost two-thirds of VDOE hearing officers never ruled in favor of a special needs child in a due process hearing over a nearly 20-year period.  The Virginia due process hearing outcomes are the result of a deliberate, long-standing effort to reward and institutionalize a system of crony hearing officers, while blocking out new hearing officers who are potentially neutral and unbiased.

**C.     The Children Behind the Statistics: Named Plaintiffs D.C. and M.B. Experienced First-Hand VDOE's Biased Due Process Hearing System**

105.     VDOE goes to great lengths to make sure that due process hearings in Virginia are a fait accompli.  Both D.C. and M.B., and their parents, have suffered at the hands of VDOE's inevitable injustice.

D.C.'s Due Process Hearing

106.     During D.C.'s 2015 due process hearing before hearing officer Morgan Brooke-Devlin, D.C.'s parents presented extensive evidence including numerous reputable medical, psychological, and educational experts who uniformly testified that D.C. would not make meaningful educational progress and would be a physical risk to himself and others, unless he

were in a residential placement with integrated educational services, like Grafton.

107.    Officials from FCPS conceded in an open, pre-trial hearing that D.C.'s family had presented the largest volume and highest quality of proof demonstrating the severity of D.C.'s disabilities and support for a residential placement—including in the form of institutional and medical expert witness affidavits—that had ever been presented in the history of Fairfax County. Mr. Chaplick testified before Ms. Brooke-Devlin in D.C.'s 2015 due process hearing that FCPS officials acknowledged the extensiveness and quality of evidence supporting D.C.'s disabilities and case for a residential placement.  Years later, this was corroborated by Grafton officials in a 2020 IEP meeting, who conceded in front of FCPS that D.C. "is one of, if not the, hardest case of autism and adverse behaviors that Grafton has treated in the school's history."  D.C.'s disabilities and behaviors are profound and extreme and have been documented by some of the most respected clinicians in the disability area.  And yet FCPS still fought his parents with litigation and refused to consider a residential placement in D.C.'s original IEP.  FCPS also lowballed D.C.'s parents in pretrial negotiations with a settlement offer that would only pay for a fraction of D.C.'s educational costs and none of his residential costs.

108.    As discussed below, the "unusually high number" of parental complaints to the U.S. Department of Education is evidence of VDOE's and LEAs' (like FCPS) overly aggressive posture towards parents.

109.    After the due process hearing, D.C.'s parents were shocked when the presiding hearing officer, Morgan Brooke-Devlin, issued a decision on September 9, 2015, finding in favor of the school system and denying the parents' requested relief for residential placement.

110.    Bill Reichhardt, counsel for D.C., and one of the most experienced special needs litigators in the Commonwealth of Virginia at the time, was so outraged by the hearing officer's

bias and irrational decision that he wrote a multiple-page letter dated October 6, 2015 to Sheila
Gray who oversaw the Office of Dispute Resolution and Administrative Services of VDOE.   A
copy of the Reichardt letter is attached as Exhibit F.

111.    In his letter, Reichhardt stated that "during my 20 years of law practice in the area
of special education I have never experienced such a biased and legally misinformed opinion from
a hearing officer as was apparent in this case."  He noted specifically the hearing officer's lack of
knowledge of the law and her willingness to misconstrue or ignore evidence.  The practical effect
of her ruling was to invalidate key provisions of federal  law regarding D.C.'s rights under the
IDEA.

112.    In his letter, Reichhardt requested that Ms. Brooke-Devlin "not be appointed in any
further Due Process actions."

113.    Neither Mr. Reichhardt nor the Chaplick family ever received an acknowledgement
or reply to Reichhardt's letter from VDOE or confirmation that VDOE investigated these concerns
and took appropriate action against Ms. Brooke-Devlin.  To Plaintiffs' knowledge VDOE took no
action in response to this letter.

114.    In the aftermath of the decision, the Chaplicks reluctantly entered into a settlement
agreement with FCPS, in which the school system supported the day portion only of D.C.'s
educational placement at Grafton.[27]  The Chaplicks did not know, at the time they entered into this
settlement agreement, that Brooke-Devlin—like over 80% of the hearing officers in Northern

---

[27] On December 8, 2015, and a result of the deficient system in Fairfax County and the state of
Virginia, the Chaplicks entered into a Settlement Agreement with FCPS, covering the time period
through December 18, 2016.  As a result, the Chaplicks' and D.C.'s claims against FCPS, relating
to D.C., do not include the time period prior to December 19, 2016.

Virginia—had never ruled in favor of a special needs family.  For years thereafter, D.C.'s residential costs at Grafton were paid for through a combination of insurance and his parents' own personal funds.

115.   During the COVID-19 pandemic, Grafton began to press D.C.'s parents to transfer D.C. to an adult group home not operated by Grafton.  On September 1, 2020, D.C.'s parents, through counsel, again requested that FCPS support D.C.'s program and residential placement at Grafton, stressing that his needs had long qualified him for a residential placement.

116.   FCPS convened IEP meetings with the Chaplicks and staff members from Grafton to discuss the parents' request and to update D.C.'s IEP.  The meetings were held virtually and were chaired by Adam Cahuantzi, at the time the Acting Coordinator for Due Process and Eligibility for all Fairfax County Schools.

117.   After only an hour and a half of discussion of placement, Mr. Cahuantzi announced that FCPS recommended the continuation of D.C.'s day placement at Grafton, and peremptorily refused his parents' request for a residential placement.

118.   The school system justified its rushed decision by pointing to the alleged progress D.C. had shown through the day placement at Grafton.  FCPS refused to acknowledge that D.C. had been living as a full-time resident at Grafton, and that the financial support of family and insurers, denied years earlier by FCPS, had substantially contributed to the progress he was achieving at Grafton.

119.   D.C.'s parents challenged the rejection by the IEP team and pursued additional IEP meetings with FCPS.

120.   D.C.'s parents requested that Mr. Cahuantzi recuse himself and that a new IEP team chairperson be appointed to replace Mr. Cahuantzi.  The parents explained that Mr. Cahuantzi had

been delaying and restricting IEP discussions and decisions, had not treated them as equal IEP team participants, and in general did not have D.C.'s best interests at heart.  In response to the parents' requests, Mr. Cahuantzi indicated that he would take their request for recusal under consideration "as the person authorized by Fairfax County to be in charge of all residential placements."

121.    However, in the two months following the meeting there was no response to the parents' recusal request.

122.    Given this second, successive rejection of their requests, D.C.'s parents commenced another due process hearing against FCPS on February 12, 2021.  They again alleged that FCPS had denied D.C. the FAPE to which he is entitled under the IDEA, by failing to propose an appropriate residential program and placement for the 2020–21 school year.  Citing the recent holding of the Supreme Court of the United States in *Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 137 S.Ct. 988 (2017), they emphasized that FCPS had failed to provide a cogent and responsive explanation for its refusal to propose a residential program.

123.    After serving FCPS with a formal request for a due process hearing, in February 2021, D.C.'s parents and their counsel were advised that the very same hearing officer who had ignored the law and ruled against them in their 2015 due process hearing, Morgan Brooke-Devlin, had been appointed to serve as the hearing officer overseeing D.C.'s new due process hearing.

124.    The parents immediately expressed concern as to this hearing officer's ability to be fair, impartial, and objective, in light of the issues experienced and the complaints filed against Ms. Brooke-Devlin in 2015.  Counsel for D.C.'s family made an oral motion for Ms. Brooke-Devlin to recuse herself based on her prior involvement with D.C. and his family.  Ms. Brooke-Devlin summarily denied the request.

125.     After Ms. Brooke-Devlin denied the recusal motion, D.C.'s parents directed their counsel, Michael Eig and Paula Rosenstock, to investigate the ruling record of Ms. Brooke-Devlin as a hearing officer based on publicly available information.

126.     The investigation revealed that Ms. Brooke-Devlin has been a hearing officer in Virginia since 1993.  Over this twenty-eight-year period, counsel were unable to identify a single due process case in which Ms. Brooke-Devlin had ruled in favor of the family of a disabled or special needs student.

127.     Counsel for D.C. promptly prepared and submitted to Ms. Brooke-Devlin a petition to disqualify her under 28 U.S.C. § 455 and Va. Code § 2.2-4024.1, also citing the hearing officer Deskbook published by the OES.  Counsel argued based on this authority that Ms. Brooke-Devlin was unable to serve as an impartial hearing officer because of her prior knowledge of, and objectionable conduct towards, the petitioners.

128.     In the motion, counsel further argued that a hearing officer should never accept a case that could create a conflict of interest or create the appearance of a conflict of interest.  Counsel referenced both the conflict arising from the previous 2015 due process hearing and its aftermath, including the Reichhardt letter, and the fact that she had apparently never ruled in favor of a disabled student.

129.     In response to the motion, counsel for FCPS failed to refute the claims regarding Ms. Brooke-Devlin's lack of rulings in favor of disabled students and failed to produce a single case in which Ms. Brooke-Devlin ruled for a student or parents.  Nor did Ms. Brooke-Devlin deny during the hearing that she had never ruled in favor of a disabled or special needs child.

130.     Counsel for D.C. requested and paid for the prehearing call, in which the motion for disqualification was argued and discussed, to be recorded and transcribed.  The hearing

transcript reflects Ms. Brooke-Devlin's open hostility toward counsel for D.C., including interrupting and repeatedly cutting off such counsel when he tried to speak.

131.    Ms. Brooke-Devlin issued a peremptory ruling against D.C.'s motion to disqualify. She provided no rationale for her decision other than to assert that the parents "failed to meet their burden of proof." In addition, she issued an order that the parties must move forward immediately with their case before her as hearing officer.

***M.B.'s Due Process Hearing***

132.    M.B was likewise forced to take part in a due process hearing which could only ever have resulted in one outcome – denial of the special education services he so badly needs.

133.    Over the course of seven days between March 9 and March 25, 2022, M.B.'s parents and advocates presented testimony regarding M.B.'s challenges and needs, and how FCPS had failed to meet them.

134.    Multiple experts in the fields of special education and M.B.'s particular disorders testified to M.B.'s lack of progress while placed in public school by FCPS. Indeed, in some respects, M.B.'s assessments showed that he had regressed under FCPS' placement from Fifth through Seventh Grade.

135.    An expert in school administration also opined that FCPS' recommendation that M.B. be placed at the Burke School was inappropriate, and that the Phillips School was the least restrictive environment appropriate for M.B,'s educational needs.

136.    FCPS witnesses and documents also demonstrated that not all of the goals set out in M.B.'s IEP were met during school closures caused by the COVID-19 Pandemic. Among other things, teachers stopped implementing reading services for M.B. and ceased collecting data with regard to his academic and behavioral progress.

137.    M.B.'s counsel also elicited testimony from FCPS teachers and administrators regarding the inappropriateness of his placement at the Burke School.  Among other things, they acknowledged that no representative from the Burke School had been present at M.B.'s November 2021 IEP meeting to speak to the differences between the services offered at the Burke School and the Phillips School.  FCPS administrators also acknowledged that their goal was to place M.B. at a public school, rather than accept the private placement at Phillips.

138.    Despite the evidence that M.B. was being deprived of FAPE, the hearing officer concluded that FCPS' IEPs and placements had been sufficient, placement at the Phillips School was inappropriate, and M.B, and his family were not entitled to any relief,

139.    In a May 17, 2022 decision, M.B.'s hearing officer exhibited bias against M.B. and made numerous errors which skewed the outcome in favor of FCPS, including:

a.    Discounting parents' evidence that M.B.'s grades and progress had been inaccurately tracked and inflated by FCPS;

b.    Discounting standardized testing scores which, the hearing officer acknowledged, "indicat[ed] the child's reading and math either stalled or regressed from the 5th grade to the 7th grade;" and

c.    Erroneously concluding that FCPS complied with the IDEA during the COVID-19 Pandemic  on the grounds that "[d]ue to the TLP's voluntary nature, there was no denial of FAPE because the LEA did not implement the child's IEP."

140.    In essence, VDOE's failure to provide a fair and impartial due process hearing was a foregone conclusion, and there was nothing M.B.'s parents could do to remedy his denial of FAPE.  Consequently, they were forced to pay, and continue to pay, for the special education

services M.B. needs.  Through VDOE has failed to provide FAPE, M.B. receives an appropriate

education – but not the free and public one the IDEA requires Defendants to provide.

**D.      VDOE is Responsible for the Biased Hearing Officer System It Created and Condones**

141.    For the IDEA to function as intended, due process hearing officers must be

qualified and unbiased.   Under federal law, VDOE is responsible for the supervision and

monitoring of due process hearing officers.  *See* 20 U.S.C. §§ 1412(a)(11)(A) and 1416(a); *See also*

20 U.S.C. § 1232d(b)(3)(A); *See also* 34 C.F.R. § 300.149(a).  This includes responsibility for the

evaluation, continued eligibility, and disqualification of special education hearing officers.  *See*

8VAC 20-81-210.D.3.c.   In considering whether a special education hearing officer will be

certified or recertified, VDOE must consider whether due process hearing officers engage in:

(1) Untimely decision-making, or failing to render decision within regulatory time frames;
(2) Unprofessional demeanor;
(3) Inability to conduct an orderly hearing;
(4) Inability to conduct a hearing in conformity with the federal and state laws and regulations regarding special education;
(5) Improper ex parte contacts;
(6) Violations of due process requirements;
(7) Mental or physical incapacity;
(8) Unjustified refusal to accept assignments;
(9) Failure to complete training requirements as outlined by the Virginia Department of Education;
(10) Professional disciplinary action; or
(11) Issuing a decision that contains:
    (a) Inaccurate appeal rights of the parents; or
    (b) No controlling case or statutory authority to support the findings.[28]

**1.      <u>VDOE Hearing Officers Fail to Follow the Law</u>**

142.    In contravention of its oversight duties under federal law, VDOE enables and

empowers hearing officers who do not comply with the IDEA.  No matter how many violations

---

[28] *See id.*

they commit, hearing officers who consistently rule in favor of schools are retained by VDOE. When parents, lawyers and advocates bring serious hearing officer violations to light, VDOE ignores or disregards them, fails to adequately investigate them, disclaims any direct authority over the hearing officers, and denies any need to censor or remove the culprit. Besides disregarding substantive disability rights and school law, hearing officers refuse to comply with IDEA-imposed decision deadlines, openly rely on false testimony from Virginia LEAs to rule against parents, and routinely disregard parents' expert witnesses.

### *Chronic Delay in Submitting Decisions*

143.   One of the most common ways hearing officers ignore the requirements of the IDEA, other than disregarding special education law, is to blatantly violate decision deadlines. A hearing officer is required to render a decision within 45-calendar days of the expiration of the resolution period. *See* 34 C.F.R. § 300.515(a). Any extension to the 45-calendar day deadline can only be granted if requested by a party. *See* 34 C.F.R. § 300.515(c). And even then, such an extension is only authorized if it serves the best interest of the child. VDOE hearing officers have lost sight of the fact that, to a child, time is critical. For years hearing officers have failed to resolve proceedings timely, and VDOE does nothing to rectify the problem. According to one former hearing officer, unilateral motions to extend hearing deadlines were common among hearing officers; VDOE never reprimanded hearing officers for such delays.

144.   In response to numerous complaints, OSEP conducted an investigation into the VDOE in September 2020, and concluded that the state was not exercising its general supervisory and monitoring responsibilities in accordance with 20 U.S.C. §§ 1412(a)(11)(A) and 1416(a) and 20 U.S.C. § 1232d(b)(3)(A) and 34 C.F.R. §§ 300.149(a) and 300.149(b) and 300.600(a) and (d)(2). Specifically, OSEP concluded that VDOE did not ensure and document that LEAs track

the implementation of the timelines for the resolution process for due process complaints filed by parents.

145.    As a result of the investigation, VDOE gently reminded hearing officers to comply with deadlines and other timelines established by law.  In practice, nothing has changed.  Hearing officers continue to *sua sponte* push off deadlines without agreement from the parties in flagrant disregard of what the delay means to the children whose welfare and education they are certified by VDOE to protect.

146.    In addition to the "unilateral motions" for delay that are used routinely by hearing officers, others blatantly lie about their failure to meet required decision-deadlines, and VDOE does nothing to cure the violations.  For example, in a 2022 case arising out of Chesterfield County, hearing officer Sarah Smith Freeman back-dated her untimely, substantively-revised decision, to make it appear as though she had delivered her decision on time. Though the parents' lawyer caught the hearing officer in her lie about the untimely decision, the delay truncated the parents' appellate timetable by two weeks (the length of the back-dating) because VDOE refused to intervene with the hearing officer or take any corrective measures.

147.    Disturbed by Freeman's blatant misrepresentations, parent's counsel contacted Patrica Haymes, the Director of VDOE's Office of Dispute Resolution.  Haymes expressed token sympathies but ultimately refused to resolve the issue. Haymes stated that hearing officers are "autonomous" and that VDOE's role is simply to provide "oversight."  From this, parent's counsel concluded that Haymes had no authority to require Freeman to correct the document. Haymes also stated that, "to be on the safe side," counsel should consider April 15 as the operative date for appeal purposes.  VDOE would do nothing and the parents were penalized by the improper shortening of their appeal deadline by more than two weeks.

***Unbridled Reliance on False Testimony from Schools***

148.    Another way VDOE hearing officers disregard the IDEA is to rely on blatantly false testimony from Virginia LEA officials to routinely deny parents the special education services their children need.  Fundamental to the exercise of due process is trust in the fact-finding mission, which necessarily assumes an effort to distinguish truth from falsehood with a goal of accepting only the truth.  That is not the mission of VDOE's due process proceedings, and truth is not a goal set by the hearing officers.  VDOE certifies and recertifies hearing officers who blatantly accept and rely on false testimony and patently inadmissible evidence proffered by the Virginia LEAs, while almost always ruling against children and their parents.

149.    For example, during D.C.'s due process hearing, FCPS presented false testimony that D.C. could read books and count to 50 when he could do neither.  When school officials observed testing of D.C. by Grafton, prior to their due process hearing testimony, they witnessed that D.C. could only count to 2 and could not decode words.  Nevertheless, the school officials testified to the contrary during the hearing, and the hearing officer uncritically accepted the testimony, despite it being demonstrably false.  Based at least in part on this false testimony, the hearing officer denied D.C.'s request for a residential placement at Grafton..

150.    During another due process hearing in 2022 between Chesterfield County Public Schools and the parents of a special needs student, the child's math teacher, testified that (a) his student never turned in any math work, and (b) the math teacher had never communicated with the child's parents.  The math teacher made these statements despite numerous email communications with the parents and academic records showing that the child had submitted work.  The parents' lawyer was able to access the child's school records that controverted entirely the math teacher's testimony.  Nevertheless, the parents lost the hearing, and their child was denied the special

education services they were seeking in the complaint.

151.    The falsehoods hearing officers routinely accept and rely on is not limited to a single math teacher misrepresenting school assignments and parent emails.  Virginia LEAs have implemented policies and practices that require teachers to inflate grades and ignore assignments, which covers up the need for greater special education services.  For example, teacher Elizabeth Houston admitted during a due process hearing that she routinely does not include incomplete work or missing assignments when calculating grades for special needs students, and she never gives grades below 50% even when a student fails to submit any work, because school policy forbids it.  The VDOE hearing officer heard directly from Houston that the student's grade in her class was grossly inflated and reflected false progress, yet the parents left the hearing without obtaining any relief or changes to their child's education program.

152.    A special education coordinator explained in testimony before a hearing officer that a Virginia LEA principal advised her to make after-the-fact changes to service logs and teacher notes.  The coordinator also explained to the hearing officer that she was responsible for making edits to the logs and notes in an attempt to show the child was "making progress" under her current education program.  The hearing officer concluded the student was "making progress," despite being told by the coordinator that the records of progress were a sham, and, she denied the parents' request for additional services for their child.

***Policy of Excluding Parents' Expert Witness Testimony***

153.    VDOE hearing officers' pretextual exclusion or discounting of parents' experts is also a widespread problem.  The IDEA expressly authorizes the use of expert witnesses.  Parents and advocates report that hearing officers will routinely exclude parents' qualified expert witnesses – but not the school district expert witnesses – for nonsensical reasons, including because the

expert witness resides in a different state.

154.    In the same due process hearing arising out of Chesterfield County Public Schools discussed *supra* at ¶¶ 150–52, a hearing officer rejected the parent's proffered expert as lacking Virginia special education licensing credentials.  To the contrary, this witness testified that she was presently a certified special education teacher who had taught virtually for FCPS the preceding year.  This same witness also testified that she had offered expert testimony in ***over sixty*** prior due process hearings.

155.    This three-tiered injustice – inexcusable delay of decisions, chronic reliance on LEAs' false and misleading testimony and baseless rejection of parents' expert witnesses erodes the crucial due process safeguard in the IDEA.

## 2.    <u>VDOE Hearing Officers Are Not Impartial</u>

156.    In addition to allowing the conflicts of interests and bias of hearing officers to go unheeded, VDOE also plays a more direct role in tilting the outcomes of due process hearings in favor of its LEAs.

***Ex Parte Communications with VDOE Representatives and LEAs***

157.    VDOE's policies and practices facilitate *ex parte* communications among hearing officers, local education agencies, and VDOE.

158.    VDOE employs two "monitors" named Brian K. Miller and Reginald B. Frazier to attend due process hearings as a VDOE representative.  The "monitors," sometimes referred to as "VDOE evaluators," are hired by VDOE to attend all due process hearings.[29]  They are also

---

[29] According to VDOE's July 21, 2021 request for proposal for "Evaluators and Appeal Reviewers," these evaluators play a role in how VDOE carries out its "responsibility" of oversight for the management of all hearings, evaluating the hearing officers' management of due process hearings."  The RFP on to state that "the VDOE, through its hearing officer evaluators, is

included in VDOE's list of hearing officers.  The presence of these VDOE evaluators in due process proceedings, coupled with their *ex parte* communications, improperly influences hearing officers to rule in favor of school districts and against parents.

159.    Parents and advocates have complained that VDOE evaluators display favoritism towards schools, engage in secret conversations with hearing officers, and try to influence the outcome of due process hearings.  A former hearing officer reported that one of the VDOE "monitors" advised him in several *ex parte* discussions to disregard expert testimony offered by parents.  This former hearing officer stated that the unsolicited requests were made during multiple scheduling calls in which none of the other parties were present.  He also indicated that the VDOE evaluator "knew he wasn't supposed to say that."  The former hearing officer ultimately declined to follow the VDOE monitor's "advice" and ruled largely in favor of the parents and against the school district.  This was the first time in two decades that this hearing officer had ruled against a school district.  Two months after issuing his ruling, VDOE removed the hearing officer from its list.

160.    In a June 2020 email exchange, hearing officer Brooke-Devlin reached out to Dawn Schaefer of FCPS indicating that she would be available for a due process hearing in the near term, but she would need Ms. Schaefer *to delay the assignment* so Brooke-Devlin could be free to handle it. [30]  Delay in the hearing officer's appointment can be detrimental to the child because it delays the challenge to the lack of FAPE , but Brooke-Devlin asked FCPS to delay her appointment "as

---

responsible for providing guidance in managing hearings effectively, efficiently, and within regulated mandates."

[30] *See Why did HO Morgan Brooke-Devlin Work Out of the Office of Blankinship & Keith During a Due Process Hearing?*, *available at* https://specialeducationaction.com/why-did-ho-morgan-brooke-devlin-work-out-of-the-office-of-blankinship-keith-during-a-due-process-hearing/   (last accessed January 20, 2023).

long as you can." FCPS, which was the local education association responding to the due process complaint at issue in the email, delayed the hearing officer appointment for the maximum time possible—five days—and then appointed Brooke-Devlin via letter dated June 9, 2020. Brooke-Devlin then reached out to Kathryn Jones of VDOE to express gratitude for the "special accommodations" she was provided by FCPS on scheduling.

161.    Although VDOE and FCPS should not be coordinating selection of the hearing officer responsible for adjudicating claims against FCPS, it appears from the June 9, 2020 e-mail and subsequent follow-up that VDOE and its LEAs are, in fact, making such appointments together.[31]

162.    The same June 2020 e-mail also demonstrates that, at the time she sent the e-mail, Brooke-Devlin was working from the office of FCPS' outside counsel, while conducting another due process hearing. This is the same outside counsel that FCPS would eventually retain to handle the same due process hearing for which FCPS was appointing Brooke-Devlin.

163.    VDOE is charged with reviewing hearing officer performance annually, based on many factors, expressly including whether hearing officers are involved in improper *ex parte* communications. Despite repeated complaints about Brooke-Devlin, VDOE has done nothing to investigate or discipline her.

164.    In another instance arising out of Loudoun County Public Schools, the Loudoun notified the hearing officer that it was making the appointment, even though the LEA was party to the dispute the hearing officer was being appointed to decide. Loudoun County also invited the

---

[31] This concerted conduct is inconsistent with the Virginia Administrative Code, 8VC20-81-210(H)(1)(a), which requires the Supreme Court of Virginia to make hearing officer appointments, and it underscores why *ex parte* communications are prohibited:  They frustrate the very impartiality required to ensure a fair due process proceeding.

hearing officer to send it the fee bills – rather than VDOE – for payment processing.  Allowing a LEA, as one party to the dispute, to have control over the compensation of hearing officers reflects the lack of impartiality that frustrates the IDEA's due process hearings in Virginia.  VDOE, its local school districts, their counsel, and hearing officers collaborate closely, especially given their long-standing relationships and history working together on behalf of the same side, to achieve their common goal of truncating the IDEA's procedural safeguards.

165.    In a due process hearing case arising out of Arlington Public Schools, a Washington DC based attorney represented parents in a due process hearing overseen by Peter B. Vaden. In addition to serving as a Virginia-based hearing officer, Vaden served as a Washington DC based hearing officer. The attorney was familiar with Vaden and was present in numerous Washington DC based due-process hearings in which Vaden was the appointed hearing officer.

166.    According to the parents' attorney, Vaden displayed unusual behavior throughout the course of the Virginia due process hearing, was highly deferential to a "VDOE representative" present throughout the process, and seemed inappropriately reliant on his guidance. The attorney estimates that in DC, Vaden rules in favor of parents thirty to fifty percent of the time, but the same cannot be said for Virginia.

**Conflicts of Interest and Open Hostility**

167.    VDOE is responsible for certifying and recertifying hearing officers, and it has taken steps to ensure that hearing officers have a direct and substantial pecuniary interest that affects their impartiality.  This regulatory structure creates conflicts of interests and financial incentives that undermine the integrity and impartiality of the due process hearing system in Virginia.  Hearing officers appointed, reviewed, and compensated by VDOE, on behalf of its LEAs, have demonstrated over many years and in many cases that they are not reliably neutral and

impartial.

168.    Serving as a VDOE hearing officer with an active docket of due process cases from 2003-2006, James T. Lloyd received substantial fees from VDOE during his 6-year tenure, not once ruling in favor of a special needs child.  In 2006, Lloyd entered into a public consent decree including the revocation of his law license after he was caught stealing money from a client's trust account.

169.    The fees can be particularly significant for attorneys who are solo practitioners or work at small firms.  Based on publicly available information, as summarized in Exhibit E, eighteen (18) of the twenty-two (22) hearing officers who served between 2010 and 2021 worked as solo practitioners, and all hearing officers based outside of Northern Virginia worked as solo practitioners.  The remaining four (4) work for very small firms that have only two members or partners.

170.    By targeting solo practitioners and lawyers who work at very small firms, VDOE has guaranteed itself to be the hand that feeds.  And hearing officers are taught not to bite it – because VDOE has an economic stake in the outcome of each due process hearing.  The less money spent on special education services as a result of decisions in favor of parents, the more money VDOE retains in its own annual budget.  The system is designed in a way that stokes conflicts of interests, and VDOE has no natural incentive to improve it.

171.    Instead, VDOE certifies the solo practitioners and small-firm lawyers, trains them in a manner that ensures favorable outcomes, pays them generously, appoints them (accommodating their schedules, as requested, even if it means a delay of due process), and then recertifies the same crop, with the promise of a continuous pipeline of work, steady stream of net income, and no risk of negative consequences. This is powerful financial incentive and temptation

for the hearing officers to stay captive, especially when combined with VDOE's over-arching control over the due process proceedings.

172.    VDOE is not the only Defendant that uses financial incentives to pressure its hearing officers to rule against parents.  LEA lawyers have likewise wielded the threat of financial harm to ensure that due process hearings result in a victory for their LEA clients.

173.    In May 2011, a hearing officer accused three attorneys representing the school board in a due process hearing of making implied financial threats against him.  Specifically, the hearing officer claimed that the LEA lawyers indicated that they would cause problems with his billing and compensation if he did not rule in favor of the school board.  The hearing officer wrote that "(The threat of causing billing issues) has been done before in other cases by this law firm." Those same lawyers represented multiple Virginia LEAs during this time period.

174.    Hearing officers also seek to maintain and benefit from their close relationships with LEA lawyers.  In 2004, a hearing officer was disqualified from a due process hearing by the Supreme Court of Virginia after he enlisted a school board's attorney to help prepare his response to the parents' request for disqualification.

175.    Hearing officers' school bias has a tangible, corrupting effect on children's access to FAPE.  In a due process hearing  arising out of Chesterfield County Public Schools,  the school's attorney claimed not to have received a particular piece of evidence, a recording, from the parents. In response, parents' counsel proffered an affidavit establishing that the attorney had opened an electronic file containing the recording, which demonstrated the school's counsel had, in fact, received the evidence.  In an email exchange among both sets of attorneys and the assigned hearing officer, the hearing officer "concluded"  that counsel for the school did not technically "receive" the recording by the requisite deadline for its consideration because the password protecting the

file containing the recording, ostensibly, did not work.  The hearing officer added that the password had not worked for her  or the school's counsel.  Prior to this email exchange, neither the hearing officer nor the school's counsel alerted the parents to a password problem.  If they had, parents' counsel easily could have supplied a new password, and the recording would have been accessible to both the school's counsel and the hearing officer.  Instead, both the school and the hearing officer set the parents up to fail, which is exactly what the hearing officer decided when she denied the requested services.

### 3.    VDOE Stacks the Deck with Biased Hearing Officers

176.    One of the most significant impacts VDOE has on the systematic denial of due process is the unimpeded control over the certification, training, compensation, and removal of hearing officers.

177.    Between the late 1990s and 2009, VDOE paired down the list of hearing officers from over 100 to a carefully-curated list of twenty-two (22) hearing officers who almost never ruled in favor of disabled children or their parents.  Then, for more than a decade from 2010 into 2021, VDOE has declined to add or remove a single hearing officer.  In other words, VDOE manages to stack the deck and then close the door to new hearing officers.

### E.    Parents and Children Have no Viable Alternative to Due Process Hearings

178.    In theory, parents and children could challenge violations of the IDEA by filing a special education complaint with VDOE.  As described by VDOE: "A complaint is generally an expression of some disagreement with a procedure or a process regarding special education programs, procedures or services.  A formal complaint is considered a request that this division investigate an alleged violation of a right of a parent and/or child with disabilities who is eligible, or believed to be eligible, for certain services based on federal and state laws and regulations

governing special education."[32]

179.     However, in practice, the VDOE special education complaint procedure offers no real relief.  This alternative process, and the resulting investigation by VDOE, is merely another means by which VDOE delays and ultimately denies providing FAPE to children.

180.     The systematic failures of VDOE's state complaint system are so severe that they have caught the attention of the United States Department of Education ("USDOE").  As discussed further *infra*, in May 2020, the USDOE issued a differentiated monitoring and support letter which highlighted, among other issues, deficiencies in VDOE's state complaint system.   As of a September 1, 2022 follow-on letter, USDOE remained concerned that Virginia "is not addressing the complaints it receives in a timely manner."   Indeed, VDOE produced to USDOE a log of incoming communications and how they were handled, which outlines that ***of approximately 1,843 communications received, VDOE reported only 29 outcomes.***

181.     Parents who do get a response from VDOE find themselves stuck in yet another rigged VDOE process.  VDOE officials tasked with investigating complaints have demonstrated significant bias in favor of LEAs like FCPS, and against parents and children seeking services.  Among other things, VDOE officials have willfully misconstrued families' complaints in order to avoid investigating the alleged misconduct and –  after investigating conduct different than the conduct alleged –  find that no violations have occurred.  And even in those rare instances where hearing officers do identify a violation, they have failed to take necessary corrective action.

---

[32] "Special Education Complaints," available at https://www.doe.virginia.gov/programs-services/special-education/resolving-disputes/resolving-disputes (last accessed January 11, 2023).

182.    In one instance in Arlington Public Schools (APS), a family brought a state VDOE complaint challenging that the denial of FAPE to their child during the COVID-19 Pandemic.  The parents had requested placement at a private school which offered the in-person education their child needed for the duration of COVID-19 public school closures.  Their child faced significant academic and emotional challenges with distance learning.  APS rejected these requests for a change of placement and likewise rejected in-person learning.  Denial of in-person learning had drastic consequences for the child, including hospitalization for suicidal ideation brought on by a deterioration of his autism.  During VDOE's complaint process, the VDOE official "investigating" the complaint repeatedly displayed bias against the family and in favor of APS, including by:

  a. Engaging in *ex parte* communications with APS representatives and denying the parents' request to take part in such communications, even though the VDOE representative instructed the parents to include APS on all of their communications with VDOE;

  b. Adopting APS's false account of the student's return to "in-person" learning despite the contradictory contemporaneous evidence provided by the parents;

  c. Ultimately concluding in an April 2022 Letter of Findings that APS was in compliance because it made a "good faith effort" to implement the child's IEP(s), which is not the standard under the IDEA.

183.    When the parents expressed their dismay that the hearing officer had uncritically accepted APS's narrative of events, despite unequivocal contrary evidence, the VDOE officer claimed that she was not a decider of fact, and if they wanted an adjudicator to make a credibility determination, they would need to file for a due process hearing.

184.    Unbeknownst to the parents, this same VDOE representative also had *ex parte*

communications with APS in April 2022 concerning the IEP for the parents' other child, who also has recognized disabilities.  APS's IDEA compliance officer reported in an internal email to other APS employees that the hearing officer recommended that ***APS consider taking the family to a due process hearing*** to challenge an IEP that APS had already put in place for that child.

185.    In other words, VDOE's hearing officer was acting not as an impartial adjudicator for the IDEA system, as required under federal law, but as an advocate for the school district, advising them to take action against the parents by filing a due process hearing.  This is part of VDOE's and the Virginia LEAs' substitute system of delaying and denying services.

186.    VDOE's systematic failure to properly implement the state complaint process further deprives children and their families of the protections afforded by the IDEA.

**F.    VDOE's Ongoing and Systematic Practice of Rigging Due Process Hearings Makes it Futile to Seek Relief Through Due Process Hearings**

187.    Defendants' carefully cultivated system designed to bias its hearing officers— much of which is ostensibly conducted in accordance with state law—cannot be remedied by way of a due process hearing overseen by the very hearing officers, LEAs, and VDOE whose conduct is at issue.

188.    Even assuming that a hearing officer could fairly adjudicate a parent's claim that VDOE is depriving them and their child of rights under the IDEA, that officer could not provide the kind of systemic solution that is both badly needed and sought through this Complaint.  Given the systemic nature of Plaintiffs' allegations and requests for relief, it would be futile for them to pursue these claims through a state administrative process.

189.    Pursuing relief from VDOE or FCPS is futile.  The manifestation of bias and ill-will toward the petitioners and their attorneys falls below the standards required under federal statutes and regulations governing the conduct of due process hearings in IDEA cases.  Hearing

officers' records of seldom, if ever ruling in favor of a family, demonstrates that D.C. and M.B. were not the only people who suffered at the hands of a hearing officer who evidenced no interest in neutrality.

190.    Moreover, any parent who would seek to appeal a due process hearing officer's adverse decision, no matter how biased and erroneous, would face an uphill battle.  Hearing officers and their decisions enjoy a presumption of impartiality under the IDEA, despite the evidence that, in Virginia, such a presumption is not grounded in fact.  Nevertheless, this unwarranted presumption provides yet another barrier that makes the administrative route futile.

191.    Thus, these allegations of structural shortcomings that resulted in the systemic denial of impartial hearings are appropriately addressed in this litigation, not before a Virginia hearing officer.  Defendants' biased hearing-officer requires this Court's intervention in order to ensure Virginia children with disabilities the FAPE guaranteed by the IDEA.

### VII. VDOE and Virginia School Districts Systematically Fail to Evaluate Children with Disabilities

192.    The IDEA requires that VDOE and Virginia School Districts evaluate any student who is suspected to have a disability.  VDOE is also required to oversee and monitor these school districts to ensure they are complying with their obligations under the IDEA.

193.    Under the IDEA, state education agencies, like VDOE, and LEAs are responsible for evaluating any child suspected to have a disability.  *See* 34 C.F.R. § 300.111(c).  "conduct[ing] a full and individual initial evaluation" before providing special education and related services to a child with a disability.  20 U.S.C §1414(a)(1)(A).  Such evaluations must "(A) use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information, including information provided by the parent," "(B) not use any single measure or assessment as the sole criterion for determining whether a child is a child with a disability or

determining an appropriate educational program for the child," and "(C) use technically sound instruments that may assess the relative contribution of cognitive and behavioral factors, in addition to physical or developmental factors."

194.    A parent also has a right to an independent educational evaluation (IEE) at public expense if the parent disagrees with an evaluation obtained by the public agency, subject to certain conditions.  *See* 34 C.F.R. § 300.502.  If a parent requests an IEE at public expense, the school district must, without unnecessary delay, either: (1) Initiate Due Process Procedures under 34 C.F.R. § 300.507 through 300.513 to show that its evaluation is appropriate; or (2) Ensure that an IEE is provided at public expense, unless the school district shows that the evaluation obtained by the parent does not meet agency criteria.  34 C.F.R. § 300.502(b).  If a parent requests an independent educational evaluation, the school district may not unreasonably delay either providing the IEE at public expense or filing a due process complaint to defend the public evaluations.

**A.    VDOE Permits Virginia LEAs to Exploit a Policy and Practice of Avoiding, Limiting and Delaying the Student Evaluations  Required Under the IDEA**

195.    FCPS has repeatedly and systematically denied students FAPE by improperly denying, limiting and delaying evaluations.  In the circumstances in which Defendants agree to evaluations, it often takes months or even years for Defendants to grant such requests and actually perform or authorize the evaluations.  When evaluations or IEEs reveal serious issues and deficits in a child's learning, FCPS administrators will often downplay or completely ignore the results to bar additional accommodations and private placements.

196.    In FCPS, a former teacher reports that during her tenure at FCPS, educators were repeatedly instructed not to write "dyslexia" in IEP documents.  The teacher further indicated that FCPS asserts that there is a difference between "educational models" and "medical models" for

evaluations.  On this basis, FCPS often rejects the findings of independent evaluations and trains its educators to put medical diagnoses to the side and give higher deference to school diagnoses. This former teacher also reports that FCPS does not collect baseline data in evaluations that include all five components of reading, leading to highly distorted and inaccurate data sets.

197.    As one example of FCPS' policy in practice, FCPS denied a child an evaluation three times between first and sixth grade.  Frustrated with the school, the child's parent paid for an independent evaluation in sixth grade.  Among other things, the child was reading on a third-grade level and had numerous other low or borderline impaired scores.  When the parent presented the results of the evaluation to the school, the school psychologist told her orally (but not in writing) that he would not accept the outside expert evaluation, claiming that the evaluation was "anecdotal" and that he would have to perform his own evaluation.  The parent discovered later on, through a FERPA request, that the principal of the school told the psychologist not to respond to the parent in writing.

198.    The school ultimately performed their own evaluation.   While the evaluation revealed that the child had areas of need, it was not comprehensive.  After expressing her concerns about the non-comprehensive nature of the evaluation, the school principal responded that "We only test for eligibility."  This is inconsistent with the requirements of the IDEA and its enforcing regulations, which require LEAs to utilize a "variety of assessment tools and strategies to gather relevant functional, developmental, and academic information about the child," such that "the evaluation is sufficiently comprehensive to identify all of the child's special education and related services needs, whether or not commonly linked to the disability category in which the child has been classified."  *See* 34 CR 300.304.

199.    From seventh to tenth grade, the parent continued to press for a more complete

evaluation that would comply with the requirements of the IDEA.  Unsatisfied with FCPS'
repeated failures, the parent requested independent evaluations.  In tenth grade and eleventh grade,
the child was independently evaluated, and speech language deficiencies and visual processing
issues were identified. FCPS had successfully avoided and delayed a complete evaluation of this
child for nearly the entire period of this child's primary education.

200.    And this child is not alone.  As the gatekeeper of special education services, FCPS
routinely denies and delays initial evaluations and reevaluations, essentially waiting out the
children because eventually, they age out of eligibility for services.  FCPS uses a variety of excuses
to justify the delay or outright denial of an initial evaluations.  In another case, FCPS refused to
conduct an initial evaluation of a child suspected to have autism, ADHD, and dyslexia. FCPS
claimed the child was performing on grade level obviating the need for an evaluation.   To provide
additional support for their assessment, one of the child's teachers presented an example of the
child's writing work that could not have been completed without extensive coaching.  This was
done to justify the denial of the parents' evaluation requests.

201.    These are just a few examples of FCPS' ongoing practice of delaying and denying
the complete evaluations to which disabled students are entitled under the IDEA.

**B.    VDOE Sanctions and Supports Virginia LEAs' Policy and Practice of Refusing IEEs
as Required under the IDEA**

202.    VDOE is obligated under the IDEA and related regulations to ensure that FCPS and
other LEAs are complying with their obligation to provide an IEE at public expense unless the
relevant LEA has initiated a due process hearing.  20 U.S.C. § 1414. VDOE has repeatedly ignored
its oversight obligation.  More than simply turning a blind eye, VDOE took the position,
documented in Virginia Regulations, that school districts do not have to provide an IEE at public
expense, unless the school district has previously conducted its own evaluation of the child on the

same specific issue and the parent disagreed with the results.[33]  Under VDOE's application of the IDEA, Virginia school districts could refuse to conduct an evaluation in the first place, in violation of its legal obligation to do so, and then refuse to provide an IEE at public expense, creating an almost absolute barrier to FAPE.

203.    On June 23, 2020, the US DOE's Office of Special Education Programs (OSEP) cited VDOE for its violation of these provisions of the IDEA.  *See* OSEP June 2020 Letter, at 14-17.  The DOE ordered VDOE to change the regulation, comply with the IDEA, and ensure that Virginia LEAs do not limit a parent's right to obtain an IEE at public expense.  In response, VDOE defiantly made a one-word change to the regulation but failed to require the implementation of that change by the LEAs and even failed to notify the LEAs of the change.

204.    In a chart attached to a follow-up letter to VDOE's Superintendent of Public Instruction dated February 8, 2022, the Director of OSEP noted:

> The State had to submit to OSEP a copy of a memorandum that the State has issued to all LEAs, parent advocacy groups, and other interested parties instructing LEAs to comply with 20 U.S.C. 1415(b)(1) and 34 C.F.R. § 300.502(b) by also providing an IEE at public expense in areas where the LEA previously has not conducted its own evaluation, unless the LEA has demonstrated, through a due process hearing decision, that its evaluation is appropriate; and advising that the State will be revising Virginia Administrative Code 8VAC20-81-170(B)(2)(a) and (e), to, at a minimum, remove the word "component" following the word "evaluation"…***The Memorandum submitted did not ensure compliance with the required action because the memorandum only relayed the language of the statute and regulation*** found at 20 U.S.C. §1415(b)(1) and 34 C.F.R. 300.502(b)]".  The memorandum did not mention the specific issue or practice of an LEA not granting IEEs in areas where the LEA had not previously conducted their own evaluations.

---

[33] *See* Letter Dated June 23, 2020 from, Laurie VanderPloeg, Director, Office of Special Education Programs, to James Lane, then Superintendent of VDOE, *available at* https://www2.ed.gov/fund/data/report/idea/partbdmsrpts/dms-va-b-2020-letter.pdf (last accessed January 19, 2023).

*See* DOE OSEP Findings and Required Actions, at 14.[34]

205.    VDOE's failures to fulfill its oversight obligations under the IDEA has facilitated FCPS' pattern and practice of delaying and denying evaluations and refusing IEEs.

**C.    VDOE Permits Virginia LEAs' Policy and Practice of Manipulating Student Evaluations and Assessments to Avoid Providing Special Education Services**

206.    Virginia LEAs routinely prevent parents and children from receiving the services to which they are entitled under the IDEA by generating and relying upon false records and testimony regarding children's education, services, and academic progress.  For example, FCPS and other Virginia LEAs have a policy and practice of manipulating student academic records, including grade inflation, for the sake of arguing that the child is "making progress" under an existing education program.  These falsehoods prevent parents from detecting when children need to be evaluated for disability services and when schools have failed to properly implement IEPs.  This inaccurate information also prevents parents from collaborating with schools to find solutions that have a better chance of providing FAPE to their children.

207.    FCPS routinely inflates the grades of children who have IEPs to further paint a false picture of progress.

208.    In one instance, M.B. was given an 85% score on an English test, even though he had only answered 7 out of 20 questions correctly.  When the Binghams sought clarification of this grade, they were informed that it was FCPS' practice to start grading at 50% and add points for correct answers from that artificially inflated baseline.  In other words, although M.B. only answered 35% of the questions correctly, FCPS pretended as though he had answered an additional

---

[34] *See* "U.S. Dept. of Education Finds Virginia at Fault for Continued Noncompliance", available at https://specialeducationaction.com/u-s-dept-of-education-finds-virginia-at-fault-for-continued-noncompliance/

10 of the questions correctly and gave him a score of 85% on this evaluation.  In another case, M.B. was awarded "A" grades on assignments for which he only completed one out of five necessary slides.  And, on other occasions, he was given "A" grades while teachers were simultaneously documenting that M.B. was not participating or completing his work for much of the school day.

209.   To effectuate its grade inflation practice, FCPS' tactics include false representations in student IEP's, combined with coached-teacher affirmations, that  students are "making progress," when there is no legitimate support for these statements.  FCPS makes patently false statements to parents in IEPs and in due process hearings.  As discussed *supra*, during D.C.'s due process hearing, FCPS presented false testimony that D.C. could read books and count to 50 when, in reality, he could do neither.  Prior to their testimony in D.C.'s due process hearing, school officials observed D.C. being tested at Grafton, and they witnessed that he could only count to 2 and could not decode words.  Their false testimony was brought into stark relief when school officials, in the years following,  signed off on IEPs for D.C. that have never described – to this day – any such capabilities in math or reading.  Remarkably, nowhere in D.C.'s latest proposed IEP is there any mention at all of D.C.'s reading and math skill levels; nor are there any stated goals for D.C. to pursue with respect to reading or basic math skills.  FCPS has completely abandoned any attempt to teach D.C. how to read, write, or county even though D.C. has another two years to attend Grafton for his education.  FCPS' testimony regarding D.C.'s "progress" at his due process hearing was unequivocally false.

210.   Virginia LEAs' policies and  practices of exaggerating the progress made by children with IEPs enable them to falsely claim they are meeting a child's IEP goals, when often, the child has not actually been making the progress the school touts.  Were the child's progress (or

lack thereof) accurately described, the school could be required to provide additional services, potentially at greater cost, in order to comply with the IDEA.

211.    The obvious effects of these insidious practices is evidenced by the experiences of a Prince William County eligible child who was routinely fed correct answers on classroom assessments by teachers and special education aids.  Though the special needs child received an "A" in the IEP-assigned sixth grade math class, the child was unable to independently complete second-grade math problems.

212.    FCPS is not the only Virginia LEA that employs grade inflation and similar tactics to make it appear as though children are making progress, when in reality they are not.  As one example, Prince William County teachers and aids have repeatedly steered a disabled child towards thecorrect answers on tests, which has resulted in that child receiving artificially high grades.  Consequently, this child received an "A" in their Sixth-Grade math class while simultaneously requiring assistance to complete math problems at a Second-Grade level.

213.    FCPS and other LEAs' pattern and practice of exaggerating the progress made by children with IEPs enables FCPS to falsely claim that it is meeting IEP goals, when in reality, it is falling well short of its obligations under the IDEA.

214.    FCPS also systematically fails to disclose challenges faced by eligible students in a school setting.  Because of the errors, omissions, and falsehoods included in children's evaluations, parents do not have a real "opportunity to inspect and review all education records with respect to — (1) The identification, evaluation, and educational placement of the child; and (2) The provision of FAPE to the child," as required by the IDEA and its enforcing regulations. 34 C.F.R. § 300.501.

215.    M.B. is one of the children impacted by FCPS and VDOE's failures to create and

maintain accurate records of his progress.  As M.B.'s parents eventually learned, M.B.'s teachers failed to grade or even administer some of his assignments.  And, they inflated his performance on several occasions.  During a 2022 due process hearing, they also learned that M.B.'s special education teacher had no certification nor training as a behavior specialist, a critical requirement to assess and support M.B.'s need.  And, at times, she was forced to attempt to collect behavioral data for M.B.'s Functional Behavioral Assessments while simultaneously instructing M.B.'s multi-disability classroom.  FCPS thus put M.B. in a situation where it could not, and did not, gather the data necessary to identify, assess, and respond to his behavioral needs.

216.    At a January 31, 2020 IEP meeting, the FCPS team recognized that M.B.'s teachers had failed to accurately record his progress.  Notes from that meeting reflect that FCPS recommended "going back and look at the previous level tests, *score ungraded tests*, and re-teach until masters," as well as "additional coaching sessions for staff implementing this program." Nevertheless, inaccurate reports regarding M.B.'s progress would be repeated in subsequent IEPs.

217.    These are just a few examples of FCPS employees misrepresenting, falsifying and concealing information related to disabled children within their schools.  This practice is widespread at FCPS and other Virginia LEAs.

218.    On information and belief, Virginia LEA employees are also trained to not create records or disclose information regarding LEAs' failures to comply with the IDEA.  Among other things, LEA employees are advised to instruct teachers and other employees not to create written records of concerns that the IDEA requirements are not being met.

219.    For example, in one such training document, a lawyer for Reed Smith (who was outside counsel for several Virginia LEAs at the time) instructed trainees not to failures to provide

FAPE and failures to implement IEPs in writing.[35]  This training indicated in quotes what "not-to-say" in special education meetings and then gave instructions for how to handle these situations, including by not documenting these issues in writing:

    a.    **Dear Special Education Director: I have just learned that the student's IEP has not been implemented for the past six months. What do I do? Frustrated Teacher."** "This type of statement is not a good one to put in writing.  It is a good statement to address orally with the administration and to discuss strategies for the provision of compensatory education services."

    b.    **"Dear Special Education Director: I do not believe that this student is making progress and am writing this e-mail to document my concerns. Sincerely, Puzzled Teacher."** . . . "Do not document in writing the failure to provide FAPE."

As demonstrated above, Virginia LEAs' counsel have established written training in which they instruct LEA employees to avoid documenting information which would show that the LEA is not meeting its obligations under the IDEA"[36]

    220.    FCPS' and other LEAs' policy of exaggerating children's progress, including

---

[35] *See* Mehfoud, Kathleen, "Things Not to Say at Special Education Meetings," (Last Accessed January 7, 2023), *available at*, https://wyominginstructionalnetwork.com/wp-content/uploads/2018/05/Things-Not-to-Say-in-Special-Education-Meetings.pdf.   Mehfoud drafted this document as an attorney at Reed Smith, who at the time was outside counsel for numerous Virginia LEAs.  On information and belief, Virginia school officials received this document as part of IDEA trainings.  A similar training prepared by Mehfoud, while at Reed Smith, called "More Things not to Say in Special Education Meetings" was presented to the Virginia School Board Association.  *See* "More Things not to Say in Special Education Meetings", *available at* https://kipdf.com/updated-more-things-not-to-say-in-special-education-meetings_5aca6d611723dd38f4c9617e.html (Last Accessed January 16, 2023).

[36] *See id.*

through grade inflation, makes it all the more difficult to identify and rectify their violations of the IDEA and the Constitution of the United States.  These practices skew the administrative record at any due process hearing and on appeal from any adverse hearing officer decision.  Defendants' manipulation of children's academic and behavioral records violates the IDEA and adds to the futility of raising a challenge to FCPS' and other LEAs' conduct through a due process hearing.

221.    VDOE itself goes to great lengths to hide relevant information and  records related to Due Process hearings and other administrative procedures.  Among other things, they have obstructed parents and advocates efforts to access documents and information concerning disabled children both by unduly burdensome FOIA procedures and otherwise.[37]

222.    This pattern and practice of manipulating student records and barring access to the same thus hinders families' efforts to challenge Defendants' conduct by making it impossible to discover that their rights have been violated until well after the fact, if ever.

**D.    VDOE's Student Evaluation Policies Violate the IDEA**

223.    VDOE's failure to comply with the IDEA is not limited to the rigged due process hearing officer system.  Rather, VDOE is both itself depriving children and families of services to which they are entitled under the IDEA, and failing to prevent LEAs from across the Commonwealth of Virginia from depriving children and families of federally-mandated services as well.

224.    Despite the clear mandate under the IDEA that a "[s]tate educational agency, other State agency, or local educational agency *shall* conduct a full and individual initial evaluation," to determine if "a child is a child with a disability," 20 U.S.C. § 1414(a), VDOE has implemented an

---

[37] FOIA issues are discussed in greater detail *infra* at the section titled "VDOE has Failed to Require LEAs to Provide Parents with Records to Which They are Entitled under the IDEA."

express policy and procedure that frustrates the very purpose of the IDEA to ensure FAPE by placing illegitimate eligibility requirements on the right to receive an initial evaluation. Under VDOE policy, eligibility for an initial evaluation, which is a non-discretionary right under the IDEA, must first be authorized through VDOE's "special education process," which requires a "referral for evaluation"[38] before an initial evaluation will be conducted. In Virginia, a request for evaluation can come from any source or individual, including a parent; however, the special education process reflects the path illustrated in Figure 2:



225. However, nothing in the IDEA contemplates the committee process that must precede an initial evaluation in Virginia. Once the initial evaluation request is made, it is either referred to another special education committee for consideration, approved, or rejected with

---

[38] *See* Supplemental Guidance for Evaluation and Eligibility *available at*, www.doe.virginia.gov/programs-services/special-education/evaluation-and-eligibility (last accessed January 7, 2023).

notice sent to the parents.  VDOE does not have the legal right to put in place a gatekeeping policy and practice that denies an initial evaluation under the IDEA, and this policy is inadequate to meet VDOE's statutory obligation to ensure that students with disability-related behaviors receive a free appropriate public education.

226.    Independently, VDOE's systematic failure to comply with the IDEA's non-discretionary requirement to conduct initial evaluations is detrimental to the provision of FAPE, and in combination with its failure to require Virginia LEAs to approve independent education evaluations ("IEEs") pursuant to 34 C.F.R. § 300.502, VDOE's systematic failures preclude Virginia children from accessing the special education they so desperately need.

227.    Parents have the right to an IEE at public expense unless the public education agency files a due process complaint to show an IEE is not necessary.  *See* 34 C.F.R. § 300.502. Very few Virginia LEAs file their own due process complaints, which would require them to carry an affirmative burden of proof in the process, so parents should regularly be afforded the right to an IEE.  VDOE's application of IEE regulations is, however, inconsistent with federal law because it restricts parents' rights to an IEE at public expense to those choice areas in an initial evaluation or reevaluation in which the education agency had previously evaluated the child.

228.    So, for example, when a Virginia LEA fails or refuses to do a comprehensive initial evaluation in a manner that addresses multiple suspected disabilities, and instead, decides to conduct only a partial evaluation, Virginia parents are denied their right to an IEE because the Virginia LEA failed in the first place to conduct the complete evaluation.  The Virginia LEA system of blocking access to an IEE, which is an important procedural safeguard for disabled children and their parents, while simultaneously controlling access to initial evaluations, frustrates the IDEA's fundamental mandate to "ensure that children with disabilities residing in [Virginia]

… and who are in need of special education and related services, are identified, located, and evaluated." 34 C.F.R. § 300.111.  Without proper identification and evaluation, Virginia special needs children are completely cut off from FAPE.

### VIII. VDOE Systematically Fails to Carry Out its Obligation to Oversee Virginia LEA Compliance with the IDEA

**A.**      **VDOE is Required to Ensure Compliance with the IDEA**

229.      As the state education agency for the Commonwealth of Virginia, VDOE is obligated to ensure that the Virginia LEAs comply with the requirements of the IDEA.  *See* 20 U.S.C. § 1416(f).  For years, VDOE has failed to effectively monitor the LEAs to ensure Virginia educators are making FAPE available to all eligible students pursuant to the IDEA.

230.      VDOE uses three components to evaluate LEA compliance with the IDEA:

a.       On-site "comprehensive" reviews:  VDOE conducts a risk assessment to select local educational agencies (LEAs) for on-site visits.

b.       Desk Audits: Desk audits are conducted of all LEAs annually to collect SPP/APR compliance indicator data.

c.       Dispute Resolution: State complaints, mediation, and due process hearings are used to address allegations of noncompliance.

231.      These oversight tools are woefully insufficient to ensure that Virginia LEAs comply with the IDEA.  For example, VDOE has reported that it only conducts on-site monitoring of 4 to 6 of its 132 LEAs annually.  This means that VDOE, which is required to maintain continuous oversight to ensure that the various LEAs comply with the IDEA, *is in fact doing an on-site comprehensive review of each school district, on average, once every 22 to 33 years.*  Moreover, VDOE effectively relies on LEAs' own self-reporting and self-evaluation to perform the "risk

assessment" to determine which LEAs require an on-site visit.[39]   VDOE's dispute resolution monitoring method is patently inadequate as well, as demonstrated by Virginia LEAs' systematic noncompliance with the procedural safeguards required by section 1415 of the IDEA.

**B.      VDOE's Faulty Oversight Enables FCPS and other Virginia LEAs to Regularly Ignore Their IDEA Obligations**

232.     VDOE's faulty compliance mechanisms have been broadly criticized by parents, advocates, and, most notably, by USDOE, as woefully inadequate to ensure that LEAs' comply with the IDEA.  In a June 2020 letter and enclosed Differentiated Monitoring and Support Report, USDOE stated that it "had received communications from numerous parents and advocates alleging that the Virginia Department of Education (VDOE) was not fulfilling its general supervisory responsibilities under IDEA Part B."[40]   During the resulting investigation, USDOE confirmed parents' accounts that "VDOE does not have procedures in place, outside of formal dispute resolution procedures, to identify whether noncompliance has occurred, even in situations where it appears that the State was provided with credible information about potential noncompliance . . . ."[41]   Moreover, USDOE noted:  "*[G]iven that the State does not appear to have any other mechanism for including, in its monitoring system, the ability to consider and address credible allegations of LEA noncompliance, the State is not reasonably exercising its*

---

[39]VDOE's characterization of its LEA oversight and compliance process as "risk assessment" underscores that it is designed to fail.  The purpose of the oversight requirement is to ensure that Virginia special needs children are afforded their legally protected and humane right to FAPE, not to gauge the risk of VDOE and its LEAs being sued.

[40] Letter Dated June 23, 2020 from, Laurie VanderPloeg, Director, Office of Special Education Programs, to James Lane, then Superintendent of VDOE, *available at* https://www2.ed.gov/fund/data/report/idea/partbdmsrpts/dms-va-b-2020-letter.pdf (last accessed January 19, 2023).

[41] *Id.* (emphasis added)

***general supervisory and monitoring responsibilities to ensure LEA compliance consistent with the requirements in IDEA***.''[42]   Notwithstanding USDOE's admonition to VDOE that it must "revise its general supervision and monitoring system to include procedures and practices that are reasonably designed, as appropriate, to consider and address credible allegations of LEA noncompliance in a timely manner,"[43] VDOE's compliance monitoring system remains deficient.

233.    VDOE's pervasive lack of oversight has real world consequences for Named Plaintiffs and the classes they seek to represent.

234.    As explained in the proceeding sections, LEAs across the Commonwealth of Virginia take advantage of VDOE's negligible oversight to violate the rights of children with disabilities and their families under the IDEA.  VDOE has failed to correct systemic, policy-driven violations of the IDEA in Virginia schools.

1.    **VDOE Fails to Ensure that FCPS and Other LEAs Provide Families Complete and Accurate Student Records**

235.    The IDEA requires disclosure of student records upon parental request: "Each participating agency must permit parents to inspect and review any education records relating to their children that are collected, maintained, or used by the agency under this part."  *See* 34 C.F.R. § 300.613; *see also* 20 U.S.C. §1415(b).

236.    LEAs in the Commonwealth of Virginia do not comply with this most fundamental obligation, and VDOE does nothing to deter or rectify the noncompliance.

237.    As a standard means of addressing parents' record requests, some LEAs have gone so far as to adopt a policy of complete refusal followed by an instruction to use the Virginia FOIA

---

[42] *Id.*

[43] *Id.*

process to access their child's education records.

238.    Rather than admonish LEAs for refusing to provide parents with access to their students' records, VDOE has abetted this practice by making efforts to seek records under Virginia's FOIA as exhausting, expensive, and fruitless as possible.

**Virginia's FOIA**

239.    The Virginia FOIA provides access to *government* information from the public record.  Pursuant to a FOIA request, agencies like VDOE are required to disclose information relevant to their functions,  formal or informal procedures, and their rules of procedure.  5 U.S.C. § 552(a); *see also* Virginia Code §2.2-3704.   FOIA requests are governed by detailed administrative rules and procedures.   Individual student records are not typically (or legally) required to be accessed through a FOIA record request.

**VDOE Makes a Burdensome FOIA Process Worse**

240.    Under the IDEA parents are entitled to access their child's complete and accurate education records from the child's LEA, but when the LEA fails and refuses to comply with federal law and instead forces parents to go through a FOIA request, VDOE further obstructs parents' efforts to obtain records by making the FOIA process considerably more laborious and difficult than is warranted.  VDOE drastically impedes the FOIA process by delaying responses, claiming (falsely) a lack of responsive information, demanding large payment deposits before collecting and producing documents, charging cost-prohibitive amounts to produce even partial records, withholding relevant information on bogus privilege grounds, and misrepresenting their legal obligations to provide information.

241.    In response to a 2022 FOIA request regarding Virginia IEPs and hearing officers, VDOE demanded the requestor pay $25,000 for production of the requested materials, and before

VDOE would begin to search and gather any responsive documents, it demanded a $12,500 deposit.  Ultimately VDOE  returned the $12,500 deposit check to the requester because the actual cost for the FOIA production was $2,000, less than 1/10th of the initial charge  Similarly, in response to a FOIA request for VDOE reports on due process hearings and other information relating to the IEP and hearing officer process, VDOE demanded $43,000.  VDOE insisted on a $21,000 deposit before it would even begin to collect the documents.

242.    In another round of FOIA requests concerning the hiring and training of hearing officers, VDOE responded that it could not produce such documents because VDOE does not hire or employ hearing officers.  VDOE is responsible for determining hearing officers' qualifications, certifying them, recertifying them each year, and training them.  *See* 8VAC20-81-210. [44]

243.    After one due process hearing, a FOIA request was made for all notes from before and during the hearing, but VDOE denied any such materials existed, although the requested notes were witnessed, in public, during a due process hearing.

244.    Even when material is produced by VDOE or LEAs, it is often provided in an illegible document format or heavily, and inexplicably, redacted to the point of non-disclosure. An example of such improper redaction by an LEA is excerpted below:

---

[44].VDOE's Annual Report of the Dispute Resolution Systems and Administrative Services specifically addresses, among other things, VDOE's training of hearing officers, recertification of hearing officers, and officer performance.



Please be aware that email correspondence is subject to the Virginia Freedom of Information Act (FOIA) and may be made public if someone requests it – even if you have asked that your message be kept confidential. If you have received this email in error, please notify the sender immediately and delete the email. The receipt by any unauthorized person does not constitute a waiver of any applicable protections.



*By Making FOIA Requests Overly Burdensome, VDOE Helps its LEAs Conceal Records*

245.    LEAs' efforts to route parents' requests for their child's education records through an unduly burdensome FOIA process not only amounts to a violation of the IDEA, it enables VDOE to assist LEAs in their efforts to conceal the complete and accurate education records of special needs children while covering up VDOE's other failures to comply with the IDEA.

**2.     VDOE Fails to Require FCPS and other LEAs to Develop and Amend IEPs in Accordance with the IDEA**

246.    As part of its obligations under the IDEA, the Commonwealth of Virginia is also required to ensure that LEAs carry out their duties with respect to the development and amendment of IEPs. *See, e.g.,* 20 U.S.C. § 1412(a)(4). In Virginia, that oversight responsibility rests with VDOE. More specifically, VDOE is required to "ensure that each local school division develops

an IEP for each child with a disability served by that local school division. . . ." VAC20-81-20(2). VDOE has failed in its oversight.

247.    LEAs are required to "have in effect, for each child with a disability within its jurisdiction, an IEP" at the beginning of the school year.  34 C.F.R. § 300.323(a); *see also* 20 U.S.C. § 1414(2)(A).  They are likewise responsible for assembling an IEP team for each child with a disability that must include the child's parents, one or more of the child's educators, and a qualified and knowledgeable representative of the school district.  *See* 34 C.F.R. § 300.321(a).  In some circumstances, the team may also include additional individuals who can interpret the instructional implications of evaluation results and other individuals "who have knowledge and special expertise regarding the child." *Id.*

248.    Each student's IEP team is tasked with developing the child's IEP based on considerations of:

"a. The strengths of the child;

b. The concerns of the parent for enhancing the education of their child;

c. The results of the initial or most recent evaluation of the child; and

d. The academic, developmental, and functional needs of the child."

34 C.F.R. § 300.324(a).  In addition, LEAs must ensure that the IEP team reviews the child's IEP periodically, but not less than annually, to determine whether the annual goals are being achieved and to revise its provisions, as appropriate."  *See* 34 C.F.R. § 300.324(b).  In addition, "[e]ach public agency must take steps to ensure that one or both of the parents of a child with a disability are present at each IEP Team meeting or are afforded the opportunity to participate."  34 C.F.R. § 300.322.  A collaborative IEP process among parents, educators, and other informed stakeholders is set out in the IDEA.

***IEPs are Improperly Treated as Adversarial***

249.    In practice, IEPs often are not the product of a consensus-driven deliberative process among the members of a child's IEP Team, but, instead, school administrators often drive the IEP process towards their predetermined outcome that results in the denial of services the child needs in order to benefit from FAPE.

250.    As a matter of general policy, school personnel are instructed to treat the IEP process as an adversarial dispute.  Before parents can raise any substantive objection to their child's education program, the LEAs hire teams of lawyers to draft the child's IEP, coach teachers and other educators how and when to speak, and how to behave during IEP Team meetings to avoid divulging information the LEAs would consider too risky or adverse to their own interests.

***FCPS' Mistreatment of M.B and his Parents***

251.    On August 21, 2018, M.B.'s parents met with FCPS to establish a new IEP.  M.B.'s parents requested that the IEP team consider placement at a specific FCPS special education program called a Comprehensive Service Site ("CSS"), which is located at the Armstrong School. At the time, this would have been the most an appropriate placement for M.B.  But during the IEP Team meeting, the LEA-based team inexplicably would not consider CSS placement for M.B.

252.    When M.B.'s parents toured the CSS site at Armstrong, a school administrator reiterated that M.B. would not be placed at the CSS.  Unlike the IEP Team members, the administrator was upfront about the reason why:  there were already several children in M.B.'s grade at CSS, and the administrator did not want M.B.'s placement there to affect the development of the other children.  The preferred IEP placement for M.B. did not have capacity, but the LEA would not be honest about the circumstances or make appropriate accommodations for M.B. in CSS.  Instead, FCPS determined the appropriate IEP was to keep M.B. in his then-current school

where he did not enjoy the benefits of FAPE.

253.   M.B.'s parents continued to request modification of his IEP so that he could be placed at a CSS location in Spring and Fall of 2019.  Despite mounting evidence of M.B.'s worsening academic and behavioral challenges, FCPS denied that IEP modification.

254.   During the IEP team meeting on May 26, 2020, M.B.'s parents requested that FCPS consider a private or multi-agency placement outside of FCPS where M.B. would have access to much needed services beyond what his current school or CSS provided and a small group setting that could address his behavioral and academic needs.  FCPS rejected their request.  Instead, it recommended that M.B. be placed in a CSS setting, despite having rejected his parents' earlier request for such a placement.  FCPS did not consider M.B.'s individual academic and behavioral needs in making this decision.  Rather, it simply did "not believe that all options had been exhausted in FCPS."

255.   Following FCPS' multiple refusals to properly place M.B. in a setting where he would receive FAPE, his parents opted for private placement placed him at the Phillips School.

256.   On November 4, 2021, the FCPS IEP team again met to consider M.B.'s placement. Ignoring M.B.'s most recent assessments from the Phillips School, including M.B.'s demonstrable and recorded progress in that setting, FCPS arbitrarily concluded the Phillips School was not necessary.  Rather, the FCPS IEP team continued to recommend placement at the Burke CSS – despite the fact that FCPS had long resisted a CSS placement.  Again, this decision was not based on an individualized assessment of M.B.'s needs, but because the school was public, the least expensive, and available..

257.   In other words, from 2018 to 2021 FCPS, resisted providing M.B. with the services and academic setting which he required for FAPE, and only relented in offering additional services

when those services were no longer adequate to meet his needs.  This pattern and practice of denial and delay typifies Defendants' system for depriving children and families of their rights under the IDEA.  LEAs' failures to properly develop IEPs, and VDOE's failure to provide the oversight necessary to prevent such failures.

***FCPS' Mistreatment of D.C. and His Parents***

258.    In 2020, FCPS convened an IEP meeting to discuss the Chaplicks' request to modify D.C.'s IEP.  FCPS' then-Acting Coordinator for Due Process and Eligibility for all Fairfax County Schools, Adam Cahuantzi, chaired the sessions.  After no more than an hour and a half of discussing D.C.'s placement, Mr. Cahuantzi announced the end of consideration and FCPS' recommendation to continue day-placement, only, at Grafton – peremptorily refusing the parents' request for a residential placement.  FCPS' abrupt end to the IEP modification meeting, stone-wall refusal to engage with D.C.'s parents, and disinterest in giving due consideration to the requested placement, in light of D.C.'s well-documented needs, did not comply with the IDEA.  Despite its awareness of D.C.'s painful predicament and FCPS' refusal to engage, VDOE would do nothing to enforce FCPS' obligation to provide a fair and appropriate IEP.

259.    LEAs are required to follow a prescribed process when revising a child's IEP outside of an IEP team meeting:  "In making changes to a child's IEP after the annual IEP team meeting for the school year, the parent and the local educational agency may agree not to convene an IEP team meeting for the purposes of making those changes, and instead may develop a written document to amend or modify the child's current IEP."  *See* 20 U.S.C. § 1414(d)(3)(D).

260.    Nevertheless, FCPS unilaterally imposes changes to children's IEPs without holding an ordinary IEP meeting or obtaining parental consent.  For example, on April 9, 2021, the Fairfax County Community Services Board ("CSB") notified D.C.'s parents that D.C. was

eligible to be awarded DD Waiver funds to provide certain residential services but did not include coverage of D.C.'s residential costs. Over the next six months, the family took the requisite actions to qualify D.C. for DD Waiver, including identifying and reaching out to ResCare, a provider of adult group homes.

261.    ResCare had an opening in an adult group home in Winchester. This Winchester group home would (i) allow D.C. to continue attending Grafton for his education if he had an appropriate service to take him to and from his home to school, and (ii) provide the same level of care and support on a 24-hour basis that Grafton had been providing D.C.

262.    On August 4, 2021, after fighting the parents so hard for over eight years on their residential placement request for D.C., FCPS agreed that D.C. required a residential placement and placed him at Grafton, the school where he had been residing and receiving his education for the last seven years. Relying on FCPS' decision that D.C. would be entitled to a residential placement to cover his residential costs, because the DD Waiver program did not cover D.C.'s room and board costs at the ResCare group home, D.C.'s parents made arrangements to move D.C.

263.    On September 16, 2021, the parents notified FCPS that D.C. would be moving on October 7, 2021, to his new group home that would be partially funded by the DD Waiver. D.C.'s parents asked FCPS if another IEP meeting was necessary to formalize the change in location. Despite the impending move date, FCPS did not respond. On September 29, D.C.'s parents' counsel again raised this question with FCPS, asking where things stood and if they needed to meet again to address the change in location.

264.    FCPS did not respond until nearly three weeks after D.C.'s parents' original inquiry. At 7:56 pm on Tuesday evening October 5, 2021, without notice or meaningful explanation and less than 48 hours before the move was scheduled to occur, FCPS sent an email

to the family informing the parents that D.C.'s placement was being changed without his parents' consent from a residential to a day program.  FCPS stated, in a letter attached to the October 5 email:

265.    On September 7, 2021, the IEP team was informed that D.C.'s parents are in process of transitioning D.C. to an adult group home through his Community Living Waiver, with a tentative move-in of October 7, 2021.  Once D.C. moves into this group home, FCPS will no longer be able to implement the IEP as agreed-upon and D.C. will access Grafton as a day school student.  The group home, ResCare, is not associated with Grafton's residential program."

266.    FCPS did not respond to D.C's parents' or their counsel's inquiry about whether a new IEP was necessary to effectuate the move.  FCPS instead simply decided that a location change was unnecessary for D.C.  Although FCPS did not respond to the Chaplick's inquiry in that letter, FCPS sent another email later that day, refusing to hold an IEP meeting to address this issue and stating, "[a]n IEP meeting is not necessary at this time."

267.    D.C.'s parents through counsel immediately objected to FCPS' refusal to approve D.C.'s change in location.  In a letter dated October 12, 2021, addressed to outside counsel for FCPS, the parents stated that such unilateral action taken by FCPS was in violation of D.C.'s current IEP and a violation of the IDEA and D.C.'s federal rights.

268.    In response to FCPS' false assertion that D.C.'s residential placement was being paid for by the DD Waiver, the family countered in a separate email that (i) the DD Waiver was only paying for certain services and was not paying for D.C.'s residential costs, and (ii) nothing had changed in D.C.'s circumstances other than moving from the Grafton group home to an adult group home managed by ResCare, with both locations in Winchester so that D.C. could continue attending Grafton for his education.

269.    D.C.'s family moved him into the ResCare group home because they believed the move was in his best long-term interest.  To date, FCPS has not responded substantively to the October 12, 2021 letter from the family's attorneys, and FCPS has provided no explanation for its refusal to hold an IEP meeting before unilaterally changing D.C.'s IEP from a residential to day placement.  Likewise, VDOE has failed to provide any assistance and continues to fail in the necessary oversight to ensure LEAs like FCPS are properly developing IEPs through the IEP meeting process.  Cf. 34 C.F.R. § 300.600.

**3.      VDOE Fails to Prevent FCPS' and other LEAs' Pattern and Practice of Making Misrepresentations During the IDEA Process**

270.    LEA lawyers and administrators also train and instruct LEA employees to give parents a false impression of how their children's IEPs are developed.  On information and belief, Virginia teachers and school officials are routinely coached on "things not to say at special education meetings." [45]

271.    For example, IEP team members are coached to conceal the fact that LEA administrators have ongoing involvement in decisions to deny private school placements, while simultaneously disavowing any decision-making authority about private school placement.  LEA employees are instructed not to say:  "We cannot make a decision about a private school placement unless someone from central office is present."[46]  IEP team members are trained to instead deflect and delay by saying:  "The IEP team has the authority to make the placement decision but before

---

[45] According to one school district's board minutes, a presentation titled "More Things Not to Say at Special Education Meetings" was presented at the 2013 Virginia School Board Association School Law Conference.  A powerpoint version of a presentation of the same name, authored by School Law attorney Kathleen Mehfoud of Reed Smith (counsel to several Virginia school districts), was located at https://kipdf.com/updated-more-things-not-to-say-in-special-education-meetings_5aca6d611723dd38f4c9617e.html (Last Accessed January 16, 2023).

[46] *See id.*

we decide whether a private school placement is needed, we would like to obtain more information about the private program.  Let's schedule a follow up IEP meeting."[47]

272.    LEA employees have also been instructed to conceal their lack of qualifications necessary to develop and implement IEPs.  LEA lawyers advise employees not to expressly acknowledge that they "don't have the necessary training" or "have not worked with this type of condition before."[48]   Rather, LEA lawyers have scripted a party line for Virginia educators, suggesting that they tell parents that they are "qualified to work with your child and am continually receiving additional training."[49]

273.    The concealment and coaching from LEA lawyers and administrators is designed to minimize liability risk for Virginia LEAs (and VDOE) and maximize uncertainty and clarity for parents.  They instruct LEA employees *not* to tell parents when the schools are failing to  provide appropriate services, and they coach educators to minimize the roles of administrators, when in reality, LEA administrators are the ones driving the process.  LEA lawyers explicitly advise LEA employees not to document incidents that expose a failure to provide an eligible child with FAPE – particularly via email communications.  LEA lawyers suggest that such acts or omissions should be relayed, if at all, only in an oral communication with school administrators.[50]

274.    Another document prepared by LEA lawyers and presented to LEA employees explains: "Often the administrator will say 'no' [to requested special education services] in order

---

[47] *See id.*

[48] *See id.*

[49] *See id*.

[50] *See id.*

to end up with an appropriate IEP and protect the school division."[51]   Protection of "school divisions" is not within the mission of the IDEA, and this "explanation" from Virginia LEAs acknowledges that their goal is to avoid providing services where possible.

275.    Further reflecting the Virginia education system's self-protection mission, LEA lawyers and administrators also coach employees on when and how to reject requests for special education services.  In a document titled "How To Say 'No' the Legal Way,"[52] Virginia educators are supplied scripted phrases to use during IEP team meetings to give false impressions of concern and compliance, such as: "The request will infringe in an improper way on the day-to-day decision making of the teacher or in the administration of the school," and "There are professional concerns about the request and granting the request is against your better judgment."[53]   In reality, there is no "legal way" to deny an eligible child services that are needed to provide FAPE, but VDOE turns a blind eye while its LEAs try to get away with doing just that.

### 4.    VDOE's Use of IEP "Facilitators" Enables, Rather than Prevents, LEAs' Violations of the IDEA

276.    VDOE has failed to provide the necessary oversight to ensure that LEAs like FCPS are properly developing IEPs through the IEP meeting process.  *Cf.* 34 C.F.R. § 300.600.  In at least some respects, VDOE has facilitated LEAs' efforts to cut children and parents out of the collaborative IEP development process envisioned by the IDEA.

277.    VDOE has established a system of IEP Facilitators who are available to "assist

---

[51] Mehfoud, Kathleen, "How to say 'no' the legal way," (Last Accessed January 7, 2023), *available at*,    https://wyominginstructionalnetwork.com/wp-content/uploads/2018/05/Saying-_No_-in-a-Legal-Manner-by-Mehfoud.pdf.   On information and belief, Virginia educators received this document as part of IDEA trainings.

[52] *See id.*

[53] *See id.*

keeping the IEP meeting on track with regard to content and progress." [54]   According to VDOE,
these facilitators are supposed to be "substantively neutral, impartial" and  serve as "[a]n advocate
for the IEP process."[55]

278.    However, VDOE IEP Facilitators have instead demonstrated bias in favor of LEAs
and against parents seeking services.   On information and belief, in some instances, IEP
Facilitators have pressured parents to accept IEPs that do not provide FAPE.  IEP Facilitators has
also held *ex parte* communications with LEA employees about specific IEP recommendations.

279.    VDOE's use of IEP Facilitators does not fulfill its oversight obligation or otherwise
ensure IEP-process compliance. Instead, it is another means by which the IEP development process
is used to curtail the provision of services required by the IDEA.

5.     **VDOE Fails to Ensure that FCPS and other LEAs Provide Children with the Services to Which They Are Entitled under the IDEA**

280.    Once an IEP has been developed, FCPS and other LEAs continue to resist providing
services to eligible children by failing to properly implement that IEP.  VDOE fails to provide the
necessary oversight to prevent these failures, and indeed facilitates them by depriving parents
viable avenues of relief through adequate due process hearings.  This glaring failure to enforce
Virginia LEA implementation of student IEPs was highlighted, though not begun, during the
Pandemic.

281.    On March 13, 2020, FCPS schools closed due to the COVID-19 pandemic.  M.B.'s
IEP team met and developed a temporary learning plan (TLP) for the remainder of the school year.
M.B.'s TLP addressed only four goals in distance learning (out of fifteen goals on his IEP), and

---

[54]   Facilitated IEPS," *available   at*   https://www.doe.virginia.gov/programs-services/special-education/resolving-disputes/facilitated-ieps (last accessed January 7, 2023).

[55] *Id.*

otherwise reduced M.B.'s services for math and language arts to 120 minutes per day, which could include anything from telephone contact, emails, pre-recorded videos, and videoconferencing sessions.  The TLP was woefully inadequate to provide M.B. with FAPE.

282.    M.B. by no means is the only child impacted by FCPS' failures during the COVID-19 Pandemic.  On November 30, 2022, the U.S. Department of Education's Office for Civil Rights announced resolution of an investigation into FCPS' provision of services to children with disabilities during the COVID-19 Pandemic.[56]  It found that FCPS "failed to provide thousands of students with services identified in the students' Individualized Education Programs (IEPs) and 504 plans during remote learning."[57]

283.    OCR's findings hauntingly parallel many of the allegations in this Complaint, including:

a.    That FCPS ignored existing IEPs in favor of newly developed "Temporary Learning Plans" in the form of one-page letters to parents that FCPS conceded to OCR would not contain the same level of services and accommodations as such students' IEPs and would not meet their educational needs;

b.    "Categorical reduc[tion] and/or limited . . .  services and special education that students were entitled to receive through their IEPs" based on considerations other than the students' individual educational needs (e.g.

---

[56] "U.S. Department of Education's Office for Civil Rights Announces Resolution of Investigation into Fairfax County Public Schools in Virginia, Related to the Needs of Students with Disabilities During the COVID-19 Pandemic," November 30, 2022, *available a*t https://www.ed.gov/news/press-releases/us-department-educations-office-civil-rights-announces-resolution-investigation-fairfax-county-public-schools-virginia-related-needs-students-disabilities-during-covid-19-pandemic (last accessed January 8, 2023).

[57] *Id.*

"FAPE *in light of the circumstances*" in the context of remote learning and the pandemic).

c.    That FCPS lowered thresholds for testing performance against standards agreed to in students' IEPs, and not only concealed such actions, but misinformed the public that "it did not expect the materials covered that year to change."[58]

d.    Failure to develop and implement a plan adequate to remedy the instances in which students with disabilities were not provided FAPE during remote learning, and failure to track such violations so necessary compensatory services could be delivered in the future.[59]

e.    That FCPS inaccurately informed staff that the school division was not required to provide compensatory education to students with disabilities who did not receive FAPE during the COVID-19 pandemic because the school division was "not at fault."[60]

---

[58] *Id. See also* Hannah Nathanson, *What you need to know about Fairfax public schools this year*, Wash. Post (August 30, 2020), *available at* https://washingtonpost.com/education/2020/30/fairfax-public-schools-faq/ (asked in August 2020 whether "the school system curriculum changed as a result of the pandemic", a FCPS spokesperson reportedly told the *Washington Post* that "[t]he Standards of Learning set by the Virginia Department of Education [would] remain the foundation of what [was to be] taught in Fairfax classrooms").

[59] *See* Letter dated November 30, 2022, from Emily Frangos, Regional Director of the Office of Civil Rights to Dr. Michelle Reid, the Superintendent of Schools for Fairfax County, *available at* https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/11215901-a.pdf (last accessed January 18, 2023).

[60] *Id.* OCR observed that FCPS "administrators were explicitly advising their IEP and Section 504 teams to steer parents away from conversations about compensatory services , and to discuss only "recovery services" instead" that the OCR found inadequate.

f. Failure to provide "recovery services" that were significantly less than compensatory services and only provided such reduced services to approximately 1,070 disabled students out of 25,000 disabled students served by FCPS.[61]

284.   FCPS also produced email correspondence to OCR confirming that FCPS administrators were aware that disabled students were not receiving all of the required supports and services required under their IEPs.  These failures had measurable adverse impacts on disabled students.  By its own study published in November 2020, FCPS estimated that the number of disabled students with disabilities learning remotely during the pandemic who failed one or more classes more than doubled during the pandemic.[62]

285.   OCR observed that "by refusing to discuss compensatory services, [FCPS] appears to be ***applying the same erroneous standard*** that it used to deny students FAPE in the first place." (emphasis added).  Notably, the OCR observed that students who made "***any progress at all***, no matter how minimal, would apparently **not** be eligible for recovery services." (emphasis added).

286.   FCPS' abject failure to comply with the IDEA during the COVID-19 Pandemic is merely a symptom of the broader systemic ills outlined in this Complaint.  FCPS misused erroneous standards and inflated evaluations to deny services to children with disabilities well before schools shut their doors in 2020, and continues to use these same tactics to deny services to children today.  Unfortunately, M.B. is one such child who has been deprived, and remains deprived of his rights under the IDEA.

287.   M.B. received his first IEP in Fall of 2013.  However, from the outset, FCPS failed

---

[61] *Id.*

[62] *Id.*

to properly implement M.B.'s IEP.  Among other issues, FCPS did not provide M.B. with movement breaks and other support required under his IEP to manage his ADHD and related disorders.

288.    Faced with FCPS' failure to provide M.B. with the support and resources required under his IEP, M.B.'s parents decided to place him at a private school to begin First Grade.  M.B.'s parents paid for this placement by themselves without assistance from FCPS.

289.    After M.B. re-enrolled in public school in the Fall of 2018, FCPS continued to improperly implement his IEP.  Among other things, he was deprived of use of a calculator during math classes that he required to aid him with his dyscalculia.

290.    As time went on, FCPS also isolated M.B. from his peers.  During Fifth Grade, M.B. was placed in general education classes for all subjects except for reading and math. However, in Sixth Grade, he was placed in a multi-disabilities classroom.  M.B. was sequestered in this separate classroom with younger students who had different cognitive and emotional challenges for the majority of his school day.

291.    Unsurprisingly, M.B. struggled in the inappropriate public-school placements imposed on him by FCPS.  From Fifth Grade through Seventh Grade, he continued to fall further and further behind his grade level in several metrics even as his FCPS IEP team reported that he was making progress.

292.    As M.B. fell behind academically, his behavioral challenges worsened as well. And, these behavioral challenges further impacted his ability to learn – compounding M.B.'s academic and emotional struggles.  Nevertheless, during an October 15, 2019 Functional Behavior Assessment, and over the disagreement of M.B.'s parents, M.B.'s school-based IEP team determined that the data did not indicate that M.B. required a Behavioral Intervention Plan ("BIP").

93

293.    When confronted with its failures to properly implement M.B.'s IEP, FCPS did not change course and attempt to offer the services to which he was entitled under the IDEA.  Instead, during an April 2020 IEP meeting, an FCPS administrator expressed concern that M.B.'s IEP had too many goals on it given his lack of progress and behavioral struggles.  In other words, rather than provide the services or placement necessary to meet M.B.'s educational needs, FCPS sought instead to lower the bar.

294.    It was not until M.B.'s parents saw the writing on the wall and decided unilaterally to place him at the private Phillips School, at their own expense, that M.B. received a proper and properly-implemented IEP that addressed his academic and behavioral needs.  Although he now receives an appropriate education, it is neither free, nor public, as guaranteed by the IDEA.  The ongoing deprivation of M.B.'s right to FAPE is the direct result of VDOE's ongoing failures to carry out its oversight of LEAs including FCPS.

**6.    VDOE Fails to Prevent FCPS and other LEAs from Bullying Parents and Advocates When They Attempt to Exercise Their Rights under the IDEA**

295.    Within due process hearings and beyond, Virginia LEAs employ outrageously aggressive and retaliatory tactics against parents and advocates in an obvious attempt to bully and silence those seeking to justice for disabled children.  VDOE does nothing to try to prevent this type of retribution or punish it.

296.    For example, in September 2021, an advocate filed a FOIA request seeking information about how much money FCPS was spending on its lawyers.  Over 1,500 pages of electronic documents were produced as a result of the FOIA request, which the advocate shared with another fellow advocate.  After reviewing the documents and carefully redacting confidential information about students and employees, the second advocate published certain of the pages on her website.

297.    In response, FCPS threatened to take legal action if the advocates did not return the properly-requested and properly-disclosed documents and if they continued to share the documents and FCPS-related information disclosed in the documents.  FCPS demanded the advocates disclose any and all recipients of the documents and remove all online postings about the documents.[63]  In short, FCPS demanded the advocates curb their speech about the information exposed through the FOIA request.  The advocates refused to comply with the demands, and in response, FCPS sued them.[64]

298.    The Court delivered a crushing defeat to FCPS, holding that its attempt to prevent the advocates from disseminating the documents and information about FCPS' tactics amounted to an unconstitutional prior restraint of free speech.[65] Though the Court protected their rights, VDOE failed them.

## C.    VDOE's Systematic Failures Enable and Encourage FCPS and Other LEAs' Concerted and Ongoing Violations of the IDEA

299.    The IDEA was designed so that state agencies, school districts, and parents would work together to ensure that each disabled student receives a free appropriate public education, including any necessary support or accommodations.  Rather than work with parents to provide an appropriate public education, VDOE and FCPS have repeatedly violated, ignored, or fought against, their obligations under the IDEA and related statutes, even in the face of federal enforcement actions.

---

[63] *See* "Update on Fairfax County School Board's Legal Action Against Parents" (December 27, 2021), *available at* https://specialeducationaction.com/update-on-fairfax-county-school-boards-legal-action-against-parents/ (last accessed January 20, 2023).

[64]  *See id.*

[65] *See id.*

300.    As noted above, from June 23, 2020 through the present USDOE has repeatedly informed VDOE that its policies and procedure do not comply with the IDEA in several respects. Nevertheless, according to USDOE's September 1, 2022 follow-on letter to Superintendent Balow, VDOE has still failed "to demonstrate it has corrected the identified noncompliance related to State Complaint Procedures, Due Process Complaint and Hearing Procedures, and Independent Educational Evaluations."

301.    VDOE and FCPS also failed to ensure school district compliance with the IDEA during the COVID-19 Pandemic, as USDOE's findings related to Virginia's largest school district (described above) clearly show.

302.    FCPS also violated disabled students' rights in other ways.  It was sued in this District in October 2019 because of its practice of excessively using physical restraint and seclusion against special needs students, a primitive practice which violates state and federal law. For more than two years, FCPS fought this litigation and continued these practices.  Finally, on December 2, 2021, FCPS entered into a settlement agreement and consent order, in which it agreed to eliminate these practices.

303.    The investigations and litigation described in this complaint are symptomatic of the deep underlying problems of IDEA noncompliance and civil rights violations by VDOE, FCPS and other local school systems in Virginia.

304.    Prohibiting a challenge to these systematic problems outside the administrative process would only serve to insulate the state procedures from review—an outcome that would undermine the system Congress selected for the protection of the rights of children with disabilities.

305.    Accordingly, Named Plaintiffs seek class-wide relief in this Court, as follows.

## COUNT I

### 42 U.S.C. § 1983 Claims for Due Process Violations of the Fourteenth Amendment to the United States Constitution

**(On behalf of Named Plaintiffs and VDOE Class against Defendant Balow and on behalf of Named Plaintiffs and the FCPS Class against Defendants Balow and Reid)**

306.    Plaintiffs incorporate all allegations set forth in paragraphs 1–305, as if alleged herein.

307.    Defendants Balow and Reid have committed constitutional violations against Plaintiffs, who are citizens of the United States, under color of law.

308.    Under 42 U.S.C. § 1983:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

309.    Defendants Balow and Reid have deprived Plaintiffs of their Fourteenth Amendment rights under color of law by depriving them of due process of law and denying them educational opportunities equal to non-disabled students.

310.    The Fourteenth Amendment mandates that all persons born in the United States are entitled to due process before restriction of their liberty or property, and to equal protection of the laws.  U.S. Const. amend XIV.

311.    Plaintiffs have a constitutionally protected property interest in being provided with an IEP consistent with the requirements of the IDEA.

312.    Plaintiffs have a constitutionally protected liberty interest in receiving an "Impartial Due Process Hearing" when challenging or contesting a proposed IEP.

313.    Plaintiffs have a clearly established right under the Fourteenth Amendment to the

United States Constitution to be free from government interference with, or deprivation of, their property and liberty interest in FAPE, their property interest in an adequate IEP, and their liberty interest in an Impartial Due Process Hearing consistent with adequate due process of law.

314.    Constitutionally, adequate due process of law requires an objective proceeding, including proper notice and a fair opportunity to be heard.

315.    A fair opportunity to be heard means neutral procedures applied by an impartial and unbiased decision maker, free from self-interest, self-dealing, malice, vindictiveness, or other illegitimate motives.

316.    Procedures that are neutral on their face and in theory, but biased at their core and in fact are a sham do not satisfy the procedural due process requirements of the Fourteenth Amendment.

317.    By way of illustration and not limitation, Named Plaintiff M.B.'s due process hearing was not adjudicated by an impartial factfinder, but by an individual who demonstrated a lack of knowledge of federal law, disengagement from the evidence, and open hostility toward the persons seeking relief.  This manifestation of bias and ill-will toward the petitioners and their attorneys fell below the standards required under federal law and regulations governing the conduct of due process hearings in IDEA cases.

318.    By way of further illustration and not limitation, in 2021 hearing officer Brooke-Devlin was assigned to adjudicate Named Plaintiff D.C.'s due process complaint.  D.C.'s parents had previously submitted complaints against Ms. Brooke-Devlin for her failures to properly conduct D.C.'s 2015 due process hearing, which created an obvious source of bias for Ms. Brooke-Devlin against D.C. and his parents.  Despite this glaring conflict, Ms. Brooke-Devlin refused to recuse herself and denied D.C.'s meritorious motion to disqualify her as the hearing officer on his

complaint.  During the contentious hearing on D.C.'s motion for disqualification, Ms. Brooke-Devlin repeatedly displayed the very bias and open hostility towards D.C. which made it inappropriate for her to adjudicate his due process complaint.

319.    VDOE's and FCPS' other actions, described above, also contributed to these sham due process proceedings.

320.    As a result of these sham proceedings, Named Plaintiffs M.B. and D.C. were denied a fair opportunity to be heard in pursuit of their property and liberty interest in a free appropriate public education, their property interest in an IEP, and their liberty interest in an impartial Due Process Hearing in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

321.    The foregoing actions and omissions of Defendants Balow and Reid constitute a policy, practice, pattern, and/or custom of discriminating against Plaintiffs in violation of their constitutionally protected liberty and property interests.

322.    Defendants Balow and Reid acted intentionally or with reckless indifference to the constitutional rights of the Plaintiffs.

323.    The foregoing actions of Balow and Reid have injured and will continue to irreparably harm Plaintiffs, unless and until prospectively enjoined by this Court as permitted by *Ex Parte Young*, 209 U.S. 123 (1908) and *Antrican v. Odom*, 290 F.3d 178, 186 (4th Cir. 2002).

## COUNT II
## 42 U.S.C. § 1983 Claims for Equal Protection Violations of the Fourteenth Amendment to the United States Constitution

**(On behalf of Named Plaintiffs and VDOE Class as against Defendant Balow and on behalf of Named Plaintiffs and the FCPS Class as against Defendants Balow and Reid)**

324.    Plaintiffs incorporate by reference each averment set forth in paragraphs 1–323 above, and reallege each as if fully set forth herein.

99

325.    Plaintiffs are citizens of the United States, and Defendants are acting under color of law for purposes of 42 U.S.C. § 1983.

326.    Plaintiffs have a constitutionally protected fundamental right to procedural due process under the Fourteenth Amendment to the United States Constitution.

327.    Defendants violated Plaintiffs' fundamental due process rights by singling them out as classes and depriving them of neutral procedures applied by an impartial and unbiased decision maker, free from self-interest, self-dealing, malice, vindictiveness, or other illegitimate motives.

328.    Defendants' denial of Plaintiffs' fundamental right to procedural due process was arbitrary, capricious, and not rationally related to any legitimate interest.

329.    Plaintiffs also have a constitutionally protected property interest in "a system of free public elementary and secondary schools," as enshrined in the Constitution of Virginia.  Va. Const. art. VIII, § 1.

330.    Defendants Balow and Reid have singled out Plaintiffs as a class based on Plaintiffs' status as individuals with disabilities and parents of children with disabilities and denied them their constitutionally protected right to a free public education.  Simultaneously, Defendants Balow and Reid have provided other children without disabilities and their parents with the free public education required by the Constitution of Virginia.

331.    Defendants' denial of Plaintiffs' right to a free public education is arbitrary, capricious, and not rationally related to any legitimate state interest.

332.    The foregoing actions of Balow and Reid have injured and will continue to irreparably harm Plaintiffs, unless and until prospectively enjoined by this Court as permitted by *Ex Parte Young,* 209 U.S. 123 (1908) and *Antrican v. Odom,* 290 F.3d 178, 186 (4th Cir. 2002).

<u>COUNT III</u>

<u>Declaratory Judgment for VDOE's Failure to Comply with Federal Law</u>

**(On behalf of Named Plaintiffs and the VDOE Class against the
Virginia Department of Education)**

333.   Named Plaintiffs and the VDOE Class incorporate by reference each averment set forth in paragraphs 1–332 above, and reallege each as if fully set forth herein.

334.   Defendant VDOE is obligated under 20 U.S.C. § 1407(a)(1) to ensure that Virginia's local school districts comply with the IDEA.  One of the stated purposes of the IDEA, set forth in 20 U.S.C. § 1400(d)(1)(B) is to ensure that the rights of children with disabilities and parents of such children are protected.  As a department of the Commonwealth of Virginia, VDOE is not immune under the 11th Amendment from a suit in this Court to remedy a violation of the IDEA, as provided in 20 U.S.C. § 1403.

335.   Defendant VDOE has failed and continues to fail to ensure that all children with disabilities residing in the Commonwealth of Virginia receive a free appropriate public education pursuant to 20 U.S.C § 1414.  VDOE has displayed a firm purpose to circumvent existing federal law and regulations and has consistently employed the IDEA's due process hearings to frustrate the legal rights of Named Plaintiffs and the VDOE Class.  In doing so, it has also failed and continues to fail to ensure that appropriate procedural safeguards are put in place as required by 20 U.S.C. § 1415, including a fair and impartial due process hearing before a qualified and impartial hearing officer, as required by federal law and regulations.

336.   The foregoing failures of Defendant VDOE to comply with federal law and regulations and to bring Virginia local school districts into compliance with federal law and regulations have injured Plaintiffs, and will continue to injure plaintiffs if they persist.  However, VDOE's acts and omissions in violation of the IDEA have been concealed by its refusal to disclose to parents the true and accurate records pertaining to their children, its obstruction of parents and

advocates' efforts to obtain information about VDOE's due process hearing system, and its systematic efforts to frustrate disable children's access to a free and appropriate public education in Virginia.

337.    As set forth above, an actual controversy exists between Named Plaintiffs and the VDOE Class and VDOE with respect to VDOE's actions, policies, and procedures concerning the provision of special education services required under the IDEA and enforcing regulations.  This controversy is ongoing and is likely to continue.  Accordingly, Named Plaintiffs and VDOE Class seek a judicial determination and declaration of the respective rights and duties of the parties with respect to the IDEA.

338.    Such a declaration is necessary and appropriate at this time so that the parties may ascertain their respective rights and duties with respect to the matters set forth above.

## COUNT IV
### Injunction for VDOE's Failure to Comply with Federal Law

**(On behalf of Named Plaintiffs and the VDOE Class against the Virginia Department of Education)**

339.    Named Plaintiffs and VDOE Class incorporate by reference each averment set forth in paragraphs 1–338 above, and reallege each as if fully set forth herein.

340.    Defendant VDOE is obligated under 20 U.S.C. § 1407(a)(1) to ensure that Virginia's local school districts comply with the IDEA.  One of the stated purposes of IDEA, set forth in 20 U.S.C. § 1400(d)(1)(B) is to ensure that children with disabilities are provided FAPE and that the rights of children with disabilities and parents of such children are protected.  As a department of the Commonwealth of Virginia, VDOE is not immune under the 11th Amendment from a suit in this Court to remedy a violation of the IDEA, as provided in 20 U.S.C. §1403.

341.    Defendant VDOE has failed and continues to fail to ensure that all children with disabilities residing in the Commonwealth of Virginia receive a free appropriate public education

pursuant to 20 U.S.C § 1414.  VDOE has displayed a firm purpose to circumvent existing federal law and regulations and consistently employed the IDEA's due process hearings to frustrate the legal rights of Named Plaintiffs and the VDOE Class.  In doing so, it has failed and continues to fail to ensure that appropriate procedural safeguards are put in place as required by 20 U.S.C. § 1415, including a fair and impartial due process hearing before a qualified and impartial hearing officer, as required by federal law and regulations.  These ongoing and continual failures, which previously had been concealed from Plaintiffs, include, but are not limited to, the following acts or omissions:

    a.    VDOE fails to conduct comprehensive evaluations and reevaluations of any child suspected of having a disability and to ensure that all Virginia LEAs conduct comprehensive evaluations and reevaluations of any child suspected of having a disability,

    b.    VDOE fails to ensure Virginia LEAs compose appropriate "Individualized Education Program Teams" as required by federal law and regulations,

    c.    VDOE fails to ensure Virginia LEAs develop appropriate Individualized Education Programs that are based on the individual needs of the child,

    d.    VDOE fails to ensure Virginia LEAs implement consistently and completely Individualized Education Programs,

    e.    VDOE fails to ensure Virginia LEAs authorize and pay for an appropriate independent educational evaluation ("IEE") when requested by a parent, unless the LEA has promptly initiated an appropriate Due Process hearing,

    f.    VDOE fails to require Virginia teachers, education administrators, and any other Virginia education employees to create and maintain accurate,

complete, and timely records of a child's academic, emotional, and behavioral progress according to the child's IEP,

g.   VDOE fails to provide to the child's parents the complete and unaltered records of the child's academic, emotional, and behavioral progress according to the child's IEP,

h.   VDOE is failing to adequately investigate complaints regarding the failure of local school districts, including defendant FCPS, to provide a free appropriate public education to all children with disabilities, and to otherwise comply with federal law and regulations that protect children with disabilities,

i.   VDOE is failing to implement and enforce procedures to afford due process to children with disabilities and their parents in resolving disputes as to program placements, individualized education programs, tuition eligibility and other matters as defined by federal statutes and regulations,

j.   VDOE is failing to implement an impartial special education due process hearing system to resolve disputes between parents and local educational agencies as required by federal law and regulations, and

k.   VDOE is failing to adequately implement and enforce procedural safeguards required to be afforded to children with disabilities and their parents by 20 U.S.C. § 1415(d) and (f), as further implemented by 34 C.F.R. § 300.121, including ensuring that every hearing officer be qualified and impartial.

342.   The foregoing failures of VDOE, including their failure to bring the Virginia special education due process hearing system into compliance with federal law have injured and will continue to irreparably harm Named Plaintiffs and the VDOE Class, unless and until prospectively

enjoined by this Court.  *See* 20 U.S.C. § 1403.

## COUNT V
## Declaratory Judgment for FCPS' Failure to Comply with Federal Law

### (On behalf of Named Plaintiffs and the FCPS Class against the
### Fairfax County School Board )

343.   Plaintiffs incorporate by reference each averment set forth in paragraphs 1–342 above, and reallege each as if fully set forth herein.

344.   Defendant FCPS is obligated to comply with the IDEA.  One of the stated purposes of IDEA, set forth in 20 U.S.C. § 1400(d)(1)(B) is to ensure that children with disabilities are provided FAPE and that the rights of children with disabilities and parents of such children are protected.  FCPS is not immune under the 11th Amendment from a suit in this Court to remedy a violation of the IDEA.

345.   Defendant FCPS has failed and continues to fail to ensure that all children with disabilities residing in Fairfax County receive a free appropriate public education pursuant to 20 U.S.C § 1414.  FCPS has displayed a firm purpose to circumvent existing federal law and regulations and consistently employed the IDEA's due process hearings to frustrate the legal rights of Named Plaintiffs and the FCPS Class.  In doing so, FCPS has also failed and continues to fail to comply with the procedural safeguards under 20 U.S.C. § 1415, including a fair and impartial due process hearing before a qualified and impartial hearing officer, as required by federal law and regulations.

346.   Not only has Defendant FCPS engaged in a systematic and pervasive failure to comply with the substantive rights and procedural safeguards afforded by the IDEA, it has also behaved in a manner intent on concealing the violations by, among other things, hiding and refusing to disclose information to parents, excluding parents from meetings and hearings pertaining to the rights of the child, and providing parents incorrect information.

347.     As set forth above, an actual controversy exists between Named Plaintiffs and the FCPS Class and Defendant FCPS with respect to FCPS' actions, policies, and procedures concerning the provision of special education services required under the IDEA and enforcing regulations.  This controversy is ongoing and is likely to continue.  Accordingly, Named Plaintiffs and the FCPS Class seek a judicial determination and declaration of the respective rights and duties of the parties with respect to the IDEA.

348.     Such a declaration is necessary and appropriate at this time in order that the parties may ascertain their respective rights and duties with respect to the matters set forth above.

## COUNT VI
### Injunction for FCPS' Failure to Comply with Federal Law
**(On behalf of Named Plaintiffs and the FCPS Class against the
Fairfax County School Board)**

349.     Plaintiffs incorporate by reference each averment set forth in paragraphs 1–348 above, and reallege each as if fully set forth herein.

350.     Defendant FCPS is obligated to comply with the IDEA.  One of the stated purposes of the IDEA, set forth in 20 U.S.C. §1400(d)(1)(B) is to ensure that the rights of children with disabilities and parents of such children are protected.  FCPS is not immune under the 11th Amendment from a suit in this Court to remedy a violation of the IDEA.

351.     Defendant FCPS has failed and continues to fail to ensure that all children with disabilities residing in Fairfax County receive a free appropriate public education pursuant to 20 U.S.C § 1414.  FCPS has displayed a firm purpose to circumvent existing federal law and regulations and consistently employed the IDEA's due process hearings to frustrate the legal rights of Named Plaintiffs and the FCPS Class.  In doing so, it has also failed and continues to fail to comply with the procedural safeguards under 20 U.S.C. § 1415, including a fair and impartial due process hearing before a qualified and impartial hearing officer, as required by federal law and

regulations.  These ongoing and continual failures include, but are not limited to, the following acts or omissions:

    a.    Defendant FCPS fails to conduct comprehensive evaluations and reevaluations of any child suspected of having a disability, as required by 20 U.S.C. § 1414(a)-(c),

    b.    Defendant FCPS fails to compose appropriate Individualized Education Program Teams,

    c.    Defendant FCPS fails to develop appropriate Individualized Education Programs that are based on the individual needs of the child, by placing arbitrary limits on special needs services, failing to include parents in development of the IEP, concealing information pertinent to the development of the IEP and reevaluation process, and using inflated grades and false indicia of progress in order to manipulate the IEP and reevaluation process,

    d.    Defendant FCPS fails to implement consistently and completely IEPs under 20 U.S.C. § 1414, *et seq.*,

    e.    Defendant FCPS fails to authorize and pay for an appropriate independent educational evaluation ("IEE") when requested by a parent, when FCPS has not promptly initiated an appropriate Due Process hearing,

    f.    Defendant FCPS fails to require teachers, administrators, and other FCPS employees to create and maintain accurate, complete, and timely records of a child's academic, emotional, and behavioral progress according to the child's IEP,

    g.    Defendant FCPS fails, upon request, to immediately provide to the child's

parent the complete and unaltered records of the child's academic, emotional, and behavioral progress according to the child's IEP,

h.    Defendant FCPS, in an attempt to circumvent existing federal law and regulations, systematically and consistently delays implementation of the IEP and procedural safeguards designed to protect the legal rights of Named Plaintiffs and the FCPS Class,

i.    Defendant FCPS systematically uses the IDEA's procedural safeguards in a manner that unnecessarily and drastically increases the costs to parents, and

j.    Defendant FCPS has displayed a firm purpose to circumvent existing federal law and regulations by engaging in bullying and threats of retaliation to frustrate the legal rights of Named Plaintiffs and the FCPS Class under the IDEA.

352.    The foregoing acts and omissions of Defendant FCPS in violation of the IDEA have long been concealed by Defendants so that it could continue to perpetrate its scheme to withhold the special education services and procedural safeguards that are necessary to provide FAPE to disabled children in Fairfax County.  The acts and omissions of FCPS have injured and will continue to irreparably harm Named Plaintiffs and the FCPS Class, unless and until prospectively enjoined by this Court.  *See* 20 U.S.C. § 1403.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

353.    Certify each of the proposed classes under Federal Rule of Civil Procedure 23(a) and 23(b)(2), with Plaintiffs serving as Class Representatives of both the FCPS Class and VDOE Class, and with Plaintiffs' counsel serving as Class Counsel.

354.    Declare that FCPS is out of compliance with the IDEA by systematically failing to

comply with the IDEA, including failing to carry out its obligations to conduct evaluations pursuant to section 1414 of the IDEA and frustrating the procedural safeguards of section 1415 of the IDEA, including due process hearings.

355.   Enter an injunction against FCPS immediately requiring it to comply with its obligations under 20 U.S.C. § 1400, *et seq.*, including to:

a.   Conduct comprehensive evaluations and reevaluations of any child suspected of having a disability, as required by 20 U.S.C. § 1414(a)-(c),

b.   Approve independent educational evaluations upon parental request, as required by 54 C.F.R. § 300.502, without requiring a prior public agency evaluation,

c.   Require teachers, administrators, and other FCPS employees to create and maintain accurate, complete, and timely records of a child's academic, emotional, and behavioral progress according to the child's IEP;

d.   Provide immediately upon parental request the complete and unaltered records of the child's evaluations, assessments, reviews, and academic, emotional, and behavioral progress, without requiring the submission of a FOIA request ;

e.   Cease and eliminate immediately practices and procedures that result in the inaccurate measurement of a student's performance, including padding of grades, disregarding grades, inflating grades, assisting students in answering tests or evaluations, and reporting that a student is making progress without a defined, reported, and recorded measurement to demonstrate such progress,

f.   Cease and eliminate immediately practices, procedures, counseling, advising,

or training of FCPS personnel that conceals or encourages concealment or non-disclosure of any violation of the IDEA,

g.   Cease and eliminate immediately any practice or procedure that delays the implementation, course, or resolution of any IDEA procedural safeguards[66], including postponing the assignment of hearing officers, the conclusion of the due process hearings, disclosure of education records to parents, or approval of IEEs,

h.   Cease and eliminate immediately any policy or procedure that conceals information or provides false information to parents concerning a child with disabilities to delay or deny the provision of special education services,

i.   Cease and eliminate immediately conduct that unnecessarily and drastically increases costs surrounding the exercise of the procedural safeguards, and

j.   Cease engaging in, approving of, or encouraging the use of bullying or threats against parents of children with disabilities who seek to exercise their IDEA rights.

356.   Declare that VDOE is out of compliance with section 1415 of the IDEA by systematically failing to carry out its obligation to provide procedural safeguards, including due process hearings, to Virginia children with disabilities and their parents by systematically failing to oversee Virginia LEA compliance with the substantive rights and procedural safeguards of the IDEA, and by failing to ensure that Virginia children with disabilities are provided a free and appropriate public education as required by the IDEA.

---

[66] The term "procedural safeguards" as used in this prayer for relief means and refers to the safeguards set forth in section 1415 of the IDEA and enforcing regulations.

357.    Enter an injunction against VDOE immediately requiring it to comply with 20 U.S.C. § 1414, including to:

a.    Conduct comprehensive evaluations and reevaluations of any child suspected of having a disability, as required by 20 U.S.C. § 1414(a)-(c), and ensure that all Virginia LEAs conduct comprehensive evaluations and reevaluations of any child suspected of having a disability,

b.    Ensure Virginia LEAs compose appropriate "Individualized Education Program Teams" in accordance with the defined term in 20 U.S.C. § 1414(d)(1)(B),

c.    Ensure Virginia LEAs develop appropriate Individualized Education Programs that are based on the individual needs of the child,

d.    Ensure Virginia LEAs implement consistently and completely Individualized Education Programs under 20 U.S.C. § 1414, *et seq*.,

e.    Ensure Virginia LEAs authorize and pay for an appropriate independent educational evaluation ("IEE") when requested by a parent, unless the LEA has promptly initiated an appropriate due process hearing,

f.    Require Virginia teachers, education administrators, and all other Virginia education employees to create and maintain accurate, complete, and timely records of a child's academic, emotional, and behavioral progress according to the child's IEP, and

g.    Upon request, immediately provide to a child's parent the complete and unaltered records of the child's evaluation, assessments, reviews, and academic, emotional, and behavioral progress, without requiring the

submission of a FOIA request .

358.    Declare that VDOE is not in compliance with the IDEA because it has failed to establish and maintain procedures in accordance with 20 U.S.C. § 1415 and 34 C.F.R. § 300.500, *et seq.*, to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education, and instead, has engaged in a systematic and harassing scheme to undermine the procedural safeguards of the IDEA.

359.    Enter an injunction against VDOE immediately requiring it to comply with its obligations under 20 U.S.C. § 1400, *et seq*, including to:

    a.    Establish and implement procedures to ensure fair and impartial due process hearings pursuant to 34 C.F.R. § 300.511 & 300.512,

    b.    Certify and recertify only knowledgeable and impartial hearing officers,

    c.    Ensure that hearing officers are in compliance with 20 U.S.C. § 1415 and the policies and procedures set forth in 34 C.F.R. § 300.500, *et seq*.,

    d.    Dismiss hearing officers who have failed to comply with 20 U.S.C. § 1415 and the policies and procedures set forth in 34 C.F.R. § 300.500, *et seq*.,

    e.    Oversee and supervise the hearing officer and due process hearing system, independently, in a manner that ensures a fair due process hearing, as required by the 20 U.S.C. § 1415 and 34 C.F.R. § 300.511(c),

    f.    Establish and implement procedures to allow parties to disputes under the IDEA, to resolve disputes through the mediation process according to 20 U.S.C. § 1415 and 4 C.F.R. § 300.506, without improper influence or interference by VDOE representatives,

g.  Ensure that parents of a child with a disability are afforded an opportunity to inspect and review all education records and attend all meetings with respect to identification, evaluation, and educational placement of the child and the provision of FAPE to the child, in accordance with 34 C.F.R. § 300.501, and

h.  Provide the requisite notice pursuant to 34 C.F.R. § 300.500, *et seq*.

360.  Declare that Defendant Balow's failure to ensure the procedural safeguards required by the IDEA, including the hearing officer system administered by VDOE, deprives Plaintiffs of procedural due process as provided by the Fourteenth Amendment to the Constitution of the United States.

361.  Declare that Defendant Balow has violated Plaintiffs' rights to equal protection under law, as provided by the Fourteenth Amendment to the Constitution of the United States, by establishing and allowing to persist systematic and pervasive efforts to deprive children with disabilities and their parents of their rights to due process under law and to a free public education.

362.  Enter an injunction against Defendant Balow in her official position prohibiting her from depriving children with disabilities and their families due process and equal protection under the law and requiring her to:

a.  Establish and implement procedures to ensure fair and impartial due process hearings pursuant to 34 C.F.R. §§ 300.511 & 300.512, including:

i.  establish an independent board to oversee the hearing officer system composed of knowledgeable educators and parents of disabled or special needs children to ensure balance and fairness, including overseeing the appointment, recertification, compensation, and training of hearing officers,

     ii.   collect, assemble, and make publicly available monthly and annual individual and aggregate hearing officer ruling statistics, with sufficient detail to determine the ruling record of each hearing officer for the time period at issue,

     iii.   collect, assemble, and publicly report individual and aggregate hearing officer statistics, on at least a quarterly basis and annual basis, in a manner that is readily accessible to the public,

     iv.   investigate hearing records and rulings of each hearing officer whose has ruled in favor of disabled students and parents less than 30% of the time over the last ten (10) years, to determine whether each such hearing officer has demonstrated that he or she has been knowledgeable and impartial in their rulings and publish a summary of the findings for each hearing officer,

     v.   remove any hearing officer who has a demonstrated history of unfairly ruling against disabled students and parents in due process hearings;

     vi.   publish a detailed explanation of the process going forward for qualifying, certifying, recertifying, training, and appointing hearing officers for due process hearings in the Commonwealth of Virginia, including the steps to be taken to ensure that hearing officers are knowledgeable and impartial in their rulings,

b.   Certify only knowledgeable and impartial hearing officers,

c.   Ensure that hearing officers are in compliance with 20 U.S.C. § 1415 and the policies and procedures set forth in 34 C.F.R. § 300.500, *et seq.*,

d.      Dismiss hearing officers who fail to comply with 20 U.S.C. § 1415 and the policies and procedures set forth in 34 C.F.R. § 300.500, *et seq.*,

e.      Oversee and supervise the hearing officer and due process hearing system in a manner that ensures a fair due process hearing with a knowledgeable and impartial hearing officer, as required by the 20 U.S.C. § 1415 and 34 C.F.R. § 300.511(c),

f.      Cease and eliminate the policy and practice of assigning or allowing VDOE representatives to serve as "monitors" or "facilitators" in due process hearings or mediations under the IDEA,

g.      Establish and implement procedures to allow parties to disputes under the IDEA to resolve disputes through the mediation process according to 20 U.S.C. § 1415 and 34 C.F.R. § 300.506, without improper influence or interference by VDOE representatives,

h.      Ensure that parents of a child with a disability are afforded an opportunity to inspect and review all education records and attend all meetings with respect to identification, evaluation, and educational placement of the child and the provision of FAPE to the child, in accordance with 34 C.F.R. § 300.501, without the requirement of submitting a FOIA request, and

i.      Provide all requisite notice pursuant to 34 C.F.R. § 300.500, *et seq*.

363.    Declare that Defendant Reid has violated, and continues to violate, the due process rights of the FCPS Class by establishing and allowing to persist systematic and pervasive efforts within FCPS to undermine the procedural safeguards in the IDEA.

364.    Declare that Defendant Reid's failure to ensure the procedural safeguards required

115

by the IDEA, deprives families of due process under the law as provided by the Fourteenth Amendment to the Constitution of the United States.

365.    Declare that Defendant Reid has violated the equal protection rights of the FCPS Class by establishing and allowing to persist systematic and pervasive efforts to deprive children with disabilities and their parents of their rights to due process under law and to a free public education.

366.    Enter an injunction against Defendant Reid in her official capacity prohibiting her from depriving children with disabilities and their families equal protection and due process under the law, by requiring her to:

      a.    Establish and maintain procedures in accordance with 20 U.S.C. § 1415 and 34 C.F.R. § 300.500, *et seq.*, to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education:

      b.    Implement the above-mentioned procedural safeguards without undue delay,

      c.    Implement policies and procedures to prevent FCPS employees from concealing information and providing false information to parents ,

      d.    Cease unnecessarily and drastically increasing costs surrounding the exercise of the procedural safeguards,

      e.    Implement policies and procedures to prevent FCPS employees from bullying and threatening retaliation for exercising any of the procedural safeguards.

      f.    Prevent FCPS administrators and other employees from discriminating against children with disabilities and their families when providing free public education services,

g.    Prevent FCPS administrators and other employees from concealing information and providing false information to parents,

h.    Prevent FCPS from evading the requirement to evaluate and reevaluate any child suspected of having a disability, as required by 20 U.S.C. § 1414(a)-(c),

i.    Ensure FCPS creates appropriate "Individual Education Program Teams" in accordance with the defined term in 20 U.S.C. §1414(d)(1)(B),

j.    Preclude FCPS from modifying children's IEPs without complying with the notice and consent requirements of 20 U.S.C. §1414,

k.    Preclude teachers, administrators, and other FCPS employees from creating and maintaining, incomplete, inaccurate, and misleading records of a child's academic, emotional, and behavioral progress, and

l.    Preclude FCPS administrators and educators from improperly influencing the conduct and outcome of due process hearings.

367.    Award Plaintiffs' their attorney's fees and other costs of litigation to the maximum extent allowed under the IDEA, 42 U.S.C. § 1988, and any other applicable law, and any other relief to which they are entitled.


Dated:  January 20, 2023                         Respectfully submitted,

                                        By: */s/ R. Braxton Hill, IV*
                                            R. Braxton Hill, IV (VSB No. 41539)
                                            Craig T. Merritt (VSB No. 20281)
                                            MERRITTHILL, PLLC
                                            919 E Main Street, Suite 1000
                                            Richmond, VA 23219
                                            T  804-916-1600
                                            bhill@merrittfirm.com
                                            cmerritt@merrittfirm.com

Aderson B. Francois
(*pro hac vice to be submitted*)
Civil Rights Clinic,
Georgetown University Law Center
600 New Jersey Avenue NW, Suite 532
Washington DC 200001
T 202-661-6721
aderson.francois@law.georgetown.edu


William R.H. Merrill (*pro hac vice*)
Scarlett Collings (*pro hac vice*)
Michael Adamson (*pro hac vice*)
Justin Kenney (*pro hac vice*)
SUSMAN GODFREY, LLP
1000 Louisiana, Suite 5100
Houston, TX 77002
T 713-653-7865
bmerrill@susmangodfrey.com
scollings@susmangodfrey.com
madamson@susmangodfrey.com
jkenney@susmangodfrey.com

*Counsel for Plaintiffs*